```
 1                    UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF PENNSYLVANIA (PHILADELPHIA)
 2

 3   UNITED STATES OF AMERICA,      :Case No. 2:23-cr-00215-KBH-3
              Plaintiff,            :
 4   v                             :
                                   :
 5   CHIHEAN JONES,                 :
              Defendant.            :Philadelphia, Pennsylvania
 6                                  :July 9, 2024 at 10:10 a.m.
     . . . . . . . . . . . . . . . .
 7
                     TRANSCRIPT OF MOTIONS HEARING
 8             BEFORE THE HONORABLE KELLEY B. HODGE
                 UNITED STATES DISTRICT COURT JUDGE
 9
        APPEARANCES:
10
        FOR THE PLAINTIFF
11
        UNITED STATES OF
12      AMERICA:              CHRISTOPHER PARISI, AUSA
                              AMANDA MCCOOL, AUSA
13                            U.S. ATTORNEY'S OFFICE
                              615 CHESTNUT STREET, SUITE 1250
14                            PHILADELPHIA, PA 19106
                              215-861-8467
15                            267-601-3370
                              Email:
16                            Christopher.parisi@usdoj.gov
        FOR THE DEFENDANT         amanda.mccool@usdoj.gov
17
        CHIHEAN JONES:        CAROLINE A. GOLDNER CINQUANTO, ESQ.
18                            THE LAW OFFICE OF CAROLINE GOLDNER
                              CINQUANTO
19                            2 GREENWOOD SQUARE
                              3331 STREET ROAD, SUITE 450
20                            BENSALEM, PA 19020
                              267-565-7412
21                            Email:  carrie@cclegal.com

22                            ALAN TAUBER, ESQ.
                              TAUBER LAW PHILADELPHIA
23                            TWO PENN CENTER, SUITE 900
                              1500 JOHN F. KENNEDY BOULEVARD
24                            PHILADELPHIA, PA 19102
                              215-575-0702
25
```

1  Court Recorder:  Jeff Lucini

2  Transcription Service:  Associated Reporters Int'l., Inc.
   10 River Drive
3  Massena, New York 13662

4
   Proceedings recorded by electronic sound recording;
5
   transcript produced by transcription service.
6

7            I N D E X   O F   P R O C E E D I N G

8  WITNESSES:

9  CORPORAL DEBRA KIKER;

10 DX Examination by Mr. Parisi              64
   CX Examination by  Ms. Cinquanto         67

11
12 OFFICER CEIN STRANGE

   DX Examination by Mr. Parisi              77,102
13 CX Examination by  Ms. Cinquanto         89

14 CHRISTIAN CHAVEZ

   DX Examination by Mr. Parisi              118
15 CX Examination by  Ms. Cinquanto         122

16 OFFICER ERIC NOVASAK

17 DX Examination by Mr. Parisi              123
   CX Examination by  Ms. Cinquanto         128

18 DETECTIVE JOHN BARTOL

19 DX Examination by Mr. Parisi              129,156
   CX Examination by  Ms. Cinquanto         139,158
20

21
              E X H I B I T   I N D E X
22
   PLAINTIFF EXHIBITS                        ID    MK    EV
23
   Government Six                            84
   Body camera footage from August 22nd
24

25

           **Associated Reporters Int'l., Inc.   518-465-8029**

1        (The hearing commenced at 10:10 a.m.)

2        COURT CLERK:  Today on session the Honorable

3   Kelly B. Hodge presiding in the matter or United State V

4   Chihean Jones, criminal action number 23-215.

5        THE COURT:  Good morning, good morning,

6   everybody.

7        MS. McCOOL:  Good morning, Your Honor.

8        MR. PARISI:  Good morning, Your Honor.

9        THE COURT:  You all may be seated.

10       COURT CLERK:  Your Honor, we're just getting Mr.

11  Tauber, he stepped outside for a second.

12       THE COURT:  That's fine.  Good morning, Counsel.

13       MR. TAUBER:  Good morning, Your Honor.

14       THE COURT:  Everyone, we're here this morning on

15  a number of motions that have been filed, this is the

16  United States government versus Mr. Chihean Jones.  Mr.

17  Jones, good morning, good to see you, Sir.

18       MR. JONES:  Good morning.

19       THE COURT:  On criminal number 2321503, I am

20  aware of, obviously, and prepared to hear from counsel on

21  the motions that have been filed.  I want to go through

22  each of them because, as I said, we have a number of them.

23       Some of them were filed by Mr. Jones pro se

24  prior to Ms. Cinquanto subsequently filing them as I

25  recall our previous appearance, me obviously inviting her

1    to do so after meeting and conferring with Mr. Jones in

2    regards to those specific motions.

3           But as I said, I believe we have some that are

4    duplicative, so I want to try to take care of those things

5    as well today.  But before we begin, I would ask for

6    everyone that has presented themselves, Counsel and those

7    who are here alongside counsel to introduce themselves and

8    state their name for the record.  So if the government,

9    Mr. Parisi, if you'll begin.

10          MR. PARISI:  Good morning, Your Honor,

11   Christopher Parisi on behalf of the government.

12          MS. McCOOL:  And good morning, Your Honor,

13   Amanda McCool also on behalf of the government and seated

14   to my left is Special Agent Skyler Baron from A.T.F.

15          MR. BARON:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MS. CINQUANTO:  Good morning, Your Honor,

18   Caroline Cinquanto on behalf of Mr. Jones.

19          MR. TAUBER:  And Alan Tauber on behalf of the

20   Mr. Jones as well, good morning, Your Honor.

21          THE COURT:  Thank you, good morning.  At this

22   point in time, I'm going to go down the list of the

23   motions that I have and then I will invite counsel to

24   present to me the order within which they wish to address

25   each of these specific motions.

1          And if there is anything that I need to take

2    care of administratively before we begin taking evidence

3    and me hearing any argument on the motions, then we can

4    take care of that in advance of moving forward with the

5    substance of the motions themselves.

6          I have filed E.C.F. number 134, which is the

7    Defendant's motion to sever count one of the indictment

8    from counts three, four, and five.

9          I have also before me E.C.F. number 134, which

10   is titled Defendant's motion for an evidentiary hearing to

11   determine the lawfulness of the Defendant's search and

12   seizure, I have that parenthetically identified as

13   Defendant's motion to suppress, and that's regarding the

14   August 22nd, 2022 search and seizure.

15         MS. CINQUANTO:  Yes, Your Honor

16         THE COURT:  I have as E.C.F. number 141, the

17   Defendant's pro se motion regarding reproduction, copy and

18   inspection of the grand jury list.  I have E.C.F. number

19   142, which is Defendant's pro se motion to dismiss the

20   indictment, motion to dismiss the case.

21         E.C.F. number 143, which is Defendant's motion

22   for a hearing, evidentiary hearing, to determine the

23   admissibility of the Defendant's post-arrest statement,

24   also parenthetically identified as a motion to suppress.

25         E.C.F. 155, which is Defendant's pro se motion

1    and that's for grand jury transcripts.  E.C.F. 156, which

2    is the final motion that I have, which is the Defendant's

3    motion to inspect grand jury information, which from the

4    Court's perspective I see as being filed by your counsel,

5    Mr. Jones.

6              In light of and following discussions with you

7    on your pro se motions that you have filed that I've

8    identified as E.C.F. 155, E.C.F. 142 -- correction, E.C.F.

9    141, and also, E.C.F. 142.

10             So with that I would like to hear from the

11   defense on its position in moving forward on these motions

12   and then also hear from the government as to how you would

13   like to address these today.

14             MS. CINQUANTO:  Yes, Your Honor.  Your Honor, I

15   believe we could take care of E.C.F. 156, which is the

16   Defendant's request for grand jury information that was

17   filed by his counsel.

18             I think in light of that motion, we could

19   dismiss E.C.F. 141 and 142 as moot because it was -- the

20   issue will be dealt with in one five six.

21             THE COURT:  Okay.

22             MS. CINQUANTO:  I'm sorry.  One -- one four one,

23   one four two and one five five, Your Honor, I think

24   they're all asking essentially for the same thing, which

25   is --

```
1              THE COURT:  That is correct.

2              MS. CINQUANTO:  -- the grand jury information.

3     And Your Honor, where one five five may have been asking

4     for grand jury transcripts, we understand that we are not

5     entitled to those transcripts until shortly before trial

6     because that would be considered Jencks material.

7              But I do think they can be dismissed as moot and

8     we can proceed on one five six.  And Your Honor, my

9     suggestion would be that we take that issue first, because

10    I think that can be readily disposed of, based upon

11    conversations that I've had with the government.

12             THE COURT:  Okay.

13             MS. CINQUANTO:  The second motion, Your Honor we

14    should argue, I believe in -- in this order would be the

15    motion to sever, which would be E.C.F. 134 because that's

16    just legal argument.

17             THE COURT:  Uh-huh.

18             MS. CINQUANTO:  And then, Your Honor, there's

19    the two motions to, as Your Honor has styled them

20    correctly, one three five and one four three.  Your Honor,

21    my understanding was -- is we were going to take testimony

22    on that today.

23             My preference, Your Honor, would be to take the

24    testimony, order the transcript, and give Your Honor

25    supplemental briefing on that issue because I believe that
```

1 information that comes out may or may not be indicative of

2 -- of -- may not be dispositive of the issue.

3     And I would appreciate the opportunity to

4 research additional information that might be provided at

5 the hearing.  So that would be my preference, Your Honor.

6     THE COURT:  Okay. Thank you very much, Ms.

7 Cinquanto.  I will address one five six, which -- well

8 actually, based on one five six E.C.F. 141, 142 and 155 as

9 you identify as moot, and I will dismiss those as moot.

10     Presumptively, there is obviously no argument

11 from the government on my dismissal, correct?

12     MR. PARISI:  None, Your Honor.

13     THE COURT:  Okay.  So those will be dismissed.

14 So that will be noted and -- and obviously taken care of

15 on the record.  So we are looking at one five six, one

16 three four and one three five and one four three and we

17 will take them in that order unless, and I'd like to hear

18 from Mr.  Parisi, insofar as the presentation of each of

19 those particular matters in the order that Ms. Cinquanto

20 has suggested.

21     And any specific comments or opposing argument,

22 insofar as the receipt of testimony today and the

23 evidence, the ordering of transcripts and then the

24 permissive allowance of supplemental briefing regarding

25 one three five and one four three.

1          MR. PARISI:  Your Honor, I have no preference as

2    to the order, what Ms. Cinquanto suggested is -- is fine

3    with the government.  I don't believe supplemental

4    briefing will be necessary, but we can certainly address

5    that at the conclusion or if Ms. Cinquanto feels strongly

6    about it.

7          I'm prepared to argue all the motions today and

8    whether the Court wants to hear a fulsome argument or not,

9    I'll at least give you some cliff notes versions for each

10   of those motions, but we're ready to proceed on everything

11   in that order.

12         THE COURT:  Okay.  Thank you very much.  Then

13   the order that you have suggested and recommended, Ms.

14   Cinquanto is acceptable to the Court.  So you may proceed

15   in that fashion.

16         MS. CINQUANTO:  Thank you, Your Honor.

17         Your Honor the government and I had a productive

18   conversation yesterday about E.C.F. 156.  I don't want to

19   speak for the government and I would ask them to weigh in,

20   but we believe -- I -- I -- I believe it's been agreed

21   that we are entitled to the underlying information

22   regarding the composition of the grand jury.

23         It was just a question about who I am to make

24   that motion to, I had read the -- the clerk's office rules

25   and regulations regarding that and there was some -- this

1 -- we -- we -- the government and I had different ideas

2 about who we were supposed to make this application to, to

3 get the information.

4 We believe -- we both agree we're entitled to

5 and it was a question of whether or not I filed it in the

6 right forum. I went down to the clerk's office today and

7 I spoke with Kevin Eibel, E-I-B-E-L, and he informed me

8 that his belief is -- is that I did file it with the

9 correct forum, which would be Your Honor.

10 So what -- what the rules say is that the motion

11 should be filed with the chief judge, an assigned judge,

12 or a judge that's designated by the chief judge. So his

13 position is -- is that this is the correct form for Your

14 Honor to make that order.

15 So with that, Your Honor, I would ask that Your

16 Honor sign the order ordering the release of that

17 information to defense counsel so that we can inspect it.

18 And then based upon what information we've received, we

19 may or may not have a motion to dismiss because the

20 composition of this grand jury was not fairly comprised.

21 THE COURT: Thank you, Ms. Cinquanto, and the

22 question I have for you before I will allow Mr. Parisi to

23 respond and/or clarify on the understanding and agreement

24 that you and he discussed yesterday. The rule that you

25 indicated you spoke with Kevin Eibel at the -- in the

1    clerk's office about.

2           You said filing with the chief judge, the

3    assigned judge, or some other -- a designated other --

4           MS. CINQUANTO:  Correct Your Honor.

5           THE COURT:  -- I guess judge.  Is that an or --

6    or an and, so would it have to be filed with the chief

7    judge and the assigned judge, or it's an or is the way I

8    was hearing it?

9           MS. CINQUANTO:  I -- I believe it's an or --

10          THE COURT:  Okay.

11          MS. CINQUANTO:  Your Honor, I can clarify that

12   after the hearing today, if Your Honor would -- would --

13   would like, but I -- I believe it's an or, I don't believe

14   we have to file it with the three different judges in

15   order to -- to get the information.

16          THE COURT:  Okay.

17          MS. CINQUANTO:  But that's my understanding, but

18   I can't say that for sure, Your Honor, I don't have the

19   rule in front of me.

20          THE COURT:  Okay.  That is -- that is fine,

21   which -- whichever method is obviously appropriate I'm

22   presuming it is an or as well and that it doesn't need to

23   be filed with three different officers or judges of the

24   Court.

25          And that way you can go ahead and -- and do so

1    and I will look to respond to it and -- and make my ruling

2    on it accordingly.  Mr. Parisi, the representation of Ms.

3    Cinquanto and so far as E.C.F. 156 is concerned, can you

4    provide commentary as to whether or not the government has

5    any differing position or is, concurs with what Ms.

6    Cinquanto has stated?

7            MR. PARISI:  Your Honor, there's a little more

8    nuance to it.

9            THE COURT:  Uh-huh.

10           MR. PARISI:  What -- what I agree to is that, as

11   long as the Defendant follows the district court plan and

12   the requirements in that plan which was publicly available

13   and we both attached it, then she is entitled to whatever

14   the plan provides.

15           I did not agree that she's entitled to what she

16   requested which was the entire grand jury file, I don't

17   know what that means.  But looking through the district

18   court plan, there are basically three categories of

19   material.

20           The first is the names of grand jurors, I

21   presume that those are included in the master file

22   somewhere.  And what the district court plan says, and I'm

23   at pages twelve to thirteen, you know, and it's numbered

24   paragraph nine C as in Charlie, is that names may only be

25   disclosed upon order of the Court and it specifies the

1    judge who impaneled the grand jury.

2            The grand jury that indicted the Defendant in

3    this case was supervised and impaneled by Judge Diamond.

4    So I believe if the Defendant wants grand juror names, she

5    must make application to Judge Diamond and I don't believe

6    she's done that.

7            The next category of information is past grand

8    jury wheel information and that is at number paragraph

9    eleven C as in Charlie pages fourteen to fifteen of the

10    district court plan.  And that is fairly clear as I read

11    it, that that's only upon order of the chief judge or his

12    designee.

13            I don't know if there are designated other

14    judges who have that authority, but I don't believe

15    counsel has made any application to either Judge Sanchez

16    or Judge Goldberg now for past information, which was part

17    of her request.

18            And then there's this -- this additional

19    category of papers and -- papers and records that are

20    available for public inspection for the purpose of

21    determining the validity of the selection of any jury,

22    that seems to be what Ms. Cinquanto is looking for. that's

23    numbered paragraph eleven A page fourteen of the plan.

24            The plan says publicly available, I don't know

25    what that means, whether that means Judge Diamond, or Your

1    Honor, has to nudge the clerk of courts whether it means

2    the clerk of courts should have that ready.  That's an

3    open question and I can't answer it, but I am not agreeing

4    that she gets the whole file.  I'm agreeing that if she

5    follows the plan she gets what the plan permits.

6            As I've mentioned before, there are severe

7    security concerns in this case, they are ongoing, and

8    every time we talk to somebody, it seems like they're

9    being threatened.  And I'm deeply concerned that this is

10   just an attempt of the Defendants to find out who was on

11   the grand jury, or who testified before the grand jury.

12           And I -- I note that these all started from a

13   Defendant's pro se filings, and I mention that because

14   subsequent to Ms. Cinquanto sort of polishing up the

15   Defendant's filings and resubmitting them, I received an

16   identical filing from a Defendant in another case.

17           That was Kevin Johnson docketed at 24-187, and

18   that's before Judge Baylson, a verbatim pro se filing.

19   Which tells me that this is just something going around

20   the F.D.C. and I don't believe it's something that this

21   court should really take all that seriously.

22           But to the extent Ms. Cinquanto wants this

23   information and complies with the plan, I agree she can --

24   she can get it in that -- that respect.  But I'm not

25   certain that Your Honor is the appropriate forum to sign

1    this order.

2            It seems to me that it's -- depending on the

3    category, either Judge Diamond who supervises this grand

4    jury or Judge Goldberg is the chief judge.

5            MS. CINQUANTO:  Your Honor, may I respond

6    briefly?  Your Honor, I --

7            THE COURT:  Yes.

8            MS. CINQUANTO:  -- I mean, unless -- I'm happy

9    to re-file this motion with Judge Goldberg, happy to do

10   it.  The Supreme -- the Supreme Court of the United States

11   says that my client is entitled to this information,

12   there's no question about that.

13           To deny him the information that he is

14   requesting would be unconstitutional, he's entitled to it.

15   Whether or not other Defendants at the F.D.C. are asking

16   for it is of no matter.  Now, the -- I went to the clerk's

17   office, I explained the situation, I told them what I

18   needed and they said that Your Honor was the appropriate

19   forum.

20           It -- I will re-file in any forum that Your

21   Honor wishes if it -- if it would -- if it would make Your

22   Honor feel - or the government feel more comfortable, I'll

23   just re-file this in front of Judge Goldberg, not a

24   problem.

25           In addition, Your Honor, we're only asking --

1    we're not asking for the names of the grand jurors, and I

2    will make that clear in -- in whatever order that we

3    submit to, whatever forum.  We don't want the names, we

4    just need the compass -- the racial composition and the --

5    the demographic information of these folks.

6              So we don't need to know who they are, or any

7    identifying information, I just want to know the racial

8    composition, the -- the age ranges of these particular

9    jurors, and everything that the Supreme Court says that

10   needs to be in place in order for there to be a valid

11   composition of a grand jury.

12             So I'm just following the direction of the clerk

13   of court, he said you were the appropriate forum.  I don't

14   know what else I can do to clarify that if we want to --

15   we can call him, we could, or I could just -- if it just

16   makes everything easier, I could file this in front of

17   Judge Goldberg.  But that's --

18             THE COURT:  I think -- I --

19             MS. CINQUANTO:  -- there -- there's no question

20   that he's entitled to this information and to deny him

21   that information would -- would -- would ultimately end up

22   in a reversal of this case, I mean, it's -- it's black

23   letter law, he's entitled to this information.

24             THE COURT:  And I think you -- and thank you,

25   Ms. Cinquanto, I think that you and obviously Mr. Parisi,

1  you led with that at least in saying that you discussed

2  things and -- and have agreed and -- and agreed to what

3  can and should be provided.

4          So I -- I don't want to -- I'm not entertaining

5  at this point a -- you are not to receive what you are

6  entitled under the Constitution to receive for your

7  client.  I think what is necessary is to obviously flush

8  out the details and the specificity and whether it's

9  pursuant to, as Mr. Parisi says, the plan or in essence,

10 how you have just summarized it, which says we're not

11 looking for names.

12         We're looking for racial composition and

13 demographic data --

14         MS. CINQUANTO:  Right.

15         THE COURT:  -- information, so that, obviously,

16 Mr. Parisi presents valid concerns on safety and those

17 considerations and you are stating that you are not

18 seeking anything that would reveal that type of

19 information.

20         Secondary to that you have also stated that you

21 just want to know where to file in order to go ahead and

22 receive said information.  And Mr. Parisi has presented

23 based upon what is identified as the plan and what's been

24 filed, as to it needs to go to the chief judge or, I

25 believe it indicates a designee of the chief judge.

1          And in turn, also, I believe that if Judge

2     Diamond was the one that actually oversaw the grand jury

3     in this case, that it would be potentially Judge Diamond.

4          The Court is willing to make that determination

5     and direct you as to who it needs to go to, so you don't

6     have to, in essence, misfile it or be concerned that it is

7     actually being requested from the wrong entity and it's in

8     any way adverse or a penalty towards your client that

9     would not benefit you, your client, nor would it benefit

10    the government.

11         So I'm not going to let that procedural kind of

12    question mark be an impediment to the case moving forward

13    and the request being reviewed.  And if appropriately

14    submitted with appropriate law to support the basis for it

15    which -- again, you led with the agreement, then we will

16    go ahead and get that done.

17         So the Court will go ahead and make a

18    determination as to who it needs to be directed to and

19    inform you as to who it needs to be filed with.  And then

20    once I go ahead and give that direction to both you and --

21    and the government, then it can be filed at that place or

22    with that entity, if it is myself, if it is Chief Judge

23    Goldberg, if it is Judge Diamond, depending on what it is,

24    it may be more than one of us, I'm not certain, but we'll

25    make that determination and let you know.

1          MS. CINQUANTO:  I would appreciate that, Your

2      Honor, thank you so much.

3          THE COURT:  Okay.  You're welcome.  So now that

4      we've completed our discussion on E.C.F. 156, moving now

5      to the legal argument that you indicated you wanted to

6      make regarding E.C.F. 134, I am ready to hear argument on

7      that motion.

8          That's the motion for a joinder and/or severance

9      of count one of the indictment.

10         MS. CINQUANTO:  Yes, Your Honor.  Your Honor,

11     there's two Federal Rules of Criminal Procedure which are

12     at play here, there's Rule of Criminal Procedure Eight

13     which governs the joinder of offenses, and there is

14     Federal Rule of Criminal Procedure Fourteen which talks

15     about severance.

16         In my motion to Your Honor, I had conceded that

17     the cases were properly joined because I believed that the

18     government's theory was that they were similar in nature

19     and therefore they were properly joined.

20         The government's response in their motion was

21     that, in fact, I was incorrect in that, and that they are

22     joining the -- the counts because they are a continuing

23     course of conduct or a common scheme or plan.

24         And based upon that, Your Honor, I am going to

25     ask -- going to ask the Court to make two findings today.

1   One, we'll make a finding that they were not properly

2   joined upon that theory, or, in the alternative, if Your

3   Honor does believe that they were properly joined under

4   Rule 8, then, they should be severed under Rule 14(a).

5          The government's position is that this was, as

6   they said, a continuing course of conduct or a common plan

7   and scheme, and that's why the cases were joined.  But

8   Your Honor, they are not, there is in fact four -- well

9   there's four robberies that are charged in this

10  indictment.

11         But there are actually five robberies that are

12  relevant for the discussion in this case.  The first

13  robbery occurred -- and this is important for Your Honor

14  to understand, sort of, the players, because I think this

15  really goes into proper joinder and then severance, if

16  Your Honor is going to address that.

17         The -- the first robbery occurred on August 22nd

18  of -- of 2022, that robbery involved, allegedly, three

19  people.  It involved the Defendant, a Mr. Vincent, and a

20  Mr. Curtis.  That robbery took place at a cell phone store

21  at the Olney Plaza.

22         In that robbery, two men went into the store,

23  that would be Mr. Vincent and Mr. Curtis.  There was no

24  weapon that was used during that robbery, that's very

25  important, there was no weapon that was used.

1           The men successfully complete the robbery and

2      then they drive away in a vehicle, or they -- they -- they

3      leave the scene and they end up being arrested in a

4      vehicle which was driven by my client.

5           My client maintains and told the police that he

6      was a hack driver and he was basically flagged down and

7      asked to drive Mr. Vincent and Mr. Curtis away from the

8      scene.  Mr. Vincent and Mr. Curtis were both found in the

9      backseat of the vehicle, as were the cell phones in

10     question, that were stolen.

11          There was no weapon that was recovered from the

12     car, and again, that's very important.  After that, Your

13     Honor, five months later, almost six months later there is

14     another robbery that occurs on January 6th.

15          And that robbery involves a Mr. Crafter and --

16     and I believe it was a mister -- Mr. Vincent, I believe.

17     That occurs at another cell phone store, this is five

18     months later, it's a cell phone store.  My client is not

19     alleged to have been involved in that robbery at all.

20          January 15th, there's another robbery of a

21     Verizon store, a cell phone store and that involves Mr.

22     Crafter, a mister -- Mr. Brown, a Mr. Sander -- a Ms.

23     Sanders, and a Mr. Vincent.

24          Again, my client is not involved in the robbery

25     of that store, that was at -- that was the cell phone

1  store again.  Then, on the 16th, the day after that, Your

2  Honor, there's another robbery of a cell phone.

3         Now, these are all in the indictment.  And that

4  is Mr. Crafter, Mr. Vincent, Ms. Sanders, and Mr. Brown,

5  same people who were involved in the 15th, the day of the

6  15th robbery.  And again, Your Honor, that was the -- that

7  was a robbery of a cell phone store.

8         Then, we go to January 17th, in January 17th,

9  there's really no way to say it, it's just not like the

10  others.  It's a robbery of a gas station, and it -- it

11  allegedly involves Mr. Crafter, Mr. Vincent, and my

12  client.

13         And then Your Honor, when it was not charged,

14  which is very interesting in this case is the day after

15  that, Mr. Vincent, Mr. Crafter, Mr. Brown, and Ms. Sanders

16  commit another robbery.  And then, after that, one of

17  those folks was arrested, they -- they -- they made a

18  statement, and that's how sort of the dominoes fell here.

19         So the point is, Your Honor, is that this is not

20  a continuing course of conduct or a common planned scheme,

21  we have two robberies where Mr. Jones is alleged to have

22  been involved, that would have been a robbery that on --

23  on August 22nd of 2022, and then again of a gas station on

24  January 17th of 2023, almost five months later.

25         He's not involved or alleged to have been

1    involved in the January 15th, January 16th, or January

2    18th robbery.  In the January 17th robbery, Your Honor,

3    everyone was wearing masks, so there's no way to identify

4    who was actually in the store at that time.

5            So we have a situation where the robbery, where

6    mister -- there -- there's no way that the government can

7    say this is a continuing course and -- and -- and scheme

8    because we have the delay in the -- the time when my

9    client was involved.

10           We have a different type of robbery, one, you

11   know, which is a cell phone versus a gas station.  And we

12   also have the fact that he is not involved in the prior

13   two robberies.  So you're at -- at -- the prior two

14   robberies and then the -- the -- the last robbery.

15           So Your Honor, this is not a continuing course

16   of conduct, this is not a common plan scheme, and

17   therefore, under Rule 8 this -- the -- the August 22nd of

18   2022 robbery should not have been included.

19           Now, Your Honor, if we move from there and Your

20   Honor finds that they were properly joined, well then I'm

21   asking for severance under Rule 14.  And the reason why

22   I'm asking for severance under Rule 14 and that is the

23   government's -- I'm sorry, the defense's burden.

24           In Rule 14(a), states that if the joinder of

25   offenses in an indictment appears to prejudice a

1    Defendant, the Court may order separate trials of counts.

2    The defense is required to show that the denial of

3    severance would lead to clear and substantial prejudice

4    resulting in a manifest -- manifestly unfair trial.

5         And the Courts have found that there's three

6    types of prejudice that can emerge from a situation like

7    this.  I'm going to focus on two of them, the one I'm

8    going to focus on is that some of the prejudice that could

9    occur in a situation like this, is one, that proof that a

10   Defendant is guilty of one offense may be used to convict

11   him of a second offense, even though such information

12   would be inadmissible if there was a separate trial for a

13   second offense.

14        What that basically is saying, Your Honor, is

15   that the government has included the August 22nd, 2022

16   robbery and the January 17th, 2023 robbery.  And if those

17   two robberies were standing alone under Rule 404 -- 404,

18   those -- those trials would never have been tried

19   together.

20        Those cases would have been separate because of

21   the distance in time and the distance in -- in the people

22   who were involved, and the method, and the mode, and the

23   modus operandi here.  So Your Honor, the point is -- is

24   that if standing alone, the -- without these, you know,

25   the 15th robbery, the 16th robbery, the -- the government

1    is trying to string these robberies together in order to

2    bring in the August 22nd of 2022 robbery.

3         The -- the whole purpose of joining offenses is

4    so that -- for judicial economy, and in this case there is

5    no judicial economy if there's two separate trials.  We

6    have different witnesses from the cell phone store from

7    August 22nd of 2022, from the witnesses that would be at

8    the gas station.

9         We have different offers, we have different

10   evidence that would be presented.  If Your Honor was to

11   separate those trials, the only additional time that this

12   court would incur would be the selection of a jury in that

13   case.

14        Everything else would be essentially the same

15   amount of time in order to prove that robbery.  They're

16   going to have to put the same evidence on in a trial

17   before you, even if those cases were consolidated.

18        So it -- there's not a -- there's not a lot of

19   overlapping of evidence, this is what everyone is -- what

20   -- what folks are looking for, or what the Courts are

21   looking for when they're trying to determine judicial

22   economy.

23        In addition, Your Honor, and most importantly,

24   courts have found that if a Defendant wants to testify in

25   -- regarding one count, but doesn't want to testify in the

1    other count, then that is another reason why the cases

2    should be separated.

3              Now, in this case, Your Honor, we're separate --

4    excuse me.

5              In this case, Your Honor, Mr. Jones wishes to

6    testify in the August 22nd, 2022 robbery, he was a hack

7    driver during that time and he's prepared to testify that

8    he was only a hack driver and that's how these folks ended

9    up in the back of his vehicle.

10             On the other hand, Your Honor, and that is a

11   very compelling reason for him, he's going to testify, he

12   intends to testify and he will testify to that.  But he

13   does not wish to testify regarding the January 17th, '23

14   robbery.

15             In the January -- so -- the important piece here

16   is that Mr. Jones on August 22nd of 2022, admits that he

17   was in the area, was in the area, and is not saying he

18   wasn't in the area.  He -- but he was in the area because

19   he was a hack driver, which is exactly what he told the

20   police when he gave a statement thereafter.

21             On the other hand the January 17th, 2023

22   robbery, Mr. Jones maintains that he was not there, that

23   he was in fact having a romantic rendezvous with his

24   girlfriend at the time out on the streets.  What's

25   important is that his girlfriend has also been charged in

1    this case.

2           So Mr. Jones will be unable to call that witness

3    as a potential alibi witness because she's got Fifth

4    Amendment rights to remain silent.  So in that case, Your

5    Honor, Mr. Jones will choose to remain silent because he

6    cannot call his girlfriend in order to corroborate his

7    alibi, for lack of a better term.

8           But in -- in the first case, Your Honor, Mr.

9    Jones absolutely will want to testify and explain why

10   those folks were in his car and why that car, you know,

11   why they were, you know, the -- the situation around that.

12          So Your Honor, the fact that Mr. Jones will be

13   limited in his ability to testify, because obviously he

14   can't take the stand and talk about one and say, hey, I

15   was a hack driver, I didn't do it -- I didn't do it.

16          And then not say a word about the 17th robbery,

17   because a jury will just -- that would be extremely

18   prejudicial.  So Your Honor, the -- the best course of

19   action in this case is to sever that count -- the first

20   count, the August 22nd, 2022 count sever it out.

21          Your Honor will only incur an additional day,

22   day and a half with the selection of a jury and perhaps

23   the -- we can't even say the jury deliberations because

24   the deliberate -- jury deliberations are going to --

25   they're going to have to deliberate each of these counts

1    separately anyway.

2             Really it's just a question of selecting a jury,

3    that's really it, it's one day.  And so if you take that

4    -- that concern for judicial economy and you compare it to

5    the prejudice that my client will suffer if he's not able

6    to testify about where he was and why he was there on

7    August 22nd, then, Your Honor, that is substantial

8    prejudice and we -- it would result in a manifestly unfair

9    trial.  One moment, Your Honor.

10            Your Honor, that's my position.  Thank you.

11            THE COURT:  Thank you, Counsel.  Mr. Parisi, if

12   I could hear your response?

13            MR. PARISI:  Yes, Your Honor.  Your Honor, I

14   want to start with that last point about the Defendant's

15   testimony, because I think it's the most easily disposed

16   of.  There's nothing to stop the Defendant from taking the

17   stand and testifying about August 22nd and not being posed

18   questions about January 17th.

19            There may be strategic reasons why counsel

20   doesn't want to do that, but that's not prejudice, that's

21   not what prejudice is.  I -- I suspect if that were the

22   case where the Defendant only testifies about August 22nd,

23   Your Honor would limit any cross to the direct exam,

24   that's typical.

25            I can't imagine a scenario where we would be

1   allowed to get up and -- and use this as almost an open-

2   ended deposition of the Defendant.  So if the Defendant

3   wants to testify about August 22nd, he's certainly free to

4   do so.

5           But -- but a strategic decision, why he thinks

6   that may not go well for him, that is not prejudice,

7   that's not what the case law tells us.  The case law tells

8   us prejudice is -- the determination was the Defendant's

9   trial rights stripped from him.

10          So let's talk about the evidence in this case,

11  we have a group of friends, and the linchpin of that

12  friendship is Keon Vincent and the Defendants who rob

13  stores for money.

14          We did not charge every robbery we know about,

15  but we know they did this going back into '22, all the way

16  up through the -- the arrest in January of '23.  And the

17  way this worked is, whenever a group of them got together

18  to do a robbery, they needed a car and they needed a

19  store.

20          The Defendant came to two of those robberies, he

21  didn't come to all of them, but that's not a dispositive

22  fact.  The Savage case that I quoted in my response talks

23  about that specifically.  And what it says is, if I can

24  just find the quote here.

25          In essence, just because all the evidence

1    adduced is not germane to all counts against each

2    Defendant, or because certain Defendants are seemingly

3    less culpable, or because evidence is more damaging to one

4    Defendant than others, that's not prejudice, that's just

5    how trials work.

6            The way we would prove our case, Your Honor, is

7    to show that on August 22nd the Defendant drove Keon

8    Vincent and Keontae Curtis in his S.U.V. to a cell phone

9    store to rob it.  They then left the scene and were

10    arrested by the police together with all the stolen goods

11    in the backseat of the car.

12            The Defendant gave a false exculpatory statement

13    saying he had nothing to do with it, but his cell phone

14    shows otherwise.  The Defendant said to the police that

15    day, I was nowhere near that cell phone store, his cell

16    phone shows that he was right there.

17            Fast forward to January 17th, our evidence will

18    show that once again, the Defendant drove Keon Vincent,

19    and now, Robert Crafter and Reliana Ruiz (phonetic

20    spelling) to the gas station in his same S.U.V. as the

21    August 22nd robbery to commit the robbery.

22            Importantly, before both robberies the Defendant

23    made it clear he had a gun in the car.  August 22nd, Keon

24    Vincent and -- and Keontae Curtis refused to use a gun,

25    there's no gun taken into the store, but I believe there

1    was a gun in the car and the evidence will be that the

2    Defendant offered it.

3            THE COURT:  Was there a gun recovered in the

4    car?

5            MR. PARISI:  There was not, Your Honor.

6            THE COURT:  Okay.  So there was no gun on August

7    22nd, present --

8            MR. PARISI:  There was no gun that the police

9    recovered, I believe there will be testimony that a gun

10    was offered.

11            THE COURT:  Okay.

12            MR. PARISI:  And I think that's an important

13    distinction.  January 17th, the testimony will be that the

14    Defendant parked his S.U.V. across the street from the gas

15    station, they planned the robbery, the Defendant made it

16    clear he had a gun, and then they went in and did the

17    robbery before fleeing the scene.

18            Once again, the Defendant's cell phone, the same

19    cell phone that he had with him in August 22nd, shows that

20    he's at the scene of the gas station, right on the

21    property.  The Defendant gives a statement to homicide

22    detectives, again, a false exculpatory saying, I was in

23    the area earlier to have sex with my girlfriend, and then

24    nowhere near the gas station.

25            Yet again, the same cell phone shows that that's

1    false, to prove his identity, to prove that he is the

2    gunman at the robbery, at the murder, we have to introduce

3    all of those pieces to tie it together, we have to show

4    that it's his S.U.V.

5         We have video of the same color S.U.V. in the

6    area of the murder before and after, we have the S.U.V.

7    stopped after August 22nd with him behind the wheel, that

8    ties him to that car at the murder.  We have the cell

9    phone evidence and I suspect there will be testimony from

10   other people that will corroborate all of that as well.

11        These cases are inextricably intertwined and

12   there's no way to prove one without the other because the

13   evidence compliments one another and evidence from the

14   first count shows the murder and vice versa.

15        It shows the group of people together, it shows

16   their identities.  Just --

17        THE COURT:  Do you have any video evidence from

18   the scene of the January 17th, 2023 robbery murder that is

19   the Suburban that's identified as the vehicle that the

20   Defendant was apprehended in -- from August 22nd of 2022?

21        MR. PARISI:  We -- we have photos of or video of

22   a Suburban that is the same color, it's -- it's not a car

23   stop so I can't see the Defendant behind the wheel.  But

24   we have that same color Suburban, it's fairly distinctive

25   looking because it's an older model.

1           And it's pretty beat up in the area from

2    different stores or street cameras.

3           THE COURT:  You don't have a plate number?

4           MR. PARISI:  I don't believe we have a plate

5    number from that night.

6           THE COURT:  Okay.

7           MR. PARISI:  A few days later the police then

8    find the Defendant sitting in the same car with Reliana

9    Ruiz, and importantly, there's a -- there's a new plate on

10   it.  So it's all these little pieces that come together to

11   show that the Defendant is the person at the murder.

12          Just because there's -- there's some evidence of

13   other robberies with other Defendants doesn't mean that

14   there's prejudice to this Defendant.  And in fact that

15   evidence isn't going to come in, we're presenting evidence

16   on the two counts where this Defendant's charged.

17          And it's -- as counsel stated correctly, it's

18   her burden to show prejudice, the only basis for Your

19   Honor to sever a case out is if the Defendant's trial

20   right is compromised and they must show clear and

21   substantial prejudice, which they have not done.

22          The -- the key question when you examine that

23   is, can the jury compartmentalize these two separate

24   instances and -- and deliberate specifically on those

25   counts, that's the -- the Perry (phonetic spelling) case

1    from the --

2            THE COURT:  Uh-huh.

3            MR. PARISI:  -- Third Circuit that I cited.  And

4    -- and what -- what the case law tells us is when there

5    are separate offenses, disparate times, that actually aids

6    in the jury's ability to compartmentalize.  And the fact

7    that we're talking about August 22nd with a cell phone

8    store and January 17th at a gas station, that's exactly

9    what the Third Circuit and the other cases tell us.

10           That type of disparate timing helps a jury

11   compartmentalize those specific counts.  Lastly, I -- I

12   suspect Your Honor will give the jury instructions,

13   there's the standard instructions that they must consider

14   each count separately.

15           And the Third Circuit also tells us that when

16   the Court gives those instructions, that's also powerful

17   evidence that the jury can and will compartmentalize the

18   evidence.  So in sum, Your Honor, there's no way to prove

19   this case -- counsel's idea that this is a -- a -- a light

20   lift to prove them separately is -- is fanciful.

21           The only way to prove each of these offenses is

22   to prove them together because the evidence is

23   intertwined.  They have not met their burden to show

24   prejudice and the -- the Third Circuit tells us that this

25   type of case is routinely joined, rarely severed, and in

1     fact aids the jury in compartmentalizing.

2              And I won't go through all the other cases, but

3     I cited a number where there are widely disparate crimes,

4     escapes and assaults and other things that were properly

5     joined.  And I would just ask the Court to review those as

6     what I believe is of -- of -- of outer bounds -- of what's

7     permissible in this case is certainly not out there.

8              THE COURT:  The question I have for you, Mr.

9     Parisi is, what you led with in terms of your start point

10    for the -- for your argument  on defense's motion and what

11    Ms. Cinquanto concluded with just prior to -- to stepping

12    back and -- and concluding her argument on the motion,

13    which is, if in fact the jury is seated, that you've

14    indicated, I can very easily just instruct the jury that

15    there will only be questions presented on direct

16    examination regarding the offense that took place on

17    August the 22nd of 2022.

18             That no questions will be presented to the

19    Defendant who has an absolute right not to testify, but

20    can testify if he so chooses, and I've been told he will

21    choose to testify only as to -- let's say, robbery one,

22    which is the August robbery.

23             How do you cure any potential inferences the

24    jury may glean from not hearing from or having the

25    Defendant answer to anything that is related to the

1    January 17th, 2023 robbery?

2              There's the argument by counsel that prejudice

3    can be inferred and can be expected from the jurors if

4    they only hear about one and not the other, especially

5    when the other has a homicide attached to it.

6              So how do you -- how would you respond to that

7    and how would you suggest that the Court cure that

8    preemptively?

9              MR. PARISI:  As an initial matter I'm not sure

10   it's appropriate for the Court to give an instruction up

11   front that that's going to happen.  I think we first have

12   to see if the Defendant --

13             THE COURT:  Correct.

14             MR. PARISI:  -- decides to testify at all.  I'm

15   also not sure that it would be appropriate for the Court

16   to highlight that and -- and give some sort of instruction

17   that the Defendant's only going to testify about this and

18   you can't infer otherwise, that's something I'd like to

19   look into a little more.

20             THE COURT:  But you said I could -- I could

21   direct him that he's only going to be questioned on August

22   22nd --

23             MR. PARISI:  What I --

24             THE COURT:  -- so even though I'm not doing a,

25   let's say a preemptive curative instruction, which I would

1        not do, but saying, well, Counsel is directed that they

2        are only permitted to question the Defendant or question

3        Mr. Jones on the robbery of August 2022.

4                  MR. PARISI:  I -- I may have misspoke then, Your

5        Honor --

6                  THE COURT:  Okay.

7                  MR. PARISI:  -- I -- I wasn't suggesting that

8        your court should direct them at all.

9                  THE COURT:  Okay.

10                 MR. PARISI:  What I meant is if the Defendant

11       testifies about August 2022, I imagine that the government

12       would be limited to cross examination on the subjects of

13       the direct and that would obviously go beyond the scope if

14       we tried to delve into something else.

15                 And that is where I think it would be

16       appropriate for the Court to make a ruling., I -- I we

17       wouldn't --

18                 THE COURT:  Okay.

19                 MR. PARISI:  -- do that, but if we stepped out

20       of line and crossed into something that was not testified

21       to on direct, I imagine there would be an objection and

22       the Court would -- would most likely sustain that as

23       beyond the scope, that is what I was referring to.

24                 To the Court's bigger point, though, about how

25       do you cure a potential prejudice, there are pattern

1    instructions about what the jury must and must not do when

2    a Defendant does or does not testify.

3           And if the Defendant chooses to testify about

4    part of this and not the rest, the Court, I'm sure, will

5    give the pattern instruction about how to view a

6    Defendant's testimony and I believe that is sufficient to

7    cure any potential prejudice.

8           Now, whether defense counsel chooses or the

9    Defendant decides, that's still not a great idea because

10   I'm still worried about what the jury might be thinking.

11   That's a different question, but that's not the prejudice

12   that we're talking about here, that's a strategic decision

13   that they have to make.

14          And if -- if that's something they want to do,

15   that's fine, but they don't get to hold out this

16   hypothetical, we may have a defense strategy, as in a

17   (unintelligible) to entice Your Honor to sever out a

18   count, that's not the appropriate analysis.

19          The Third Circuit, the Supreme Court are clear

20   that prejudice has to be stripping them of their right,

21   that's them talking about how they might want to exercise

22   that right.  There's no right stripped there, that's just

23   a decision they make and it's not a basis to set the count

24   out.

25          THE COURT:  Do you think the jury is, or can be

1      directed or sophisticated enough to compartmentalize that

2      if they only hear about one robbery and not the other,

3      that they cannot draw any negative inference from not

4      hearing about the Defendant on the other when the

5      Defendant chooses to testify?

6              MR. PARISI:  I think so, and -- and if that's --

7      if that happens then perhaps there is a -- an instruction

8      that we can come up to -- with together at a charging

9      conference that takes from the pattern and -- and maybe

10     crafts it a little bit more to the facts of that -- of

11     that scenario.

12             But, you know, I think juries get it, I think

13     they follow the instructions.  The Third Circuit believes

14     juries follow instructions and -- and I -- I don't see a

15     basis to sever based on this hypothetical here.

16             THE COURT:  I believe that's -- that juries do

17     follow instructions and I -- I -- I believe that they are

18     sophisticated enough to get it.  But the it is the big

19     question mark --

20             MR. PARISI:  Sure.

21             THE COURT:  -- which is what does the it say?

22     And so in that regard and -- and where my concern is at

23     this point, is making sure that there is no undue

24     prejudice to the Defendant.

25             So I think that if there is an occasion, and I'm

1    sure there has been, that precedes this court in this

2    case, from all the cases that have been cited by you as

3    well as Ms. Cinquanto.

4             But specifically you as the government,

5    indicating that the joinder of these counts are

6    appropriate and necessary in these two separate offenses

7    states represent a common plan scheme and design and

8    should therefore remain joined that that type of

9    instruction is something that I would like to see.

10            MR. PARISI:  Yes, Your Honor.

11            THE COURT:  It would aid me in my deliberation

12   on the issue.  I will ask you before you step back or

13   provide me any other argument, you do note in your brief.

14            And I note -- and this is for you, and I will

15   ask Ms. Cinquanto this same question and to respond to it.

16   So Ms. Cinquanto, I'd ask you to listen closely as well.

17            MS. CINQUANTO:  Uh-huh.

18            THE COURT:  On page five of eight of E.C.F. 140

19   paragraph beginning, the government's evidence will

20   further show that, second sentence there says, the

21   government will show that the Defendant bragged to others

22   that the gas station would yield substantially more money

23   than the previous cell phone store robberies the group

24   typically engaged in.

25            That particular statement and what the

1    government anticipates its evidence is going to show

2    presents a link between the previous -- the robbery one,

3    as I'm identifying the August robbery, and robbery two

4    which represents counts three, four, and five, the January

5    robbery.

6              Can you speak to what you anticipate being

7    presented at trial regarding this specific sentence?

8              MS. PARISI:  Yes, Your Honor, I'm going to

9    choose my words --

10              THE COURT:  To the extent you can.

11              MR. PARISI:  Yes -- yeah.  I think the Court

12    understands my concerns.

13              THE COURT:  Yes.

14              MR. PARISI:  There will be witness testimony

15    that the Defendant called other people that night and

16    said, I've got a score for us, it's going to be much

17    bigger than the stuff that we usually deal with, I'm --

18    I'm paraphrasing.

19              And then solicits people to participate, and

20    that's how then Reliana Ruiz, Keon Vincent, Robert Crafter

21    end up in the Defendant's car outside the gas station.

22              And as Your Honor does point out, it does tie it

23    back to the others, it's -- again, a statement of

24    knowledge, it shows his involvement in the previous

25    robberies.

1           And as I said, it's -- it's all intertwined

2      here, there's no way to tell this story about one without

3      the other.  And that's a perfect example.

4           THE COURT:  And Mr. Vincent, Keon Vincent is the

5      individual who is arrested and charged for the August

6      22nd, 2022 robbery as robbery one and is also arrested and

7      charged in the January 17th robbery two incident, robbery

8      homicide in January of 2023, correct?

9           MR. PARISI:  Correct.  Among multiple other

10     robberies, but yes, those two, he is the -- he's the link

11     between the Defendant and this group.  It's the Defendant

12     and Keon Vincent that are sort of the center of this group

13     of friends who commit robberies and -- and were committing

14     robberies throughout the Philadelphia area for several

15     months.

16           THE COURT:  Okay.  Thank you, Mr. Parisi.

17           MS. CINQUANTO:  Your Honor, I'll address that --

18     your last question first.  Your Honor, the defense has no

19     information about this information that was -- that mister

20     -- that my client bragged to anybody about this being a

21     bigger score.

22           And I think that even if there is a witness

23     who's willing to testify to that, I don't -- I can't see

24     in any logical way how robbing a gas station at two

25     o'clock in the morning would yield a bigger score than

1    robbing cell phone stores of hundreds, thousands -- tens

2    of thousands of dollars worth of cell phones.

3           So -- but I don't have any information to that,

4    I'm assuming that would be in the Jencks that would be

5    turned over prior to trial.  But Your Honor, what I'd like

6    to do is, I'd like to just one -- one thing I need to take

7    issue with is this, you know, refrain of the false

8    exculpatory statement.

9           The defense maintains that this is not a false

10   exculpatory statement, defense maintains that for the

11   August 22nd, 2022 robbery, that this was a statement

12   explaining why he was in the car, why these two men were

13   in the back seat of the car, and why all of the -- the --

14   the items that were stolen from the cell phone store were

15   in the backseat of the car, it -- it's -- it's -- it's

16   something he's going to testify to, it's not a false

17   exculpatory statement, it's actually his defense.

18          Your Honor, what I did mention earlier, and I --

19   and I -- and I apologize to the Court, is that one -- one

20   of the other reasons why mister -- besides the fact that

21   Mr. Jones wishes to remain silent on the -- will wish to

22   remain silent on the January 17th robbery, right, is

23   because he also has a prior conviction for a felony VUFA

24   charge, which would be admissible against him if he were

25   to testify, even if it was against the August 22nd

1    robbery.

2            Now, remember, the August 22nd robbery doesn't

3    -- now there may be allegations from cooperating

4    Defendants that, oh, he said there was a gun, but there

5    was never a gun that was recovered, there was never a gun

6    that was used, there wasn't a gun that was found in the

7    vehicle.

8            So Mr. Jones can testify regarding his defense

9    in that case, and even if the VUFA comes out, it's not

10   necessarily prejudicial because there was no weapon that

11   was used in that -- in that case, unlike the January 17th

12   robbery where not only was there a gun that was -- that

13   was used, that gun was used to -- to murder the -- the

14   store clerk.

15           So it would be highly prejudicial to have Mr.

16   Jones testify and be impeached with a prior conviction for

17   VUFA, which would be the -- the government could do that

18   under six zero nine.  And have him, number one, be charged

19   with not only there being a shooting, but him being the

20   actual shooter.

21           And to Your Honor, if he has to remain silent,

22   you know, this is, you know, Your Honor is spot on, it's a

23   legal fiction to believe that a curative instruction

24   where, oh, the Defendant has a right to remain silent on

25   the murder, but he's going to testify to -- frankly, what

1    is, you know, a robbery with frankly, no -- no moment.

2              You know, the guidelines for this one robbery

3    for the August 22nd are relatively low, we're talking a

4    matter of -- of -- of a few years.  There's not even a

5    nine twenty-four C for a consecutive hit.  We're talking

6    about three, four years max.

7              We're talking about a man who's willing to take

8    the stand and testify about that and say, hey, I wasn't

9    there.  But he's going to remain silent on the murder of a

10   charge that results in where he's accused of murder.

11             And not only did the clerk die, but he's accused

12   of being the one who shot the clerk and he's going to

13   remain silent on that?  That is a charge where he's facing

14   life in prison.

15             And it is a folly for -- for anyone to believe

16   that any type of curative instruction can be given where

17   this jury's going to be like, well why the heck didn't he

18   just say he didn't do it?

19             And I'm -- frankly, I don't care about the

20   questions from the government, that's not the point.  The

21   point is the inference from the jury, I believe the

22   government won't even go there because it serves them

23   well.

24             Why would they go there -- why would they go

25   there?  You know, he -- he doesn't say anything about it,

1    I mean, the inference of the jury is if he didn't do it,

2    he would say it -- he didn't -- he said he didn't do it in

3    the first one, why isn't he saying he didn't do it in the

4    second one?

5           And that's the point, Your Honor, it's -- it's

6    -- it's -- it's a fiction that we can -- we can resolve

7    this with a curative instruction.  This case is too

8    serious, there is a guideline range of life in this case.

9    There is no offer from the government to resolve this

10   case, well, this case is going to trial.

11          And when I've got a Defendant who's facing a

12   guideline range of life we can't embark on this fictional

13   hope that the government -- that this jury's going to

14   believe, well, oh, it's okay, he has the right to remain

15   silent.

16          In addition to that, the government's saying,

17   oh, they're in -- these -- these robberies are intertwined

18   -- intertwined.  They are not intertwined, they are not,

19   we have the robbery on August 22nd.

20          And -- and if You Honor would like, and I think

21   it might be very helpful to the Court, and perhaps I

22   should have done this earlier, but I will do it after

23   this.

24          I can provide just a chart of -- of -- of the

25   evidence of -- of who was involved in what robbery.

1          So for example, August 22nd, we have the

2    Defendant, we have a Mr. Vincent, and we have a Mr.

3    Curtis.  And mister -- the Defendant was allegedly, or was

4    driving his vehicle, he was in -- in the vehicle at the

5    time.

6          The vehicle that they're connecting on the 17th

7    robbery, there is a grainy, you know, video that looks a

8    little bit like it.  But there's no license plate, there's

9    no identifying information for that vehicle.  On the other

10   hand, Your Honor we have three robberies, two robberies on

11   the 15th and 16th, and also the robbery on the 18th.

12         This is important because the government chose

13   not to charge that, and they chose not to charge that

14   because the 15th, 16th, 17th, and 18th, all -- the 15th

15   involved Crafter, Brown, Sanders, and Vincent.

16         The 16th, Crafter, Brown, Sanders, and Vincent,

17   the 18th, Crafter, Brown, Sanders and Vincent, those three

18   robberies that occurred consecutively, that is where

19   Sanders was the getaway driver in a Dodge.

20         So inserted in there, we have the robbery on the

21   17th where now it's Crafter, Vincent, and the Defendant.

22   My point is, these robberies are not all the same, they're

23   not intertwined.  If they were intertwined, then the 18th

24   would have been charged.

25         But the government knows that they're not

1    intertwined, these are separate robberies.  So we have a

2    Defendant who has the right to testify, the Third Circuit

3    has said, this is from the Third Circuit, this is from the

4    Richter case, Your Honor --

5              THE COURT:  Uh-huh.

6              MS. CINQUANTO:  -- 647 F2nd 397, this is set

7    forth in our briefs.  But the Court said that the accused

8    wished to testify on one but not the other of the two

9    joint offenses, which were clearly distinct in time,

10   place, and evidence.  They're -- they're referring to

11   another case out of the D.C. Circuit Court.

12             Subsequent decisions of that court make it clear

13   that it requires severance only where the Defendant makes

14   a convincing showing that he has both the -- both

15   important testimony to give regarding one count and a

16   strong need to refrain from testifying in another, that's

17   from the Third Circuit.

18             And what we're saying here, Your Honor, is that

19   he has important testimony to give, he is going to testify

20   in the -- regarding that August 22nd trial, just like he

21   told the police officers.  He said, I was a hack, the

22   evidence corroborates that he was a hack.

23             Now, whether the jury believes it is a different

24   story, but that's what he will testify to.  And regarding

25   the -- and his reasons for not testifying at the other,

1    I've gave Your Honor those reasons, he wishes to remain

2    silent on the other.

3            Number one, if we've got this VUFA charge that's

4    out there that he can be impeached with, and there's a gun

5    that was involved, which he was accused of using to kill

6    someone, so he can't testify regarding that.

7            He has got an alibi, but his alibi can't

8    corroborate because he's also charged in this case, and

9    he's got a Fifth Amendment right to remain silent.

10           And Your Honor, the fact that the -- that --

11   that a jury is going to believe that a Defendant is going

12   to take the stand and testify about a robbery where there

13   was no gun involved and say, hey I didn't do this, but

14   he's going to remain silent on a robbery where he was

15   accused of executing a store clerk, essentially, it's just

16   -- it's folly.

17           And -- and this case is simply too serious to --

18   to allow that.  The government says too that this is --

19   they're inextricably interwoven these robberies.  Again,

20   they are not, if you -- if Your Honor looks at the case

21   law and I'm sure your -- Your Honor has and will --

22           THE COURT:  Uh-huh.

23           MS. CINQUANTO:  Okay.  But Your Honor, those

24   cases where -- these cases are in -- in -- in --

25   inextricably intertwined, those cases involve, like for

1　　example, there's one on the Third Circuit.  I -- it's --

2　　in fact, that's the Langelier case.

3　　　　　　But in that case, Your Honor, there was a

4　　Defendant who was getting a divorce from his wife.  And

5　　what happened was, he failed to pay child support, he ends

6　　up in jail.  So what he does is he decides he's going to

7　　hire a hitman to kill the wife.

8　　　　　　And then he decides he's going to hire a hitman

9　　to kill, I believe it was the investigating officer.  And

10　　what that Defendant in that case wanted to do is he wanted

11　　to sever those cases out, he's like, well, you know, I,

12　　you know, there's no reason why this really bad case about

13　　me wanting to hire a hitman should be combined with me,

14　　you know, making threats against my wife.

15　　　　　　And the Court found that it was inextricably

16　　linked, right?  You don't have the threats to kill people

17　　unless there's the original charge.  And here we don't

18　　have that, that -- that -- that's not what we have here.

19　　　　　　Or in a case where there's an escape, you know,

20　　someone's charged with something and then he escapes from

21　　prison because of that charge, that's -- that's

22　　intertwined.  This is not intertwined, we've got separate

23　　-- five separate robberies that are distinct in location,

24　　time, participants, and roles.

25　　　　　　And each of these cases can be tried and should

1    be tried separately.

2              THE COURT:  Ms. Cinquanto, does a common --

3    common scheme plan or design theory only work if there is

4    more than two?  Because the government only alleged two

5    robberies to which your client has been charged involving

6    the counts that he has been indicted on.

7              And so I know you have emphasized five robbery

8    incidents, however, he is only alleged to have been

9    involved in two, has only been charged with two.  And

10   while there may be others that Mr. Parisi has referred to

11   and the government has referenced, the Court is only

12   concerned with what's presented to it in the indictments.

13             And I'm looking at Federal Rule of Criminal

14   Procedure 8(a), and it says, two or more offenses, so

15   isn't two sufficient?

16             MS. CINQUANTO:  Your Honor, two would -- two

17   would be sufficient.  So let's just say we're taking these

18   two cases in a vacuum, right, let's just say we take the

19   August 22nd and we take the January 17th --

20             THE COURT:  That's what the Court's taking.

21             MS. CINQUANTO:  Okay -- okay.  But -- so then it

22   just begs to reason why we're bringing in the 15th and

23   16th or if -- why that's even coming in, or even the 18th,

24   why that even wasn't charged.  Because I believe that the

25   common plan scheme is with Crafter, Brown, Sanders, and

1    Vincent, that's the common plan scheme.

2            But if we're just taking August 22nd and we're

3    just taking the 17th, and that was the indictment that

4    appeared before Your Honor, that case would be severed.

5    Because you cannot bring in those two robberies that

6    occurred in different locations, different times,

7    different places, that case -- that would be severed.

8            The government is trying to -- to create this

9    chain to create a common plan and scheme, but there is no

10   common plan and scheme.  Does that --

11           THE COURT:  Can you have a -- you can have a

12   common plan scheme and design with just two offenses, am I

13   correct or incorrect?  Do you agree with that or not?

14           MS. CINQUANTO:  I completely agree with that,

15   Your Honor --

16           THE COURT:  Okay.

17           MS. CINQUANTO:  -- but -- but -- but here's the

18   -- but here's the situation.  If you just look in a vacuum

19   of August 22nd, 2022 and you look at January 17th of 2022,

20   there is no common plan or scheme.  There you have a

21   situation where there was a robbery with Defendant, Mr.

22   Vincent and Mr. Curtis.

23           It occurs five months before the 17th, it is a

24   robbery of a cell phone store, okay, where there is no

25   weapon involved.  Now fast forward five months later,

1       okay, now we have different Defendants except for when

2       we've got Defendant, my client, Crafter, who was not

3       involved in the August 22nd robbery.

4              We've got Ruiz, which is not involved in the

5       August 22nd robbery, and we've got Vincent, he's the only,

6       you know, two.  It's the -- a robbery of a gas station, it

7       uses a weapon and it -- and it involves incredible

8       violence, these are not the same, this is not a common

9       plan or scheme.

10              THE COURT:  Things don't necessarily need to be

11       identical or apples to apples, would you agree, Counsel,

12       in order to have a common plan scheme or design?

13              MS. CINQUANTO:  I -- I -- I agree, Your Honor,

14       but -- but -- but -- may I, Your Honor?

15              THE COURT:  Uh-huh.

16              MS. CINQUANTO:  But there has to be a whole lot

17       more than some cooperating Defendant saying, oh, yeah, he

18       said, you know, this is -- this will be a better score if

19       we rob a gas station than it is a cell phone store.

20              There's no -- there's no other connection

21       between those two robberies.

22              THE COURT:  Except Mr. Vincent.

23              MS. CINQUANTO:  Well, except Mr. Vincent, but

24       even Mr. Vincent's uncorroborated testimony, if that is

25       what he's going to testify to, also doesn't make a --

1               THE COURT:  I don't know who's going to testify.

2               MS. CINQUANTO:  I know, exactly.  But Your

3       Honor, if whoever testifies to that, you know, convenient

4       piece of information, right, it -- and it doesn't even

5       make a whole lot of sense.

6               Who thinks they're going to rob a gas station at

7       two o'clock in the morning and it's going to be a bigger

8       haul than a cell phone store where they get tens of

9       thousands of dollars a product?

10              THE COURT:  Well, regardless of the location of

11      the robbery two, whether it was a 7-Eleven or an Exxon or,

12      I mean, T-Mobiles and -- and Verizon's aren't open between

13      the hours of -- or at least the hour that the second

14      robbery took place.

15              Regardless of what the location is, I think it

16      is the method to which the robbery was conducted and who

17      was involved.  And we do have commonality as to who was

18      involved and based upon what the government has stated,

19      while a weapon was not present, recovered at Robbery One,

20      there was -- I would suspect, based on what's been

21      presented to me, at least the discussion and/or dialogue

22      over the weapon and the use of a weapon in robbery one.

23              So there are elements there that the government

24      has presented which suggest the basis for why they joined

25      these matters, that is your burden to tell me why they

1    should not be.

2         MS. CINQUANTO: Well -- okay. Well, Your Honor.

3    Okay. So -- so we are dealing with like two different

4    rules here. So under Rule 8, right, which I originally

5    had conceded, okay. And we are -- and the government now

6    is saying, you know, and then I came back and said, well,

7    I don't think it's a common plan scheme.

8         If, Your Honor, you know, I'm just going to rest

9    on that piece. If -- if -- if Your Honor is saying, you

10   know, I believe there's a common plan scheme, Rule 8

11   they're properly joined, fine. Let's go to the real --

12   the real issue here.

13        And the real issue here is Rule 14(a), which

14   gives this court the discretion to sever when there is

15   substantial prejudice to a defendant. And one of those --

16   and it's not that this is a very rare offense.

17        I just handled a case in (unintelligible) matter

18   where Judge Schmill had absolutely no problem with

19   severing out the honor services piece of that case with

20   the theft piece. Okay, no problem whatsoever. So this

21   isn't some, you know, unknown thing.

22        Your Honor, what we have here is if -- if -- if

23   you take -- what the case law says is that substantial

24   prejudice can arise in an -- in a number of different

25   ways. The way that it is arising in this case, besides

1    the fact that we have, you know -- well, let's just say

2    the way it's arising in this case, which is of most

3    concern to the defense, is that Mr. Jones has a defense to

4    the August 22nd robbery.

5          He has told the police that defense.  This isn't

6    coming out of whole cloth, okay?  He told the police that

7    defense, the -- the circumstances of that with the two

8    defendants, the co-defendants sitting in the back of the

9    seat with all the stuff found in the back seat would be a

10    reason for him to testify.

11          No question.  And he will testify to that.  But

12    Your Honor, he wants to remain silent on the murder.  And

13    he -- he -- for -- for a number of reasons that I've

14    already explained to Your Honor --

15          THE COURT:  Correct.

16          MS. CINQUANTO:  -- which I won't -- I won't go

17    into again.  But -- and the case law out of the Third

18    Circuit makes it very clear.  It is essential that the

19    defendant present enough evidence regarding the nature of

20    the testimony he wishes to give on one count, which is

21    what I've -- we've told Your Honor, okay, and his reasons

22    for not testifying on the other.

23          His reasons for not testifying on the other is

24    that his -- his -- his alibi, so to speak, and the -- and

25    the statement he gave to the police, which is he was

1  having a romantic liaison with his girlfriend, Ms. Ruiz,

2  she's also been charged in this case.  He can't call her

3  to testify.  He can't lean on her to corroborate that.

4         Furthermore, Your Honor, if he testifies on the

5  June 22nd, it opens himself up to cross-examination on a

6  gun conviction, a felony gun conviction that he has.  I

7  don't mind that on the August 22nd because there's no gun

8  involved.

9         But I certainly, that's a certain -- certainly a

10  problem when we get to the testimony regarding his -- the

11  cross examination when the government seeks to impeach him

12  on the gun charge and he's being charged in another crime

13  where he not only used it -- well, he used a gun allegedly

14  to kill somebody.

15         And then finally, Your Honor, we have a

16  situation where we have, you know, a fairly innocuous

17  robbery that occurs on August 22nd with no weapon, no

18  death, no harm to anyone and where the defendant is going

19  to be willing to speak to that, but yet is not going to

20  answer to the allegation that he shot someone in the back

21  at a gas station.

22         You -- the -- the jury just simply will not be

23  able to -- to overcome the -- the inference of guilt that

24  he's not testifying to that.  And no instruction can --

25  can cure that.  I mean, so that -- that's the defense

1           position.  Let me just check with my co-counsel to make

2           sure that I've --

3                     THE COURT:  Of course.

4                     MS. CINQUANTO:  -- covered everything.

5                     THE COURT:  Thank you, Ms. Cinquanto.

6                     MS. CINQUANTO:  Thank you, Your Honor.  I

7           appreciate that.  Nothing further.

8                     THE COURT:  You're fine.  Okay.

9                     MS. CINQUANTO:  Yes.

10                     THE COURT:  Thank you, Ms. Cinquanto.  And Mr.

11          Parisi, I'm happy to hear from you, but I think the only

12          thing that I stated earlier, which is what I would

13          anticipate receiving from the government is -- is what

14          would be a suggested cure and/or instruction in terms of a

15          pattern jury instruction that may have been presented in

16          previous cases where situations like this are presented

17          where a defendant has testified and seeks to testify on

18          one, but not any of the other or more than one other,

19          multiple other matters that are being joined or have been

20          joined by the government and the prosecution.

21                     MR. PARISI:  We will dig into that, Your Honor.

22                     THE COURT:  Go ahead.

23                     MR. PARISI:  The only thing I -- I just wanted

24          to correct, Ms. Cinquanto said the January 18th robbery

25          was never charged.  It was, it's count six.  I --

1                    THE COURT:  Thank you.

2                    MR. PARISI:  You know, that -- that's all I

3          wanted to clarify.  But otherwise --

4                    THE COURT:  I appreciate that clarification.  I

5          was actually looking with the counts that I have here, but

6          I only have those in so far as Mr. Jones is concerned.

7                    MR. PARISI:  Right.

8                    THE COURT:  So I don't have any as to any of the

9          other identified --

10                   MR. PARISI:  Yeah, that -- that's --

11                   THE COURT:  -- defendants.  And so I -- I lacked

12         that count in front of me, so thank you.

13                   MR. PARISI:  Yeah.

14                   THE COURT:  I will -- having heard all the

15         arguments on that motion and knowing what the Court has

16         directed counsel to provide to it in order to complete my

17         deliberation.  I will make a decision subsequent to

18         receiving the information from counsel.

19                   And what I will do is I will set a date after I

20         hear and receive evidence on the remaining motions where

21         everything can be submitted to the Court.  So I will hold

22         off on providing a date due until after we hear and

23         receive evidence on the motions to suppress.

24                   MS. CINQUANTO:  Your Honor, could I preserve the

25         right to respond to whatever order the government puts

1        together so I could just --

2                  THE COURT:  Yes.

3                  MS. CINQUANTO:  -- get it, respond to it and --

4        okay, thank you, Your Honor.

5                  THE COURT:  Yes, you -- you will have the right

6        to respond to that.  Yes.

7                  MS. CINQUANTO:  Thank you.

8                  THE COURT:  Now, we're moving into the motions

9        to suppress that have been filed, and we have E.C.F. 135

10       and E.C.F. 143.  They were filed by defense counsel on the

11       basis of violations of the defendant's due-process rights

12       and equal protection under the United States Constitution.

13                 And so the burden is on the government,

14       obviously to present evidence that would counter that

15       specific basis.  I will let, obviously, Ms. Cinquanto

16       state for the record the basis of her motion again, and

17       then I will turn to the government to go ahead and present

18       them in the order that -- that he would like to do so and

19       to make sure that the witnesses that you have an intent to

20       present are present in the Courtroom.  Ms. Cinquanto?

21                 MS. CINQUANTO:  Yes.

22                 THE COURT:  For purposes of the record, I don't

23       want to couple them.  So I would advise you to do one and

24       then do the other.  That way it makes it clear, because I

25       will be making my ruling obviously, independently.

1           So if that provides some guidance for you,

2      whether you start with 135 or 143, I -- I don't have a

3      preference.  The Court will take them in in any order, and

4      it may be based on the government's witnesses and who's

5      available.  But you are welcome to proceed.  I just ask

6      that you do address them separately.  I will take one of

7      them first and then the other One second.

8           MS. CINQUANTO:  Yes, Your Honor.  Your Honor,

9      I'm going to refer -- address E.C.F. 135.  Your Honor, in

10      this case we are -- we are moving -- we -- we've requested

11      at the evidentiary hearing, which we think will result in

12      the suppression of Mister -- of -- of the statement that

13      was taken from Mr. Jones, as well as items seized from his

14      car after his initial seizure on August 22nd, 2022.

15           As I stated in my motion, Your Honor the

16      question here is whether the initial seizure of Mr. Jones

17      through the establishment of a roadblock on Broad Street

18      without any individualized articulable suspicion concerned

19      -- concerning either him or his vehicle violate --

20      violated his constitutional right -- his constitutionally

21      protected right to be free from unreasonable searches and

22      seizure.

23           And in this case, Your Honor, we are arguing

24      that there is no indication at the time of the roadblock

25      that the police knew a vehicle was used to leave the scene

1    of the August 22nd robbery, much less the type of vehicle

2    or the identity of the driver.

3         Likewise, there is no indication how many

4    vehicles or people were stopped -- and people were stopped

5    at the roadblock, or whether the stop included pedestrians

6    who were in the vicinity of -- who were in the vicinity of

7    the roadblock.

8         In fact, after the roadblock is put in place,

9    officers at the roadblock are repeatedly given

10   information, which would nullify the need for a roadblock,

11   including information that the perpetrators were on foot.

12   That one of the perpetrators had escaped the area on a

13   SEPTA bus.

14        And that the tracker continued to show the

15   phones on the move even after the cars had been stopped at

16   the roadblock.  So in the absence of sufficient evidence

17   to justify the use and operation of the roadblock, Mr.

18   Jones respectfully submits that the seizure was

19   presumptively impermissible, and the fruits of the search

20   must be suppressed.

21        THE COURT:  Thank you, Ms. Cinquanto.  Mr.

22   Parisi?

23        MR. PARISI:  Yes, Your Honor.  Your Honor, we

24   have two witnesses for this issue.  Before I -- I call the

25   first one, we have an agreement with counsel that all the

1    government's exhibits for both the suppression motions are

2    admissible.

3         So I'm -- I'll just formally move the admission

4    of Government's One through Seven.  And for the record

5    Government's One is the defendant's January 25th statement

6    to homicide investigators.

7         Government's Two is a written summary of the

8    defendant's statement to homicide investigators on January

9    25th.

10        Government's Three is a video recording of the

11   interview the defendant gave to detectives after the

12   August 22nd robbery.

13        Government's Four is the complete collection of

14   nine one one calls and police radio broadcasts surrounding

15   the August 22nd robbery.

16        Government Five is the body camera footage from

17   Officer Cappellano of the Philadelphia Police Department

18   on August 22nd.

19        Government's Six is a body cam for August 22nd

20   of Officer Strange.  And Government's Seven is the body

21   cam for an Officer Swaitaj (phonetic spelling) also from

22   August 22nd, as I just said.

23        So just with that, I'm going to call our first

24   witness, if I may, Your Honor

25             THE COURT:  You may.  And all those exhibits

1    will be accepted into evidence as moved by you and without

2    objection from defense.  Thank you

3            MR. PARISI:  Your Honor.  First witness is

4    Corporal Debra Kiker.

5            COURT CLERK:  Please raise your right hand.  Do

6    swear or affirm that the testimony (unintelligible) the

7    Court should be the truth and nothing but the truth, so

8    help you God and do you so affirm?

9            MS. KIKER:  I do.

10           WITNESS; DEBRA KIKER; Sworn

11           COURT CLERK:  Please state and spell your name

12   for record.

13           THE WITNESS:  Deborah Kiker, K-I-K-E-R.

14           THE COURT:  Thank you very much.  Good morning.

15           THE WITNESS:  Good morning, Your Honor.

16           THE COURT:  Nice to see you.

17           MR. PARISI:  May I proceed, Your Honor?

18           THE COURT:  Yes.

19           DIRECT EXAMINATION

20           BY MR. PARISI:

21           Q.   Good morning.  Corporal Kiker, where is it

22   that you work?

23           A.   Police Radio.

24           Q.   For the Philadelphia Police Department?

25           A.   That's correct.

1           Q.   And how long have you been with the police
2    department?
3           A.   The police department, twenty-eight years.
4           Q.   And how long with the police radio
5    responsibilities?
6           A.   Seven.
7           Q.   Have you ever encountered, and I'm focusing
8    in on your time with police radio, a situation where a
9    robbery occurs in Philadelphia and a G.P.S. tracking
10   device is taken?
11          A.   Yes.
12          Q.   Can you tell the Judge just a little bit
13   about what information the police radio unit gets when a
14   G.P.S. tracker is taken?
15          A.   So we -- an alarm goes off, it sounds like,
16   no, oh!  The alarm goes off.  When the alarm goes off, the
17   map appears.  So when they log onto the tracking system
18   it's just a screen where you could actually look at
19   different devices.
20          When a tracker actually goes off, a map pops up
21   shows you where the device is and the direction the device
22   is going.
23          Q.   And Corporal Kiker when – (unintelligible)
24   understand that the G.P.S. trackers are monitored or
25   controlled by a private company?

1           A.    Yes.

2           Q.    Is 3SI Security one of those companies?

3           A.    Yes.

4           Q.    But the Philadelphia Police Department has

5     access to the -- the data, is that --

6           A.    Correct.

7           Q.     -- accurate?

8           A.    Yeah, we log onto the system and we monitor

9     it.

10          Q.    And when that happens and that the -- the

11    alarm goes off, do officers in the police radio unit have

12    responsibilities for broadcasting the device's location?

13          A.    They are civilians, they're not officers.

14          Q.    Okay.  Thank you.

15          A.    But yes, they do.  So we keep it on what we

16    call our J band, which is our citywide band because they

17    can dispatch to any band.  When the tracker goes off, they

18    verify that it is or was taken and they're not just moving

19    it, so we got to verify that first.

20          And they go over there and notify the officers

21    what directions it's going.  You can tell the speed it's

22    going.  So you can usually tell if it's in a car or

23    walking or sometimes, like if they're on a bicycle, like

24    it's a little confusing.  But you can usually tell whether

25    they're walking or in a car.

1          Q.   Is the location accuracy sufficient to give

2     intersections and directions of travel on streets?

3          A.   Yes.

4          Q.   Have you ever encountered a situation where

5     the G.P.S. device becomes stationary?

6          A.   Yeah.

7          Q.   When the G.P.S. devices are stationary, how

8     accurate is the location data?

9          A.   Well, that depends on the situation because

10    the map will tell you the radius of accuracy that -- that

11    the tracker is.  So you'll have a general idea of a radius

12    of where the tracker is.

13         Q.   Have you encountered situations where the

14    tracker is stationary, but on your map or that radius as

15    you just described it, it still appears to be moving?

16         A.   Yeah, it just kind of jumps all over, it's

17    -- it's -- because they bounce off of the cell phone

18    towers, so it's just the G.P.S. hitting towers.  So it

19    looks like it's kind of just jumping around in there.

20              MR. PARISI:  That's all I have, Your Honor.

21              THE COURT:  Thank you.  Cross-examination?

22              MS. CINQUANTO:  Yes, Your Honor.

23              CROSS EXAMINATION

24              BY MS. CINQUANTO:

25         Q.   How you doing?

1             A.    Hi.

2             Q.    Just a couple of questions.

3             A.    Uh-huh.

4             Q.    So you testified that you could tell if --

5    if someone is -- the tracker if somebody was walking or in

6    a car, is that right?

7             A.    Well, normally, because the speed of it,

8    it'll tell you how fast the tracker is going.  I mean, and

9    if it's going twenty-five, you're not walking.

10            Q.    Okay.

11            A.    But if you're in traffic, it could, you

12   know, be deceiving.

13            Q.    Right.  But -- but -- but -- but my point

14   is that -- is that if -- if -- if -- if the track -- if

15   the tracker was walking down the street, that is easily

16   discernible versus it being in a vehicle.  Is that right?

17   If a vehicle is traveling at a certain speed of fifteen,

18   twenty miles an hour?

19            A.    Yes.

20            Q.    Okay.  And regarding it being stationary

21   and bouncing all over the place, because let me just make

22   sure I got this clear.  You've got pretty much a -- a map

23   in front of you, is that right?

24            A.    Correct.

25            Q.    What does the little icon look like of the

1        -- of the -- the little track -- the thing you're

2        tracking?

3                  A.   It's just lines.  It's just lines on the

4        map.

5                  Q.   Okay.  Okay.  So when you have these lines

6        on the map though, like if it's a line, how do you know

7        where the -- the beginning of the line is and the end of

8        the line is?  Do you know what I'm saying?  I'm -- I'm

9        just confused.

10                 A.   Well, the beginning is at the store and it

11       just goes on the map.

12                 Q.   Fair enough.

13                 A.   It just keeps --

14                 Q.   Okay.  No, no, thank you.  I just --

15                 A.   Okay.

16                 Q.   I've never seen this before, so just bear

17       with me here.  So I guess my question to you then --

18                 THE COURT:  Well, may I ask the question?

19                 MS. CINQUANTO:  Uh-huh.

20                 THE COURT:  If it is not beginning at the store,

21       but is moving from another point, is there -- is the

22       object or the tracker an arrow, or is it a dot?  Like how

23       is it represented on the map?

24                 THE WITNESS:  It's represented as a continuous

25       line from start --

1           THE COURT:  Understood.

2           THE WITNESS:  -- to finish.

3           THE COURT:  Thank you.

4           THE WITNESS:  It continues --

5           THE COURT:  Okay.

6           THE WITNESS:  Okay.

7           BY MS. CINQUANTO:  (Cont'g.)

8           Q.  And when you say that when it's stationary,

9      sometimes this line will sort of go here and then go here

10     and when I -- when I'm saying that I'm actually moving for

11     the -- let the record reflect of moving a foot to the left

12     a foot to the right.

13           I mean, how far is this distance if it's

14     stationary, is it sort of bouncing around?  Does it bounce

15     around a few feet?  Does it bounce around a few hundred

16     feet?  Like can you describe that?

17           A.  Yeah, it's usually just in the area.  See,

18     when it goes off, it has a circle around it also.  And it

19     gives a radius of its -- you know, the tracker is in that

20     radius for each tracker.  And each time it's different.

21           Q.  All right.  Well, my -- my -- my question

22     to you is this, you testified that the tracker is bouncing

23     off of a cell tower, is that right?

24           A.  Well, yeah, it -- it's communicating

25     through the towers.

1           Q.   Okay.  Now when you're saying it's

2     communicating through the towers, is it just bouncing off

3     of one tower or is it being triangulated?

4           A.   I don't know.  I don't work for 3SI, I do

5     not know.

6           Q.   Okay.  Do you know -- but do you know that

7     bouncing off of one tower is -- is less precise than if a

8     -- if -- if a something is being -- is being triangulated

9     with three different cell towers?  I mean, are you aware

10    of that or --?

11          A.   I mean, I would -- I don't know.  I guess

12    it would be more accurate, but I don't know how they do

13    it.

14          Q.   Fair enough.

15          A.   I don't know their -- their --

16          Q.   So I'm -- I'm putting -- I'm putting you in

17    front.  Did -- were you the, were you the officer who was

18    in front of the screen kind of watching all this going

19    around?

20          A.   No, I was not.

21          MS. CINQUANTO:  Well then, Your Honor I

22    misunderstood.  I thought this was the officer who

23    actually was watching the movement of the tracker.

24          BY MS. CINQUANTO:  (Cont'g.)

25          Q.   So you're not testifying in concerns in --

1    in particular to this particular case, right?

2              A.    No, just how the tracker works.

3              Q.    All right.  Fair enough.  But when you say

4    -- I -- I just need to get down to this bouncing around

5    issue.  Is it fair to say that when a tracker is in the

6    city, right, where cell towers are very close together,

7    that it will tend to bounce off of one cell tower?

8              A.    I do not know that.  I do not work for the

9    company.  I do not know how the trackers are -- that they

10   hit one tower, multiple towers.  I do not know.

11             Q.    Do you have any idea when a -- when the

12   cell phone is or when the tracker is stationary, how far

13   it will bounce around the screen when it -- how -- I'm

14   trying to get an idea, does -- does -- does the -- does

15   this bouncing thing occur like, and it goes, it bounces a

16   block this way or a block that way?

17             A.    No, no, not that far.

18             Q.    How far does it bounce around?

19             A.    It -- it -- it's usually within the area

20   with -- I mean --

21             Q.    And how big is that area that you're

22   talking about?

23             A.    Maybe an intersection, maybe.

24             Q.    So -- and I'm not trying to -- to -- to --

25   I'm just -- I'm curious, I'm not trying to confuse you.

1          So this area, would it be, you know, a ten feet

2     diameter, a five feet diameter?

3          A.   The tracker would tell you the radius, if

4     -- if you were -- if you had it in front of you and you

5     were looking at it actively as it's going on, it puts a

6     circle and says it's in -- within this radius, it tells

7     you at that time.  So it varies for each, each incident --

8          Q.   Right.

9          A.    -- where it is.

10         Q.   So I -- so I guess my question is, is the

11    radius, so how big is that radius?  Is it a two-block

12    radius or one block radius?  A five-foot radius?  That --

13    that -- that's the question that I have that's -- that's

14    important.

15         MR. PARISI:  Objection, asked and answered.

16         THE COURT:  I will let her ask it.  I -- I know

17    where Ms. Cinquanto is trying to go.  And so I'll allow

18    this -- this attempt again to see if we can drill down how

19    large of a radius it is.  Can you identify the radius in

20    terms of feet?

21         THE WITNESS:  No.  No, because I didn't see the

22    tracker when it was going off.  I don't know what the

23    radius was at the -- at the time that it went off, but

24    that tells them.  So they know what the actual current

25    time, what the radius is.  And they can tell the officers

1       it's in this general area.

2                   MS. CINQUANTO:  Sure.

3                   BY MS. CINQUANTO:  (Cont'g.)

4                   Q.   I -- I -- I -- I get that.  Let me ask you

5       this question.  You had testified before that you had

6       experience with tracking these type of trackers?

7                   A.   Yes.

8                   Q.   So let's just talk about your personal

9       experience.  When you are tracking these trackers in other

10      instances, what was the radius distance in that situation?

11                  A.   It's -- it's normally right there in the

12      general area of where the tracker is.

13                  THE COURT:  If I may Ms. Cinquanto?

14                  MS. CINQUANTO:  Uh-huh.

15                  THE COURT:  So Corporal, are you able to

16      identify with this tracker or any other tracker that you,

17      in your experience, have had the opportunity to track or

18      -- or watch.  Are you able to identify how large the

19      radius is based upon what you are viewing on your screen?

20                  THE WITNESS:  The screen will tell you how large

21      the radius is.

22                  THE COURT:  Okay.

23                  THE WITNESS:  While you're actively tracking it,

24      it will tell you, because it puts a little circle and it

25      says it's within this radius, and --

1              THE COURT:  Okay.

2              THE WITNESS:  -- it depends on the tracker and

3      -- and what's going on, how big or small the radius is.

4              THE COURT:  And in this instance, you did not

5      see the --

6              THE WITNESS:  I did --

7              THE COURT:  -- tracker for this specific matter

8      involving this specific defendant, correct?

9              THE WITNESS:  I did not, correct.

10             THE COURT:  So you're not able to say what the

11     tracker in this case was emitting in terms of a radius

12     when the -- when the tracker was stationary?

13             THE WITNESS:  Correct.

14             THE COURT:  Am I correct?

15             THE WITNESS:  Correct.

16             THE COURT:  You may continue with your question.

17             MS. CINQUANTO:  All right.  One moment, Your

18     Honor.

19             BY MS. CINQUANTO:  (Cont'g.)

20        Q.   One or two more questions about that.

21             When you're looking at this radius, in your

22     experience, does it give you a numeric number?

23        A.   Yes.

24        Q.   Does it say -- okay --

25        A.   It's usually meters.  It's usually what it

1    goes meters.

2                   Q.    Okay.  Okay.  And in your experience, how

3    small was the radius that you've experienced with your --

4    with the trackers that you've had to track?

5                   A.    Usually within a block.

6                   Q.    Okay.  All right.

7                   MS. CINQUANTO:  That's all I have, Your Honor.

8    Thank you.

9                   THE COURT:  Thank you.  And my quick follow to

10   that that within a block is when the tracker is

11   stationary, correct?

12                  THE WITNESS:  Yes.

13                  THE COURT:  Okay.  That's the only follow up.  I

14   -- did my question prompt any question from you, Ms.

15   Cinquanto?

16                  MS. CINQUANTO:  No, Your Honor.

17                  THE COURT:  Okay.  Mr. Parisi?

18                  MR. PARISI:  No redirect.  Thank you, Your

19   Honor.

20                  THE COURT:  Okay.  Thank you, Corporal.

21                  THE WITNESS:  Thank you, Your Honor.

22                  THE COURT:  You may step down

23                  MR. PARISI:  The next witness, Your Honor, is

24   Officer Cein Strange.

25                  MR. STRANGE:  Thank you.  Morning, Your Honor.

1           THE COURT:  Good morning.  How are you?

2           MR. STRANGE:  Good, thank you ma'am.

3           THE COURT:  Thank you.

4           COURT CLERK:  Please raise your right hand.  You

5     do swear or affirm that the testimony you shall give the

6     Court will be the truth, the whole truth, and nothing but

7     the truth so help you God or you do -- you do so affirm?

8           MR. STRANGE:  I do.

9           WITNESS; CEIN STRANGE; Sworn

10           COURT CLERK:  Please state and spell your name

11     for the record.

12           THE WITNESS:  Police Officer Cein, C-E-I-N,

13     Strange, S-T-R-A-N-G-E, badge six nine two six, assigned

14     35th District.

15           THE COURT:  Thank you.  Officer, you may have a

16     seat.

17           THE WITNESS:  Thank you, Ma'am.

18           MR. PARISI:  Mr. Parisi?

19           MR. PARISI:  Thank you, Your Honor.

20           DIRECT EXAMINATION

21           BY MR. PARISI:

22           Q.  Officer Strange, how long have you been a

23     police officer in Philadelphia?

24           A.  Just over four and a half years.

25           Q.  And you just mentioned you were assigned to

1    the 35th.  Have you been in the 35th the whole time?

2                    A.    I have, yes, Sir.

3                    Q.    All right.  I'm going to focus your

4    attention to August 22nd of 2022.  Were you working in the

5    35th that day?

6                    A.    I was.

7                    Q.    And right around three p.m., did you

8    receive a radio call about a robbery at a cell phone

9    store?

10                   A.    I did.

11                   Q.    Were you alone that day or working with

12   another officer?

13                   A.    I was working with a partner police

14   officer, Joseph Cappellano, C-A-P-P-E-L-L-A-N-O, his badge

15   is two four five two.

16                   Q.    Do you recall whether you were driving or

17   -- or Officer Cappellano was driving?

18                   A.    I was driving.

19                   Q.    All right.  So shortly after three p.m.

20   when you received the radio call about a robbery was that

21   at a Metro P.C.S. store at 101 East Olney Avenue here in

22   Philadelphia?

23                   A.    It was.

24                   Q.    Besides the initial broadcast, did you

25   receive additional radio calls concerning that robbery?

1          A.    We were being relayed through J Band cell

2     phone tracker information.

3          Q.    And was that a cell phone tracker taken in

4     the robbery?

5          A.    Yes.

6          Q.    So is it -- was it a -- a police radio

7     employee or dispatch or broadcasting location of that,

8     that tracking device?

9          A.    Correct, they were updated in locations.

10         Q.    And were you listening to those locations

11    as you -- I assume proceeded to the area?

12         A.    I was.

13         Q.    Did they -- did you receive broadcasts

14    indicating particular road intersections where the tracker

15    was located at various times?

16         A.    (unintelligible) either road intersections

17    or -- or a hundred blocks it -- it could come in usually

18    in that kind of -- either -- either, it'll be at an

19    intersection or it'll be a -- a hundred block or between

20    streets, things like that.

21         Q.    Okay.  So as on August 22nd, as you're

22    receiving those broadcasts and you were proceeding into

23    the area, did you believe you were looking for a device

24    that was on foot with a person or in a vehicle?

25         A.    I believe it was in a vehicle based on the

1    speed at which the tracker was moving.

2            Q.    And are you familiar with the bus routes

3    and public transit routes in that area?

4            A.    Somewhat.

5            Q.    Just thinking about the tracking locations

6    that you were receiving, were you aware of any bus routes

7    on that -- that path?

8            A.    No.

9            Q.    So did that go into your thought process,

10   that there was a -- that you're looking for a car

11           A.    Correct, yes.

12           Q.    Ultimately, did you and Officer Cappellano

13   and other officers end up at the intersection of Broad

14   Street and Venango Avenue here in Philadelphia?

15           A.    We did.

16           Q.    And why'd you end up there

17           A.    Following the tracker.

18           Q.    Was that kind of the last location that was

19   broadcast?

20           A.    It was.  It was pinging to that block of

21   Broad Street.

22           Q.    When you initially arrived to that

23   intersection, did you block traffic at all?

24           A.    I did.

25           Q.    For approximately how long, if you recall?

1          A.    I don't remember the exact length of time.

2          Q.    Did you exit your vehicle at that location?

3          A.    I did.

4          Q.    And did you start looking for the tracker?

5          A.    I did.

6          Q.    While you were doing that, were you

7     receiving flash radio information or descriptions of the

8     people involved in the robbery?

9          A.    We were.

10         Q.    And was it more than one person?

11         A.    It was.  It was -- the flash was being

12    given for two males.

13         Q.    Ultimately, did you and other officers find

14    men who you believed fit that description in an S.U.V.

15    driven by the defendant, Chihean Jones?

16         A.    We did.

17         Q.    Before you identified them or pulled them

18    out of the vehicle, which we'll get to in a minute, did

19    you notice their demeanor?  Did you see them in the car?

20         A.    I did see them in the car, yes.

21         Q.    Was there anything unusual about the

22    demeanor of the defendant and the other two men in the

23    S.U.V.?

24         A.    They were all sat quite upright and staring

25    straight forward.  They weren't paying too much mind to

1 the fact that the police were there.  They were -- they

2 weren't looking directly over to us, (unintelligible) the

3 rest of the traffic.  Everybody in all the other vehicles

4 was trying to figure out what was going on.  They were all

5 pretty laser focused at looking forward.

6    Q.  So did that stand out to you when you got

7 to that intersection?

8    A.  It stood out to be -- as unusual.

9    Q.  And then focusing on the S.U.V. itself, was

10 there anything about the -- the S.U.V. that drew your

11 attention to it?

12    A.  Tinted windows, and then the Pennsylvania

13 temp tag on the rear of it.

14    Q.  Well, first about the tint, what was

15 unusual or what drew your attention with the tint?

16    A.  The tint is illegal in the city of

17 Philadelphia just did -- based off the traffic code --

18    Q.  Okay.

19    A.   -- the front windows were tinted.

20    Q.  And then what about the -- the temporary

21 tag?

22    A.  A temporary tag appeared to be a fake

23 Pennsylvania temporary -- temporary tag, which is very

24 common in the city.

25    Q.  Ultimately, did you remove two men from the

1    backseat and place them in handcuffs until a victim could

2    arrive and -- and try to identify them?

3            A.   I removed one male.

4            Q.   Okay.  Did another officer remove another

5    individual?

6            A.   Correct, yes.

7            Q.   On August 22nd, were you wearing a body

8    camera?

9            A.   I was.

10           Q.   And did you activate it at the point when

11   you removed that man that is in the backseat?

12           A.   I did.

13           Q.   Okay.

14           MR. PARISI:  This has already been admitted,

15   Your Honor.  May I publish Government's Six, Officer

16   Strange's body camera?

17           THE COURT:  You may.

18           BY MR. PARISI:  (Cont'g.)

19           Q.   Officer Strange, I'm going to just pause

20   that.  Can you see that on the screen there?

21           A.   I can.

22           Q.   And there's also -- there's a big screen in

23   front of you, but --

24           A.   Yeah, it's clear.

25           Q.   Is this your body camera footage from

1    August 22nd?

2              A.    I believe it is, yes

3              Q.    And is that the man there in this -- in the

4    seat, the man you pulled out of the car?

5              A.    Yes.

6              Q.    I want to focus first in the top right

7    hand.  Is there a time and date stamp on that?

8              A.    There is.

9              Q.    And it says 2022 August 22nd, and then

10   what's the time next to it?

11             A.    So it says nineteen twenty hours and

12   thirty-two seconds.  The Z is Zulu.  So it's what the

13   military would use.  Zulu time is essentially G.M.T., it's

14   time -- time zone in London and that's what they tag the

15   body cameras under.  So the time difference will be four

16   to six hours based on whatever time of year we're in.

17             Q.    And --

18             MS. CINQUANTO:  I'm sorry, what exhibit is this?

19             MR. PARISI:  This is Government's Six.

20             MS. CINQUANTO:  Six, thank you.

21             BY MR. PARISI:  (Cont'g.)

22             Q.    All right, so that time of year, nineteen

23   twenty hours, Zulu, what does that correspond to in -- in

24   some regular people time?

25             A.    It -- it should be two twenty p.m.  It

1           should be a five-hour time difference.

2                   Q.   If the radio call was at three o'clock,

3           could it have been three twenty?

4                   A.   Yeah, it could have been.  Yeah.  Yeah, it

5           depended on --

6                   Q.   Okay.

7                   A.   Again, it depends on their time zone

8           changes at different times to ours, so.

9                   Q.   All right.  Have you also reviewed --

10          before I hit play on -- on these body cams -- body cams

11          from Officers Cappellano, your partner and another officer

12          named Swaitaj who were also at the scene?

13                  A.   I have.

14                  Q.   And did they all fairly and accurately

15          capture everything?

16                  A.   They did.

17                  Q.   Okay.  All right.  So at approximately

18          three twenty p.m. is that when you had already identified

19          the Keon Vincent, the man on the screen and -- and began

20          the process of taking him out of the car?

21                  A.   Yes.

22                  Q.   I'm actually going to jump over to -- am I

23          correct that your body cam didn't turn on until this

24          point?

25                  A.   That's correct.

1          Q.   Okay.  So you didn't have the response

2     time, so to speak?

3          A.   No.

4          Q.   Okay.  Did Officer Cappellano's body cam

5     capture the response?

6          A.   It did.  He had the -- the woman at

7     (unintelligible) prior to turning his on.

8          MR. PARISI:  All right, Your Honor, this is

9     Government's Five that was already admitted.

10          BY MR. PARISI:  (Cont'g.)

11          Q.   Officer Strange, just looking at that, is

12     this Officer Cappellano's body cam from August 22nd?

13          A.   It appears to be, yes.

14          Q.   And then the timestamp on this, what time

15     is that?

16          A.   Nineteen seventeen Zulu, so three seventeen

17     p.m.

18          Q.   Okay.  So approximately three minutes

19     before you removed Keon Vincent from the car?

20          A.   Correct.

21          Q.   All right.

22          MR. PARISI:  I'm just going to hit play if I

23     may, Your Honor?

24          THE COURT:  You may.

25          BY MR. PARISI:  (Cont'g.)

1          Q.   And Officer Strange as this is playing, is

2     this while you and Officer Cappellano were still going to

3     Broad and Venango?

4          A.   That's correct.  There's no audio because

5     it's a buffer, he hasn't actually activated his camera

6     yet.  It's just on a standby mode.

7          Q.   So once he activates it, it goes back about

8     a minute and takes the, the video data from that?

9          A.   That's correct.

10         Q.   Okay.

11         MS. CINQUANTO:  One moment, Your Honor.

12         MR. PARISI:  Do you even pause it?

13         THE COURT:  You could pause.

14         BY MR. PARISI:  (Cont'g.)

15         Q.   At this point, nineteen seventeen or just

16    over to nineteen eighteen, have -- have you driven into

17    oncoming traffic a little bit there?

18         A.   Yes.

19         Q.   And now you've pulled over at -- let me

20    pause it right there where the audio kicks in.  And it

21    looks like Officer Cappellano gets out of the car.  Is

22    that -- am I reading correctly, nineteen eighteen?

23         A.   That's correct.

24         Q.   All right.  And is this the intersection

25    Broad and Venango?

1           A.    It is.

2           Q.    All right.  I'm just going to hit play here

3      then.

4                (Video plays)

5           Q.    Just pause for a second there at nineteen

6      eighteen and forty seconds, have you now moved your --

7      your patrol car out of the way of traffic?

8           A.    I believe I've moved it out of at least one

9      of the lanes.

10          Q.    Okay.  I'll hit play again.

11               (Video Plays)

12          Q.    All right, I'm going to pause it there.

13     Timestamp, am I correct it's nineteen twenty and nine

14     seconds?

15          A.    Correct.

16          Q.    And at this point, are you now at the --

17     the back door of that S.U.V.?

18          A.    I am.  That's me just off the right side of

19     that brake light there.

20          Q.    And -- and there's another officer with you

21     and -- and moments later, is that when you identify Keon

22     Vincent, begin to pull him out of the car?

23          A.    Yes.

24          Q.    And just so we're abundantly clear, that's

25     the S.U.V. we're talking about, right?

1            A.   That's correct.

2            Q.   Okay.  I'm just going to play up to that

3    point and then we'll -- we'll stop.

4            (Video Plays)

5            Q.   All right.  And now we're at nineteen

6    twenty and forty-four seconds.  At this point, have both

7    you and -- and Officer Cappellano begun to remove both

8    backseat passengers?

9            A.   That's correct, we have, yeah.

10           Q.   Ultimately, do you know if -- if stolen

11   cell phones were taken out of the back of this car?

12           A.   I'm not a hundred percent sure.

13           Q.   You don't know?  Okay.

14           A.   No.

15           MR. PARISI:  Your Honor, those are all the

16   questions I have for Officer Strange.  And I'll refer to

17   some of the radio call evidence later in my argument, but

18   that's all I have for him.

19           THE COURT:  Thank you, Counsel.  Ms. Cinquanto?

20           MS. CINQUANTO:  Okay.  Yes.

21           CROSS EXAMINATION

22           BY MS. CINQUANTO:

23           Q.   Good morning, Officer Strange.

24           A.   Good morning.  Good morning, Ma'am.

25           Q.   Good morning.  So is it fair to say that

1    you were involved in this -- pursuing the robbers from the

2    cell phone store from the beginning of -- when the first

3    nine one one call came in?

4              A.    Yes.

5              Q.    Okay.  And I just want to -- I -- I know

6    you're not going to remember maybe everything that

7    occurred with the information that you were receiving

8    through the dispatcher, but was it fair to say that the

9    information that you received at first was that there was

10   two black men who had robbed the store?

11             A.    That's correct.

12             Q.    Okay.  And then they also gave a

13   description of both of those men, is that right?

14             A.    That's correct.

15             Q.    And that included one male was described as

16   dark skinned, five four, gray hoodie, blue ripped pants,

17   and a black mask is -- does that sound familiar?

18             A.    Yes, Ma'am.

19             Q.    Okay.  And the other second male was

20   described as being taller, wearing a black shirt with

21   cartoon characters on it, ripped black pants, a black mask

22   and a hat.  Is that right?

23             A.    Yes, Ma'am.

24             Q.    Okay.  And you had testified earlier that

25   there had -- was tint on the windows of the car.  So when

1    you walked up to this car, you weren't able to determine

2    whether or not these -- this description of the men inside

3    the car matched the description you had been given, right?

4              A.   Right.  We had to walk much closer to be

5    able to view inside of the vehicle, correct.

6              Q.   Okay.  Well, there was tint, so you

7    couldn't tell, you know, the colors of things or you know,

8    how tall somebody was or anything, right?  I mean, you --

9    you kind of can't have both, right?  I mean, either

10   there's tint on the windows and you can't see --

11             A.   Right.

12             Q.    -- which is why it's illegal or you can

13   see any, you can see the description of the folks, right?

14             A.   Right.

15             Q.   Okay.  And in this case, you testified that

16   there was tint on the windows?

17             A.   Yes.

18             Q.   Which is one of the reasons why you pulled

19   them over, right?

20             A.   Correct.

21             Q.   Okay.  Or one of the reasons why you are

22   justifying stopping them.  So you couldn't see inside the

23   vehicle to see if this -- these descriptions matched what

24   was provided over dispatch, right?

25             A.   Right.  Until we got much closer to the

1    vehicle and once we -- once we were right up close to the

2    vehicle, we were then able to see --

3              Q.   Well --

4              A.    -- through the windows.

5              Q.   Well -- well in fact, I mean, isn't it fair

6    to say it wasn't until you could open the door that you

7    could see that the descriptions may have matched?

8              A.   For the lower half, correct.

9              Q.   For the what?

10             A.   For their -- for their lower half of their

11   bodies, yes.

12             Q.   Okay.  Now, so the -- the first nine one

13   one call comes in roughly three o'clock.  And -- or I'm

14   sorry, dispatch provides information about the

15   description.

16             A.   Uh-huh.

17             Q.   And then shortly thereafter they -- you

18   were provided information that they fled on foot, is that

19   correct?

20             A.   I believe so, yes.

21             Q.   Okay.  There was never at any time a

22   description given of any vehicle, is that right?

23             A.   There was not, no.

24             Q.   And then you were also informed that there

25   was tracking devices on the stolen cell phone, so you --

1    you knew that they were -- dispatch was able to sort of

2    give you an approximate location?

3              A.   Yes, Ma'am.

4              Q.   All right.  Okay.  And then you were

5    repeatedly told that the robbers fled on foot?

6              A.   Yes.

7              Q.   Is that right?

8              A.   That's correct.

9              Q.   Okay.  And there was never a description

10   given of the vehicle, is that --

11             A.   There was not

12             Q.   -- right?  Okay.  All right.  And at some

13   point, you were notified that the phones were being

14   tracked and they were moving southbound on Broad Street,

15   is that right?

16             A.   That's right.

17             Q.   And again, there was no flash information

18   of a vehicle, is that right?

19             A.   There was not.

20             Q.   And in fact, on that clip that we just saw

21   three times I noted that dispatch is telling you they're

22   walking south on Broad Street, they're walking south on

23   Broad Street, they're walking south on Broad Street, is

24   that right?

25             A.   Yeah, I don't -- I don't know if that was a

1    dispatcher or a police officer.  It -- it was coming over

2    the radio though, yes.

3              Q.    Okay.  Well, the -- the person who's

4    providing that information, we can -- I -- I don't want to

5    assume, but it seems obvious that the person providing

6    that information is -- is -- is telling you that the

7    trackers are walking south on Broad Street.  Is that

8    right?

9              A.    That's right.  That's what -- yeah.

10             Q.    Okay.  And while you're getting that

11   information, because you -- you pulled the car over -- I

12   have nineteen seventeen -- you pulled the car over, right?

13   In that clip that we just saw?

14             A.    Right.

15             Q.    Okay.  And while the cars are stationary

16   three times we hear cars are not moving, they're walking

17   south on Broad Street, they're walking south on Broad

18   Street and they're walking south on Broad Street, correct?

19             A.    Correct.

20             Q.    Okay.  But they were not walking or driving

21   on Broad Street, they were stationary, correct?

22             A.    Correct.

23             Q.    Okay.  But despite that, you decide that

24   you were going to check the cars out that were -- that had

25   been stopped at Broad and Venango.  Is that right?

1           A.    That's right.

2           Q.    Now, at some point during this time period,

3      you were also notified that the -- that dispatch notified

4      you that they could be traveling on the subway.  Is that

5      right?

6           A.    Yeah, I heard that on the -- the video.  I

7      don't -- I don't recall it, but yeah, I heard that on the

8      video just now.

9           Q.    Okay.  So we have -- the cell phones are --

10     either are walking south on Broad Street, or in fact they

11     could be traveling on a subway.  Is that right?

12          A.    Correct.

13          Q.    Okay.  But despite that, you still decided

14     to look in all the vehicles that were stationary on Broad

15     and Venango?

16          A.    Correct.

17          Q.    Okay.  Okay.  One moment.  Now, despite

18     being told repeatedly that -- that the -- that the cell

19     phones -- that the -- that the cell phones or the

20     perpetrators were walking south on Broad Street, you

21     believed that it was actually in a vehicle, you were

22     looking for a vehicle, I think you testified to that.  Is

23     that correct?

24          A.    Correct, yes, Ma'am.

25          Q.    Okay.  And what basis did you have for

1    believing it was a vehicle, despite the fact that all

2    information you were getting was that the -- the

3    perpetrators were on foot?

4              A.    To go from 101 East Olney to Broad and

5    Venango in seventeen minutes on foot, it just isn't a

6    possibility.

7              Q.    How far is that?

8              A.    Miles wise, I'm not sure.  It -- it's -- it

9    is a good distance.

10             Q.    Now, you also received information at some

11   point that one of the suspects may have actually gotten

12   into a SEPTA bus.  Is that right?

13             A.    Can you say the question again?

14             Q.    Did -- at one point, did you get

15   information that one of the suspects could have gotten

16   onto a SEPTA bus?

17             A.    I don't recall it.  If -- if it's on the

18   notes for the radio, then -- then I would have, but yeah,

19   I don't recall specifically.

20             Q.    Okay.  Now -- so at the time you create,

21   there's this -- there's this roadblock, for lack of a

22   better term, you -- you did stop these vehicles.

23             A.    Correct.

24             Q.    Is it fair to say it was a roadblock?

25             A.    I blocked the road --

1          Q.    Blocked.  Okay, good.

2          A.     -- with my vehicle.

3          Q.    The information that you had was that there

4     was two males on foot and there was a description of both

5     of the men?

6          A.    Yes.

7          Q.    Is that right?  Okay.

8          A.    Yes.

9          Q.    And when you -- when you start looking into

10    these vehicles one of the things that you said was that

11    this -- the first thing, did you notice if this vehicle

12    that -- that that ended up -- that my client was driving,

13    that it had a tint on it.  Is that right?

14         A.    Yes.

15         Q.    Okay.  And that you said there was a

16    temporary fake tag, is that right?

17         A.    Correct.

18         Q.    Okay.  Now that's -- that's not what you

19    were looking for.  I mean, that's not why you -- you

20    weren't doing an investigation for tinted windows or a

21    fake tag, correct?

22         A.    Correct.  We were looking for males from a

23    robbery.

24         Q.    Correct.  Okay.  And you're looking for the

25    males from the robbery and you come upon this car that's

 1     got tinted windows in which you cannot see inside because

 2     they're tinted, right?

 3              A.   Correct.  Until we get up close to the

 4     vehicle.  And then you were able to see inside of the

 5     vehicles.  So at a -- at a --

 6              Q.   Well, you -- well, I think your testimony

 7     was that you were able to see -- I guess you were able to

 8     see the figures inside the wind -- inside the car, but it

 9     wasn't until you opened the door that you could confirm

10     that the -- that the descriptions matched.

11              A.   Correct.  So you can -- walking up to the

12     vehicle, you can see the people are in it.  You can't see

13     great detail, but when you're closer to the vehicle, even

14     from outside with windows up, you can still see through

15     the tint.

16              So like, even in the screenshot of the video

17     right there that's paused, you can see that the

18     (unintelligible) wearing a blue shirt through that tint.

19     But if you're further back from the vehicle, it's hard to

20     make out faces in the vehicle, clothing in the vehicle.

21              Once you're much closer, it's able -- you're

22     able to see inside of the vehicle.

23              Q.   And in this vehicle, there was three people

24     and not two people, correct?

25              A.   There was.

1          Q.   All right.  And your -- one of the things I

2     think that you testified to that drew your attention to

3     them was that they had this laser focus and they were

4     looking straight ahead.  Is that right?

5          A.   Correct.

6          Q.   Okay.  And but there wasn't any other

7     further movements, is that right?

8          A.   Not that I can recall.

9          Q.   All right.  They weren't, you know, acting

10     scared in any way, right?

11          A.   As far as --

12          Q.   Well, I mean, the -- the only thing that

13     you testified that you noticed that these folks were doing

14     was staring straight ahead?

15          A.   Right.

16          Q.   Okay.  All right.  But there was nothing

17     else to indicate that these folks had just been involved

18     in a robbery?

19          A.   No.

20          Q.   Okay.  Now, I believe that you -- the --

21     the -- the vehicle was pulled over -- one moment.  Now,

22     the vehicles were pulled over at approximately, I think we

23     were using different times here, but I'm going to say

24     nineteen seventeen.  Is that right?

25          A.   Correct.

1          Q.   Okay.  And when the vehicles were pulled

2     over during the entire time, those -- those -- I'm sorry,

3     the -- the roadblock is in place, right?  You're getting

4     information from dispatch, you're being provided with

5     continuous updates, is that right?

6          A.   Yes.

7          Q.   All right.  And during that time period

8     where these vehicles were stopped, you were being -- as we

9     talked about before you were being told that the vehicle,

10    that -- that the -- that the tracker was still -- or the

11    perpetrators were still walking south.  Is that right?

12         A.   I believe so.

13         Q.   Okay.  You were being told that the

14    perpetrators may have gone into a subway stop underneath

15    the area, which would explain the movement.  Is that

16    right?

17         A.   Potentially.  So yeah, it -- they said over

18    the radio.  I -- again, I'm not sure who it was that came

19    over --

20         Q.   Okay.

21         A.    -- and said about the subway

22         Q.   And these vehicles were stopped.  And

23    Mister -- how long -- how long was the -- was the -- was

24    the roadblock in place for before Mister -- that these

25    three were taken into custody?

1          A.   I'm not sure whenever the -- I guess we got

2     him out of the car here --

3          Q.   Okay.

4          A.    -- at seventeen twenty, and then within a

5     couple minutes after that, I would imagine the -- the road

6     was opened back up.  I don't recall specifically.

7          Q.   Well, would -- would -- actually twenty

8     thirteen minutes sound --

9          A.   Possibly

10         Q.    -- accurate?  Okay.  And finally, just to

11    be clear, you were being notified the entire time that

12    these -- these cars were stationary in front of you, that

13    this tracker was on the move, right?

14         A.   It was within that area, yeah.  I -- again,

15    I don't --

16         Q.   But it was -- I'm sorry, I didn't mean to

17    interrupt you.  Go ahead.

18         A.   Again, I don't remember specifically who

19    was saying that it was -- it was people walking south or

20    on the move.

21         Q.   Okay.

22         A.   But yeah, it was on the radio transmissions

23    from listening to this, yes.

24         Q.   Okay.  So you have a -- you have a -- you

25    have a group of cars that are stopped.  They're clearly

1          not moving, and you're getting information from dispatch

2          that the -- that this tracker is on the move, right?

3                    A.    Right.

4                    Q.    Okay.  One moment

5                    MS. CINQUANTO:  Your Honor, that's all I have.

6          Thank you.

7                    THE COURT:  Thank you, Ms. Cinquanto.

8                    MS. CINQUANTO:  Thank you, Officer.

9                    THE WITNESS:  Thank you, Ma'am.

10                    THE COURT:  Mr. Parisi, anything future?

11                    MR. PARISI:  Just a brief redirect.

12                    THE COURT:  Yes.

13                    REDIRECT EXAMINATION

14                    BY MR. PARISI:

15                    Q.    Officer Strange, radio calls speak for

16          themselves about walking South on Broad Street, but

17          nevertheless, when you arrived to the intersection of

18          Broad and Venango, did you see anyone fitting the

19          description, the flash from the robbery walking south on

20          Broad Street?

21                    A.    No.

22                    Q.    And comparing the demeanor and the body

23          language of the defendant and the other two men in this

24          S.U.V. to the other people that were in cars at the

25          intersection, did they stand out to you?

1           A.   Yes.   Everyone else was wondering what was

2     going on.

3           MR. PARISI:  That's all I have, Your Honor.

4           THE COURT:  Thank you.  Thanks, Officer Strange.

5           THE WITNESS:  Thank you, Ma'am.

6           THE COURT:  You may step down.

7           THE WITNESS:  Thank you, Ma'am.

8           MR. PARISI:  Your Honor on the issue of the car

9     stop, I have no additional evidence aside from the things

10    I've already moved in.  I'll reference them in my

11    argument.

12          THE COURT:  Okay.  Thank you very much.

13          MS. CINQUANTO:  And --

14          THE COURT:  Ms. Cinquanto?

15          MS. CINQUANTO:  Well, Your Honor, as -- as we

16    discussed earlier, I would prefer that -- well, I would

17    respectfully request -- strongly request, as the

18    government said, that we do not hold argument today, that

19    we be given the opportunity for supplemental briefing and

20    Your Honor can decide on the briefs or if Your Honor

21    chooses at that point, we could come back for argument.

22          But at this point, based upon the information

23    that I've heard today, especially about the tracker as I

24    am not prepared to make argument, and I would prefer if we

25    could do supplemental briefing and argument if necessary.

1          THE COURT:  Thank you, Ms. Cinquanto.  Mr.

2    Parisi, your position?

3          MR. PARISI:  Just on that.  Whatever we want to

4    label it, I have -- I -- I'm not going to sit here and

5    play a half hours' worth of police radio broadcast.  I'm

6    not going to play a half hour body cam.  The -- the Court

7    has that in evidence.

8          What I would like to do is make some argument if

9    counsel wants to reserve hers, you know, whatever the

10   Court wants to let her do.  But I also want to give, Your

11   Honor, some timestamps and specific radio broadcasts.  And

12   I -- I've pretty much had with the body cam, the same

13   thing.

14         So I'm -- I -- I'd like an opportunity today to

15   give you a few minutes of my thoughts on these two

16   motions.

17         THE COURT:  Ms. Cinquanto, I'm --

18         MS. CINQUANTO:  No, I -- I -- I get that, Your

19   Honor.  But you know, let's -- let's talk about judicial

20   economy.  First of all, we're dealing with -- we -- I was

21   -- I was referring to as in my motion to times that the

22   government and this officer was -- is -- is referring to a

23   different set of times.

24         So I've got to go back and sort of marry all

25   that information up.  Having argument today, I -- that's

 1    fine.  I'll reserve argument and I will file a brief, and

 2    then I will request that I get an opportunity for oral

 3    argument.  That's the way it's going to have to go.  I --

 4    I would prefer that we just rest out here.

 5         We get the transcripts, we file supplemental

 6    briefing, Your Honor, can decide on the papers or Your

 7    Honor, can ask us to come back for -- for oral argument.

 8    But we're going to end up coming back here again.

 9         If -- if the government gets to argue now, I'm

10    going to need to respond orally.  And that may or may not

11    be necessary once we file more papers that that's --

12    that's -- that's my position.  But I will --

13         THE COURT:  I'm --

14         MS. CINQUANTO:  -- allow them to say whatever,

15    you know

16         THE COURT:  I understand your preference, and I

17    believe that there is a way to accommodate what is being

18    argued by both of you and presented as your respective

19    positions.  So I will allow argument today, and I will

20    take it from the government, as well as, from defense

21    counsel.

22         You, Ms. Cinquanto, if you choose to, you may

23    reserve it if you so choose, there may be something today

24    that you want to speak on that is obviously at the top of

25    your mind, and -- and you want to go ahead and -- and make

1     that immediate response as to what the government states.

2            However, that will not close argument.  I will

3     then allow for what you have requested, Ms. Cinquanto,

4     which is that the transcript be made available that you

5     are allowed to provide, as well as the government is to

6     allow to provide supplemental briefing.  And that I will

7     allow -- and we will set a date for supplemental or

8     argument to be heard following today's date.

9            So the argument will not be closed, it will

10    remain open.  I will allow argument today to be continued

11    and concluded at the date that I will provide.  And in the

12    interim, I will also allow for supplemental briefing to be

13    provided to the Court.  Okay?

14            MS. CINQUANTO:  Thank you, Your Honor.

15            THE COURT:  You're welcome.  Yes, with that, I

16    -- well, I can take argument as to this now and -- and we

17    can address this specific motion, and then we can move

18    into the -- the remaining motion to suppress thereafter.

19            MR. PARISI:  Yes, Your Honor.  Your Honor, the

20    real issue here -- and actually before I get to the issue,

21    I'm going to ask the Court for this motion to suppress and

22    the -- the witnesses for the next to make a -- an explicit

23    credibility finding.

24            And -- and I'd submit that the witnesses have

25    testified credibly and will continue to do so, but I'd ask

1   the Court to make that part of your ruling.  But the issue

2   for this car stop is did the police have a reasonable

3   suspicion, a reasonable and articulable suspicion that

4   criminal activity was afoot, and was there a basis to

5   believe that this car was involved in this robbery?

6           What the Third Circuit and Supreme Court tell us

7   is it's a totality evaluation.  And in a case like this

8   where there is a broadcast, there's flash description,

9   there's location, we incorporate all of that information

10  known to the police department collectively in, in

11  examining the totality.

12          There's no strict time limits on a stop like

13  this, and it's whether or not the police were diligently

14  pursuing their suspicions.  So you know, I know Ms.

15  Cinquanto will -- will have an opportunity to respond

16  today and -- and in the future, but in her written motion,

17  she mischaracterizes some of the times and the information

18  that's provided by police radio.

19          As I said, I'm not going to play it all today.

20  I'm not going to play any of it today actually, but I

21  would like to give the Court some timestamps now within

22  Government's Four, which is the entirety of the radio and

23  nine one one calls, and I'll just bring up the file on the

24  screen.

25          Just so everyone knows, the way the files are

1    labeled begins with the time of the beginning of that

2    particular call or broadcast. So what we have is at three

3    zero two p.m. a file that's labeled O.P.S. zero seven,

4    that's 3SI, the G.P.S. tracking Company reporting, they

5    have an activated tracker.

6        And what they tell the police is that it's

7    moving down the road southeast on Adams Avenue. Three

8    zero three is the first nine one one call from the store.

9    And then at three zero nine we have G.P.S. tracking south

10    on Roosevelt Boulevard passing, Rising Sun. And there is

11    a literal and explicit mention of a vehicle.

12        At three twelve, there's another broadcast south

13    on the Boulevard at Wyoming towards North Broad Street,

14    and then onto Broad from Hunting Park and South on Broad

15    near (unintelligible). And again, a vehicle is mentioned.

16        Three fourteen, there's Bristol and the

17    Boulevard and Hunting Park in Carlisle Broadcast. Three

18    fifteen, Hunting Park in Carlisle is again broadcast, and

19    then now South at Broad at Jerome. And again, at three

20    fifteen there's a mention of a vehicle.

21        Three sixteen, another mention of a vehicle over

22    police radio Broad and Butler. Three seventeen, there's

23    an extensive broadcast, and this is where there's --

24    there's competing broadcasts. Someone says someone may

25    have gotten on a bus at a bus stop.

1        But then immediately thereafter, the G.P.S.

2    tracking is broadcast out again as south on Broad coming

3    up to Venango, followed by stationary, by the Zion Baptist

4    Church, which is right at that intersection.

5        And then we hear some broadcasts that they may

6    be on foot between Venango and Lennox, which is just north

7    of Venango, as well as south on Broad and crossing Broad.

8    Three seventeen and forty-three seconds, there's another

9    mention of vehicles and then a police officer broadcast.

10   We have multiple vehicles at Broad and Venango.

11        And then flipping over to the body cam we just

12   played at three eighteen, that's when Officers Strange and

13   Cappellano arrive at that intersection.  At three nineteen

14   zero seven, there's another broadcast where an officer

15   says, we're looking for a vehicle, we have traffic

16   stopped.

17        At three nineteen and thirty-five seconds,

18   there's another broadcast, there's still stationary north

19   of Venango on Broad.  We've got a male stop that matches

20   the flash.  And the body cam shows us that by three twenty

21   they're pulling Keon Vincent and Keante Curtis (phonetic

22   spelling) out.

23        So in the span of seventeen minutes, they --

24   they have a G.P.S. tracker stolen in a robbery that goes

25   approximately four miles by my calculations.  They know

1    it's a vehicle.  It's repeatedly broadcast as a vehicle.

2    They get to this intersection.  And I know counsel very

3    much wants this to be a -- a roadblock.

4            Even if it is, they don't win, but it's not a

5    roadblock, it's a thirty second stoppage of traffic by the

6    police car as we saw on the, on the body cam.  And within

7    two minutes, they have identified the defendant and his

8    co-conspirators as the people involved in this robbery.

9            And you heard, there were problems with the car

10    and these guys were acting completely differently from

11    everybody else, which as the Court can imagine, there were

12    a lot of people rubbernecking ten police cars in that

13    intersection, except for the defendant and his co-

14    conspirators

15            That's what I call reasonable suspicion to stop

16    that car.  And it all happened within two minutes of their

17    arrival.  Even if it's a roadblock, it's -- we still a win

18    because under the analysis in Brown v. Texas, which I

19    cited in my response, we look at the gravity of the public

20    concerns served by the seizure, the degree to which a

21    seizure advances the public interests and the severity of

22    the interference with public liberty.

23            What we're talking about here is a two-minute

24    delay in traffic at most from when they arrive at the

25    intersection until they have identified the car and

1  they're pulling them out.  It's broadcast as a gunpoint

2  robbery, which is a severe violent crime.

3          And that brief delay of traffic for two minutes

4  while there's a red light for about half of it, is a

5  reasonable police action to investigate their suspicions.

6  So whether it's a reasonable suspicion standard or the --

7  the analysis as if this is a roadblock, which I'd submit

8  to the Court, it's not, that's more of a D.U.I. checkpoint

9  type situation.

10          But either way, the police knew they were

11  looking for a car, they knew who they were looking for,

12  and they found it quickly.  There was no constitutional

13  violation here.  I -- I don't know that I'll need

14  supplemental briefing on that, but if -- if necessary, I

15  will do so, Your Honor

16          THE COURT:  I have one question for you.

17          MR. PARISI:  Yes, Your Honor.

18          THE COURT:  Do you happen to know or have any

19  information as to how long that light cycles at that

20  intersection?

21          MR. PARISI:  I don't, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          MR. PARISI:  It -- it may be something that's

24  visible in the body cam, but that's not something I

25  checked.

1                    THE COURT:  That's fine.  Thank you

2                    MS. CINQUANTO:  Your Honor, I -- I will submit

3        briefing and I will ask for argument if Your Honor

4        requires it, but I think this is -- this is important.

5        The government says, well, there was a mention of a

6        vehicle, a mention of a vehicle.

7                    Let's be very clear, when I -- in my motion with

8        -- to Your Honor I actually set forth exactly what

9        (unintelligible) mention of the vehicle is.  Fifteen -- at

10       fifteen fifteen, dispatch informed responding units that

11       the phones were tracked, moving southbound on Broad Street

12       near Jerome Street.

13                   Dispatch confirmed again, there was no

14       description of a vehicle.  At fifteen sixteen, dispatch

15       confirmed again, there was no flash information for a

16       vehicle, and the phones were continued to be tracked down

17       Broad Street.

18                   Fifteen seventeen dispatch was informed that

19       video surveillance showed a black male matching the

20       description of the perpetrators had left the area on a

21       SEPTA bus.  Meanwhile on the same radio call, another

22       responding unit, which I believe would be this officer

23       here, was at Broad and Venango and said, hey, you know,

24       we're going to check these cars out.

25                   Still, other responding units informed dispatch,

1    the perpetrators were traveling on foot.  Officers are

2    speculating at this time on this radio call that the

3    perpetrators were traveling on a subway.  Fifteen

4    seventeen, responding units informed dispatch that they

5    had wall to wall vehicles at Broad and Venango.

6         At fifteen nineteen, so that's when they do the

7    road stop -- they do the roadblock.  A roadblock is a

8    roadblock.  The man that the -- the cruiser was in front

9    of the cars that were trying to move, that is a roadblock.

10   At fifteen -- so that's fifteen seventeen.

11        At fifteen nineteen, again they're -- they're

12   informed that the perpetrators were walking southbound.

13   They talk about blocking the -- the -- the Broad and

14   Venango, they're looking in cars.  And then we don't have

15   until fifteen thirty.

16        Fifteen thirty is when officers informed

17   dispatch they had stopped a vehicle at North Broad and

18   West Venango Street and that a male was apprehended for

19   identification.

20        So when the government says that there's a

21   mention of a vehicle, the mention of the vehicle is there

22   is no vehicle or there is no description of the vehicle.

23   And I -- it's -- it's, it's very tedious, but I would

24   encourage the Court and that maybe I will -- what I will

25   do in my supplemental briefing is sort of excise some of

1  these calls.

2            But if you listen to it, it's not like the

3  government is sort of inferring that, oh, there's --

4  there's, you know, there's talk of a vehicle.  The only

5  talk of a vehicle is there is no vehicle.  That's the

6  point.

7            So I'm going -- so what I -- what I will do,

8  Your Honor, is I will flesh this out more.  I will give

9  you complete quotes from each of these calls, but the --

10 there is no information of a vehicle and for the

11 government to sort of say that they mentioned a vehicle,

12 it's really a bit disingenuous because again, they're --

13 they're just saying that there is a mention of the vehicle

14 to say that there wasn't a vehicle.  Thank you.

15            THE COURT:  Thank you.

16            MR. PARISI:  Just to respond to that point, Your

17 Honor.

18            THE COURT:  Yes.

19            MR. PARISI:  That's not accurate.  The calls

20 speak for themselves.  The broadcasts speak for

21 themselves.  And what you'll hear when you listen to these

22 is officers repeatedly asking, do we have a flash on the

23 vehicle, a description of the vehicle.

24            And what is told the there is no vehicle, what

25 that is, is the victims in the store didn't see a vehicle.

1   What the victims reported is they left on foot, we don't

2   know if they got in a vehicle.  All of the broadcasts,

3   it's very clear they're looking for a car.

4          The speed, the locations, it's -- it's obvious.

5   And they are talking about a vehicle.  The there is no

6   vehicle purely refers to did the victim see a vehicle and

7   they did not.  So that's who says there's no vehicle.

8          We don't know.  That's the only thing I want to

9   say to that.  Otherwise, I -- I'll rest on my submissions.

10         THE COURT:  Thank you, Counsel.

11         And as I stated a moment ago, I will allow for

12  supplemental argument to be made as well as briefing to be

13  received on this once the transcript is available and --

14  and based on defense's request and also based on the

15  government's response and desire to argue the motion

16  today.

17         And so in turn, the government will also have

18  the opportunity to further supplement the argument at that

19  time, as well as, provide supplemental briefing and

20  response to the defense's submission.  And we will provide

21  a date for that at the conclusion of the proceedings.

22         What I will do is we've been moving forward with

23  the motions.  We are at twelve twenty-one.  I would

24  suggest to take a brief recess for about ten to fifteen

25  minutes and come back at twelve thirty-five and we'll deal

1    with the remaining motion to suppress at that point in

2    time, and then we can conclude for the day.

3            So unless there is any reason that something

4    needs to be addressed before that, we will recess now and

5    return back and -- at twelve thirty-five.

6            MS. CINQUANTO:  Thank you, Your Honor.

7            MR. PARISI:  Thank you.

8            THE COURT:  Thank you.

9            (Off the record 12:22:17 p.m. to 12:39:23

10           COURT CLERK:  All rise.  Court is back in

11   session.

12           THE COURT:  Thank you.  You all may be seated.

13   Okay.  I am ready to hear from counsel on the remaining

14   outstanding motion to suppress, which is, I believe,

15   E.C.F. one four five, if I'm correct.  Sorry, One four

16   three.

17           MS. CINQUANTO:  Yes, Your Honor.

18           THE COURT:  Correct.  Yes.  So you may proceed,

19   Ms. Cinquanto.

20           MS. CINQUANTO:  Okay.  Your Honor, the defense

21   moves to suppress the statement that was made by Mr. Jones

22   on Jan -- on the date of his arrest, which occurred -- one

23   moment, Your Honor.  On January 24th of 2023, because it

24   was involuntary.

25           There was a custodial interrogation that led --

1    excuse me.  The custodial interrogation that led to the

2    statement began approximately fourteen hours after Mr.

3    Jones was arrested.  In the interim, he was held in small

4    -- held in isolation in a small windowless room, where he

5    was deprived of food and drink for the first ten hours and

6    fifty minutes.

7            During his ninety-minute interrogation, Mr.

8    Jones was aggressively taunted, berated, and belittled,

9    and the detective suggested that he could be exposed to

10   the death penalty, even though there was a moratorium on

11   the death penalty in Pennsylvania at the time.

12           For these reasons, Mr. Jones respectfully

13   submits that under the circumstances under which the

14   statement was obtained is involuntary.  The statement was

15   not voluntary and it should be suppressed.  Thank you.

16           THE COURT:  Thank you, Ms. Cinquanto.  Mr.

17   Parisi?

18           MR. PARISI:  Your Honor, I have three witnesses.

19   The first is Detective Christian Chavez.  And while we're

20   getting Detective Chavez, we do have a stipulation.  The

21   stipulation is that prior to the statement at issue, the

22   Defendant had previously been convicted four times for

23   possession with intent to distribute controlled

24   substances, one's for a violation of Uniform Firearms Act,

25   and one's for a charge of soliciting prostitutes.

1          And then Detective Chavez is here, and I'll have

2     him take the witness stand.

3          THE COURT: Thank you.  The solicitation, or

4     rather, sorry, the stipulation is accepted and into the

5     record.  I appreciate that.  Good morning.

6          COURT CLERK:  Please raise your right hand.  And

7     do you swear or affirm the testimony you shall give to the

8     Court is the truth, the whole truth and nothing but the

9     truth, so help you God, or you do so affirm?

10          MR. CHAVEZ:  I do.

11          WITNESS; CHRISTOPHER CHAVEZ; Sworn

12          COURT CLERK:  Please state and spell your name.

13          THE WITNESS:  Detective Christian Chavez, C-H-A-

14     V-E-Z, Badge eight one eight.  Currently assigned to

15     Northwest detectives, Philadelphia.

16          THE COURT:  Thank you.  Good afternoon,

17     Detective Chavez.

18          THE WITNESS:  Good afternoon.

19          THE COURT:  Thank you.  You're welcome to

20     proceed.

21          MR. PARISI:  Thank you, Your Honor.

22          DIRECT EXAMINATION

23          BY MR. PARISI:

24          Q.   Detective Chavez, how long have you been a

25     police officer?

1          A.   Since 2011.

2          Q.   And how long have you been a detective at

3  Northwest Detectives?

4          A.   Since 2017.

5          Q.   All right.  I want to turn your attention

6  back to August 22nd of 2022.  Were you assigned to

7  investigate the robbery of a Metro P.C.S. store at 101

8  East Olney Avenue in Philadelphia?

9          A.   That's correct.

10         Q.   As part of that investigation, did patrol

11  units stop a car driven by the Defendant, Chihean Jones?

12         A.   Yes.

13         Q.   And was the Defendant brought to your

14  office for questioning?

15         A.   He was.

16         Q.   Did you have an opportunity to speak with

17  him and ultimately interview him about that incident?

18         A.   Yes.  He was interrogated at Northwest

19  Detectives, 5960 North Broad Street.  Interrogated and

20  mirandized by myself and Detective Bransfield.

21         Q.   Okay.  When you met with the Defendant, did

22  you have an opportunity to observe his appearance and his

23  demeanor?

24         A.   I did.

25         Q.   Have you previously encountered individuals

1     who are under the influence of drugs or alcohol?

2              A.    Yes.

3              Q.    And how about individuals suffering from

4     mental illness?

5              A.    Yes.

6              Q.    Did you see anything about the Defendant,

7     Chihean Jones, that led you to believe he was under the

8     influence -- excuse me, under the influence of anything or

9     suffering from any kind of mental illness?

10             A.    No.

11             Q.    Did you see any sort of physical

12    infirmities or injuries that -- that might have impacted

13    his ability to understand you?

14             A.    No.

15             Q.    When you spoke with him, did he agree to

16    speak with you?

17             A.    Yes.

18             Q.    And were his answers to your questions

19    appropriate to the -- to the questions, they -- they --

20    were they lucid and -- and easy to follow?

21             A.    Yes.

22             Q.    Okay.  Ultimately, was there a video

23    statement taken from the Defendant?

24             A.    There was.

25             Q.    And I'm going to show you what's already

1    admitted.

2           MR. PARISI:  If I may publish, Your Honor,

3    Government's Three.

4           THE COURT:  You may.

5           BY MR. PARISI:  (Cont'g.)

6           Q.   Detective Chavez, just looking at the

7    screen there, is that the Defendant, Chihean Jones, on

8    August 22nd at Northwest Detective Division when you

9    interviewed him?

10          A.   It is.

11          Q.   All right.

12          MR. PARISI:  I'm just going to hit play here, if

13   I may, Your Honor.

14          THE COURT:  You may.

15          (Audio being played)

16          BY MR. PARISI: (Cont'g.)

17          Q.   All right.  Detective Chavez, just so we

18   have a clear record here.  Was it Detective Bransfield

19   that actually read the Miranda warnings?

20          A.   That's correct.

21          Q.   And were you filming the interview?

22          A.   I was.

23          MR. PARISI:  Your Honor, these are all questions

24   I have for the witness.

25          THE COURT:  Thank you.  Any questions, Ms.

1    Cinquanto?

2              CROSS EXAMINATION

3              BY MS. CINQUANTO:

4              Q.   Detective Chavez, were you present when Mr.

5    Jones was interrogated on January 24th of 2023?

6              A.   January 24th, no.

7              Q.   Okay.  Well, I just have a -- just one

8    question about -- about that interrogation.  During that

9    interrogation on August 22nd, did Mr. Jones tell you that

10   he was simply a hack driver for the two men who committed

11   the robbery at the cell phone store?

12             A.   I believe he did make mention of that, yes.

13             Q.   All right.  Thank you.

14             MS. CINQUANTO:  I've nothing further.

15             THE COURT:  Thank you, Ms. Cinquanto.

16             MR. PARISI:  Nothing additional, Your Honor.

17             THE COURT:  Thank you.  Mr. Parisi -- Detective,

18   thank you.

19             THE WITNESS:  Okay.

20             THE COURT:  You can step down.  Have a good day.

21             THE WITNESS:  Thank you so much, guys.  Thanks.

22             MR. PARISI:  Just two more.  Your Honor, the

23   Government's next witness is Officer Eric Novasak.

24             COURT CLERK:  Please raise your right hand.  You

25   do swear and/or affirm the testimony you shall give to the

1    Court should be the truth, the whole truth and nothing but

2    the truth, so help you God?

3              MR. NOVASAK:  Yes.

4              COURT CLERK:  You do so affirm?

5              MR. NOVASAK:  Yes.

6              WITNESS; ERIC NOVASAK; Sworn

7              COURT CLERK:  Please state and spell your name

8    for the record.

9              THE WITNESS:  Officer Eric Novasak, E-R-I-C,

10   last name, N-O-V-A-S-AK, Batch number Thirty-four eighty-

11   eight and I'm assigned to the 15th District.

12             THE COURT:  Good afternoon, officer.  You may be

13   seated.

14             THE WITNESS:  Thank you.

15             THE COURT:  Thank you.  Mr. Parisi.

16             MR. PARISI:  Thank you, Your Honor.

17             DIRECT EXAMINATION

18             BY MR. PARISI:  (Cont'g.)

19             Q.   Officer Novasak, how long have you been a

20   police officer?

21             A.   In my eighth year.

22             Q.   And have you been in the 15th the whole

23   time?

24             A.   Yes.

25             Q.   I want to turn your attention back to

1    January 24th of 2023.  Do you know if you were working

2    that day?

3             A.    I was.

4             Q.    And were you working a particular shift?

5             A.    I believe I was four to twelve.

6             Q.    Okay.  Were you working with a partner that

7    day?

8             A.    Officer Walsh, W-A-L-S-H.  Badge is Five

9    six four five.

10            Q.    On January 24th, when you were working, did

11   you receive a patrol alert for the Defendant, Chihean

12   Jones?

13            A.    Yes.

14            Q.    Had you previously known the Defendant

15   prior to January 24th?

16            A.    Not his name, but I -- I was aware of him,

17   yes.

18            Q.    And how is it you were aware of him?

19            A.    He's -- he's usually on the 5200 Block of

20   Hawthorne.  I patrolled that area quite frequently in my

21   career, and he was usually out there sitting in a vehicle

22   for the most part of the day.

23            Q.    And was one of those vehicles that you were

24   familiar with a Chevrolet Suburban?

25            A.    Yes.

1          Q.   All right.  So on January 24th when you

2     received the patroller, did it -- did it reference the

3     Defendant specifically as well as the car?

4          A.   So the patroller mentioned the Defendant's

5     name and the vehicle.  And then it also said the vehicle

6     frequents a few areas in the 15th District, and I believe

7     one of them on there said Hawthorne Street.

8          And once I saw it, I was like, I believe that

9     car is going to be parked on 5200 Hawthorne with him

10     potentially in it.  And we drove around the corner almost

11     immediately and found the vehicle with him seated in it.

12          Q.   So was the Defendant in the driver's seat?

13          A.   Yes.

14          Q.   And was there a woman in the car as well?

15          A.   Yes.

16          Q.   Did you speak to the Defendant?  Did you

17     approach the car and speak to him at all?

18          A.   Yeah, I approached the driver's side of the

19     vehicle, told him to put his hands on the steering wheel.

20     As I approached him, when I seen his hands on the steering

21     wheel, my partner told him to shut the car off.

22          I asked him for his name.  He said Chihean

23     Jones, had him lean forward, put his hands behind his

24     back, cuffed him and brought him out of the vehicle.

25          Q.   Did you put him into your car?

1          A.    Yes.

2          Q.    And then did you transport the Defendant

3     from that location on Hawthorne Street down to the

4     homicide division?

5          A.    Yes.

6          Q.    From the time -- putting aside him telling

7     you his name, but from the time you handcuffed the

8     Defendant until you brought him to the homicide division,

9     did you ask the Defendant any questions?

10         A.    No.  Other than filling out biographical

11    information for the arrest reports, no.

12         Q.    Did he proffer any statements to you?

13         A.    Nothing incriminating.

14         Q.    And did you provide the Defendant his

15    Miranda warnings for any reason?

16         A.    No.

17         Q.    And during the transport, the actual drive,

18    did the Defendant speak at all?

19         A.    There was probably some conversation.  Not

20    to my knowledge I remember anything.  It was a pretty

21    quiet ride.

22         Q.    And after you dropped the Defendant at the

23    homicide unit, did you -- well, let me ask you this.  Did

24    you actually place him into an interrogation room at

25    homicide?

1              A.   Yes, I believe we walked him in, up the

2       elevator, onto the homicide floor and into their

3       interrogation rooms.

4              Q.   And just so we have some sort of time

5       stamps on all of this.  Did you find the Defendant sitting

6       on Hawthorne Street approximately six p.m. on the 24th?

7              A.   Yes.

8              Q.   And then whatever the -- the length of time

9       it is to drive down to homicide, twenty or thirty minutes

10      or so.  Is that a fair estimate?

11             A.   Yeah.  The whole encounter, probably around

12      an hour.

13             Q.   Okay.  After you dropped the Defendant at

14      homicide, did you have anything else to do with him or

15      this investigation?

16             A.   I got interviewed with the homicide

17      detectives.

18             Q.   Okay.  But how about this?  Did you -- did

19      you interact with the Defendant in any way?

20             A.   No.  Other than checking him in and his

21      property, no.

22             Q.   Okay.

23             MR. PARISI:  That's all I have, Your Honor.

24             THE COURT:  Thank you, Mr. Parisi.  Ms.

25      Cinquanto.

1              MS. CINQUANTO:  Just -- just briefly.

2              CROSS EXAMINATION

3              BY MS. CINQUANTO:

4              Q.   Officer, so it's safe to say he was taken

5      into custody at about six p.m. on January 24th, 2023,

6      correct?

7              A.   Approximately.

8              MS. CINQUANTO:  I've no further questions.

9              THE COURT:  Thank you, Ms. Cinquanto.  Nothing

10     further for you.

11             THE WITNESS:  Thank you.

12             THE COURT:  Thank you very much.

13             MR. PARISI:  Thank you.  Your Honor, Detective

14     John Bartol.

15             COURT CLERK:  Please raise your right hand.  Do

16     you swear or affirm that the testimony you shall give the

17     Court should be the truth, the whole truth and nothing but

18     the truth, so help you God or you do so affirm?

19             MR. BARTOL:  Yes, I do.

20             WITNESS; JOHN BARTOL; Sworn

21             COURT CLERK:  Please state and spell your name

22     for the record.

23             THE WITNESS:  Detective John Bartol, B-A-R-T-O-

24     L.  Batch Nine one zero five.

25             THE COURT:  Good afternoon, Detective.

1          THE WITNESS:  Good afternoon, Your Honor.

2          THE COURT:  You may be seated.

3          MR. PARISI:  May I proceed, Your Honor?

4          THE COURT:  Yes, you may.

5          MR. PARISI:  Thank you.

6          DIRECT EXAMINATION

7          BY MR. PARISI:

8          Q.    Detective Bartol, how long have you been a

9    police officer?

10         A.    Thirty years.

11         Q.    And you're assigned to the homicide unit?

12         A.    I am.

13         Q.    How long have you been with homicide?

14         A.    Since May of 2013.

15         Q.    All right.  I want to focus your attention

16   in on a homicide that occurred on January 17th of 2023 on

17   Torresdale Avenue.  The victim was Sivaram Patro (phonetic

18   spelling).  Were you assigned to investigate that

19   homicide?

20         A.    I was.

21         Q.    And as a result of your investigation, did

22   you identify the Defendant, Chihean Jones, as a suspect in

23   that shooting?

24         A.    I did.

25         Q.    Did you issue a patrol alert for -- to

1        bring the Defendant in for questioning?

2                A.    I did.

3                Q.    And on January 24th of 2023, did patrol

4        officers contact you or the homicide division to tell you

5        that they'd found the Defendant?

6                A.    They did.

7                Q.    Was the Defendant placed into an interview

8        room at the homicide unit?

9                A.    He was.

10               Q.    And was that interview room G, if you

11       recall?

12               A.    I believe it was.

13               Q.    Do you know roughly what time the Defendant

14       was placed into the -- the interview room?

15               A.    Sometime around seven thirty p.m.

16               Q.    And when the Defendant was placed into the

17       interview room, was a recording system activated?

18               A.    Yes, it was.

19               Q.    And did that run the entire time the

20       Defendant was in that room?

21               A.    It did.

22               Q.    Does that include both audio and video?

23               A.    It does.

24               Q.    Have you reviewed the entirety of that

25       video?

1          A.   I have.

2          Q.   And did it fairly and accurately capture

3    the interview and the Defendant's time in the room?

4          A.   It did.

5          Q.   Prior to the Defendant being placed into

6    that room, was he questioned by you or any other homicide

7    detectives about that crime?

8          A.   No, he was not.

9          Q.   And did you speak with the Defendant for

10   any reason before you began your interview?

11         A.   No.

12         Q.   All right.  Do you recall approximately

13   when you began your interview with the Defendant?

14         A.   Sometime around eight thirty a.m. on the

15   25th.

16         Q.   So the following day?

17         A.   The following morning, yes.

18         Q.   So between the time, we'll call it roughly

19   seven thirty on the 24th and when you began your interview

20   on the 25th, were you doing things in -- in this

21   investigation?

22         A.   I was.

23         Q.   Were you interviewing other witnesses?

24         A.   I was.

25         Q.   Were you speaking with the district

1    attorney's office?

2          A.    I was.

3          Q.    And did those activities keep you up for a

4    good portion of the night?

5          A.    It did.

6          Q.    At some point, did you take a break and

7    actually go home and get a shower and catch a nap?

8          A.    I did.

9          Q.    All right.  So let's now focus in the next

10   day, the 25th, when you went into the interview room with

11   the Defendant, did you have an opportunity to observe his

12   demeanor?

13         A.    I did.

14         Q.    Prior to this interview, in your career,

15   have you encountered people who were under the influence

16   of drugs and alcohol?

17         A.    I have.

18         Q.    And have you encountered people who were

19   suffering from a mental illness of some sort?

20         A.    I have.

21         Q.    When you interviewed the Defendant, when

22   you observed him, did you see anything that led you to

23   believe he was under the influence of any drugs or

24   alcohol?

25         A.    I did not.

1      Q.   And how about any indicators to you that he

2   was suffering from any kind of mental disease or defect?

3      A.   I did not see any.

4      Q.   And then just talking about his physical

5   appearance, did the Defendant appear to be in -- in good

6   health to you?

7      A.   He did.

8      Q.   Did you notice any injuries or anything

9   else that was wrong with his physical person?

10     A.   I did not.

11     Q.   As part of your interview with the

12  Defendant, did you ask him if he spoke and understood

13  English?

14     A.   I did.

15     Q.   And what did he tell you?

16     A.   He did.

17     Q.   Did you also provide the Defendant with his

18  Miranda warnings before you began questioning him?

19     A.   Yes, I did.

20     Q.   And how did you do that?

21     A.   Off the standard police interrogation card,

22  75 dash Miscellaneous Three.

23     Q.   Did the Defendant tell you that he

24  understood those warnings?

25     A.   He did.

1      Q.    And -- and based on your entire experience

2    as a police officer and speaking with individuals, did you

3    believe that the Defendant actually understood those

4    warnings?

5      A.    Definitely, yes.

6      MR. PARISI:  I'm going to bring up what's

7    admitted, Your Honor, as Government's One.

8      BY MR. PARISI:  (Cont'g.)

9      Q.    And before I hit play here, Detective

10   Bartol, you can see it there.  That's the big screen up in

11   front of you.  Is this interview room G at the homicide

12   division?

13     A.    It is.

14     Q.    And is that the Defendant sitting in the

15   chair there?

16     A.    It is.

17     Q.    And just the timestamp is January 24th,

18   2023, at approximately nineteen thirty-one hours.  Is that

19   seven thirty-one p.m.?

20     A.    Correct.

21     Q.    Okay.  You mentioned you didn't speak with

22   the Defendant until the next morning, so I'm going to fast

23   forward to that portion.  But in the interim, was the

24   Defendant given food and water or something to drink?

25     A.    Yes.

1          Q.   Was he also given bathroom breaks between

2     the time he was placed in the room and you interviewed

3     him?

4          A.   He was.

5          MR. PARISI:  All right, Your Honor, just for the

6     record, I'm going to jump ahead to the timestamp, or the

7     runtime on the video is approximately thirteen twenty.

8     And the timestamp is January 25th and this is eight fifty-

9     one a.m.  You see that there, Detective Bartol?

10         A.   I do.

11         Q.   All right.  And before I hit play, is there

12    a sandwich and a drink on the table there?

13         A.   Yes, I believe there's two sandwiches.

14         Q.   Okay.

15         MR. PARISI:  Your Honor, with your permission,

16    I'll just hit play here.

17         THE COURT:  That is fine.  You may.

18         BY MR. PARISI:  (Cont'g.)

19         Q.   All right.  Before we get into the -- the

20    audio portion here, just so we have a good record, the --

21    the detective on the left-hand side, the larger man, is

22    that Detective Matt Farley?

23         A.   That is, yes.

24         Q.   And then is that you in the black shirt

25    with your back to the camera right there?

1          A.    Yes.

2          Q.    Okay.  I'll keep playing here.

3          (Video playing)

4          BY MR. PARISI:  (Cont'g.)

5          Q.    Detective Bartol, I'm going to pause it

6     here just so we have a record.  It's eight fifty-five a.m.

7     roughly on the video.  We just watched a few minutes of --

8     of the beginning of your interview, and I want to focus

9     first on the Defendant's demeanor.

10          Did -- did he maintain this demeanor throughout

11    the course of the whole interview?

12          A.    Yes, for the most part, yes.

13          Q.    And -- and was the interview in its

14    entirety, when you were speaking with him approximately

15    ninety minutes long, to the best of your recollection.

16          A.    Yes, I think it was eight fifty-two, like

17    ten twenty-two.  And then the summary was, like twenty

18    minutes, half hour later --

19          Q.    Right.

20          A.    -- for a couple minutes.

21          Q.    So you're -- the -- the period of time

22    where you're speaking to the Defendant as you are here was

23    -- was roughly, you said, until about ten twenty or so and

24    then you went out and did you prepare a written summary of

25    what happened?

1          A.   Detective Farley did.

2          Q.   Okay.  And throughout the time you spoke

3     with the Defendant, was he more or less -- was his

4     demeanor more or less like we've just observed?

5          A.   It was.

6          Q.   Did he ever start crying or yelling,

7     anything like that?

8          A.   He did not.

9          MR. PARISI:  Your Honor, I'm obviously not going

10    to play the full video for time constraints.

11         THE COURT:  Yes.

12         BY MR. PARISI:  (Cont'g.)

13         Q.   But what I'd like to do is, I'll skip ahead

14    here.  Detective Bartol, you mentioned Detective Farley

15    prepared a written statement.  Was that a summary of

16    everything that was discussed in the -- the -- the verbal

17    interview?

18         A.   Correct.

19         Q.   Did you and Detective Farley then bring

20    that into the Defendant afterwards to review?

21         A.   We did.

22         Q.   And was that also captured on the video?

23         A.   It was.

24         Q.   And did Detective Farley actually read that

25    to the Defendant?

1          A.   He did.

2          Q.   Did you and Detective Farley ask the

3     Defendant if he agreed with that summary of the interview?

4          A.   We did.

5          Q.   And did he ultimately sign and date and

6     time -- put a time on that written interview?

7          A.   He did.

8          MR. PARISI:  All right.  Your Honor, I'm going

9     to jump ahead to the runtime of fifteen twenty-five or

10    fifteen twenty-eight -- four, we'll call it.

11         BY MR. PARISI:  (Cont'g.)

12         Q.   Detective Bartol, it's -- the timestamp is

13    now approximately ten fifty-five.  Is that correct?

14         A.   Correct.

15         Q.   Is that, again the Defendant's still

16    sitting there in the chair?

17         A.   It is, yes.

18         Q.   He still -- still have two sandwiches?

19         A.   Yes, there are.

20         Q.   All right.

21         (Video playing)

22         BY MR. PARISI:  (Cont'g.)

23         Q.   All right, Detective Bartol, the -- the

24    written summary, let me show you Government's Two up on

25    the screen.  Detective Bartol, is that the activity sheet,

1    the written summary that the Defendant reviewed there in

2    the video we just watched?

3              A.    It is.

4              Q.    And scrolling down to the bottom, is that

5    the Defendant's signature with the -- the date and time?

6              A.    It is.

7              Q.    And then also there was a correction we

8    heard the Defendant make.  Was that noted by Detective

9    Farley here, where he changed two weeks to three weeks?

10             A.    Correct.

11             Q.    And did Detective Farley asked the

12   Defendant to also sign a police photograph of Keon

13   Vincent?

14             A.    He did.

15             Q.    Did the Defendant refuse to do so?

16             A.    He did.

17             MR. PARISI:  Your Honor, those are all the

18   questions I have for Detective Bartol.

19             THE COURT:  Thank you, Mr. Parisi.  Ms.

20   Cinquanto.

21             MS. CINQUANTO:  (unintelligible)

22             THE COURT:  Yes.

23             CROSS EXAMINATION

24             BY MS. CINQUANTO:

25             Q.    Good afternoon, Detective.

1          A.    Good afternoon.

2          Q.    So Detective, we've already established

3     that Mr. Jones was arrested by, I believe it was Officer

4     Chavez and Walsh at approximately six p.m.  Does that --

5          A.    Sometime at or around that time, yes.

6          Q.    Okay.  And he, at that time, was placed in

7     a -- he was brought down to the homicide unit.  Is that

8     right?

9          A.    Correct.

10         Q.    And he was placed in an interrogation room?

11         A.    Yes.

12         Q.    And that interrogation room was small.  Is

13    that right?

14         A.    It was the size on the picture.

15         Q.    Okay.  It's approximately six feet by six

16    feet.  Is that fair to say?

17         A.    I'm not sure.  I think it might be a little

18    bit bigger than that.

19         Q.    Well, how big do you think it is?

20         A.    It's the size of that picture.

21         Q.    I mean, look, I -- I'm not there, so -- and

22    you were there for a number of hours.  Can -- can you give

23    us an approximation?  Do you think it's seven feet by

24    seven feet or --?

25         A.    I'm not sure what exact measurements.

1          Q.   Okay.  Well, my -- I -- I'm looking at that

2     and I believe it's about five feet by five feet.  Maybe

3     six feet by six feet.  Is that fair to say?

4          A.   I wouldn't say that, because Mr. Jones is

5     about five eight, almost six feet.  He was laying on the

6     floor.  And some of these pictures, you can see them

7     there.  There's still some more room --

8          Q.   Sure.

9          A.   You know, so --

10         Q.   It's not your question.  I'm just -- I'm

11    just curious.

12         A.   It's -- it's bigger than six by six.

13         Q.   Seven by seven?

14         A.   Could be that.  Seven by eight.  Eight by

15    eight.

16         Q.   Okay.  But --

17         A.   Nine by eight.

18         Q.   That's okay.  But approximately in that

19    range.  Is that right?

20         A.   Yes.

21         Q.   And we can also tell from there that

22    there's no windows in that room.  Is that correct?

23         A.   Correct.

24         Q.   All right.  And when he was in there, the

25    door was locked.  Is that correct?

1    A.    Yes.

2    Q.    All right.  Now when he -- he remained

3  locked in that room without any food or drink or offer for

4  the next three hours.  Is that right?

5    A.    Correct.

6    Q.    Okay.  Now prior to your -- let -- let me

7  -- let me go back again.  When you first -- when he was

8  first placed in that room, there's no information that any

9  officers have about the last time he had eaten or had a

10  drink prior to seven thirty p.m. on January 24th.  Is that

11  right?

12    A.    Repeat that, please.

13    Q.    Prior to his being placed in that room, no

14  one had -- none of the law enforcement had any idea how

15  long it had been before he had eaten and drinking before

16  that, right?

17    A.    I don't know that.

18    Q.    Okay.  So -- so he's in this room.  He gets

19  in there about seven thirty p.m., correct?

20    A.    Sometime after about that, yes.

21    Q.    Okay.  And prior to being placed in the

22  room or as soon as he was placed in the room, he wasn't

23  told why he was being arrested, correct?

24    A.    By who?

25    Q.    By anybody.

1          A.    I don't know what the police officer told

2     him.

3          Q.    Okay.  Well, you had to inform him, or you

4     did inform him of the reason why he was arrested at about

5     eight thirty the next morning, correct?

6          A.    I did.

7          Q.    Okay.  Now he remains in that room without

8     food or drink for the next three hours.  Is that right?

9          A.    Correct.

10          Q.    All right.  And at about ten thirty p.m. he

11     requests to use the bathroom?

12          A.    Yes.

13          Q.    All right.  And he was returned to the room

14     at about ten thirty-two p.m. about three minutes later.

15     Is that right?

16          A.    Correct.

17          Q.    And after his return, he remained in that

18     room for eight more hours without any food or drink or

19     offer thereof, correct?

20          A.    Correct.

21          Q.    All right.  Now six thirty the next

22     morning.  So that's roughly twelve hours after his arrest

23     and eleven hours after he's placed in that room.  He was

24     given a glass of water and two sandwiches.  Is that right?

25          A.    Correct.

1               Q.    Okay.  And at seven forty-one, he was

2    allowed to use that, the bathroom again, and he returned

3    to the room about four minutes later.  Is that right?

4               A.    Yes.

5               Q.    And again, the door was locked behind him.

6    Is that correct?

7               A.    Correct.

8               Q.    Now at eight fifty-one, approximately eight

9    fifty-one p. -- a.m., which was fourteen hours after his

10    arrest and thirteen hours after being locked in the

11    interrogation room, that's when you started your

12    interrogation?

13               A.    Roughly, yes.

14               Q.    Okay.  Within a few minutes of that time.

15               A.    Yes.

16               Q.    Is that fair to say?  All right.  Now

17    before you go into the room, I think you testified that,

18    you know, you were -- you were doing a lot of stuff,

19    talking to the D.A.'s office.  Is that right?

20               A.    I was talking to other co-defendants.  We

21    had other witnesses there.  And I was communicating with

22    the D.A.'s office.

23               Q.    Uh-huh.

24               A.    Speaking with other police and other

25    detectives.

1          Q.   And at some point, you said, you testified

2     that you went home?

3          A.   Correct.

4          Q.   Got a shower?

5          A.   Yes.

6          Q.   Slept a little bit?

7          A.   Yes.

8          Q.   I'm assuming you ate something?

9          A.   I don't believe I've -- I usually don't eat

10    in the middle of the night.

11         Q.   Okay.  Drank something?

12         A.   Probably.

13         Q.   Okay.  So you come in the room at about

14    eight fifty-one or within a few minutes of that, and

15    that's when Mr. Jones was read his Miranda rights.  Is

16    that correct?

17         A.   I'm sorry, repeat that.

18         Q.   That's when he was read his Miranda rights,

19    correct?

20         A.   At eight fifty-one -- eight fifty-one,

21    eight fifty-two, yes.

22         Q.   Okay.  Now the entire interrogation took

23    approximately ninety minutes?

24         A.   Yes.

25         Q.   And both you and Detective Farley were in

1     that room with him at that time.  Is that correct?

2              A.   Correct.

3              Q.   And you folks were seated in two seats

4     across from the Defendant, and -- is that right?

5              A.   At -- most of the time, yes.

6              Q.   Most of the time.  And between you and the

7     Defendant -- between the Defendant and the door, you two

8     were seated in between that, correct?

9              A.   I'm sorry, repeat that.

10             Q.   I'm going to repeat that.  So we have a --

11    so you folks are sitting there.  Is that right?

12             A.   Yes.

13             Q.   For the most part?  Correct?

14             A.   Correct.

15             Q.   All right.  We'll talk about Officer Farley

16    moving around soon, but -- but for right now, there's --

17    there's Mr. Jones, correct?

18             A.   Correct.

19             Q.   And then you're seated at the table,

20    correct?

21             A.   Correct.

22             Q.   And then behind you is the door.  Is that

23    right?

24             A.   Behind me and to the right a little bit.

25             Q.   Okay.

1                    THE COURT:  And Ms. Cinquanto, just for purposes

2        of the record, if you could just identify that for the

3        video that's being displayed, kind of what the timestamp

4        is as to what you're using as your example of where

5        they're seated.

6                    MS. CINQUANTO:  Your Honor, this is

7        approximately nine a.m.

8                    THE COURT:  Okay.  Thank you.

9                    MS. CINQUANTO:  All right.  Thank you.

10                   BY MS. CINQUANTO:  (Cont'g.)

11                   Q.   All right.  So during the course of this

12       ninety-minute interrogation, there were numerous things

13       that you and Detective Farley conveyed to Mr. Jones,

14       correct?

15                   A.   We talked a while, yes.

16                   Q.   Okay.  One of the things that you talked

17       about is the fact that he could be executed if he was

18       convicted of this homicide.  Is that right?

19                   A.   Some type of conversation about that came

20       up.

21                   Q.   Well, specifically, you said he could be

22       executed if he was convicted of the homicide, but even at

23       that time, you knew that there was a moratorium of the

24       death penalty in Pennsylvania.  You do -- you are aware of

25       that as a homicide detective, correct?

1          A.    Yes.  And then right after that, I told

2     him, but that's not going to happen.

3          Q.    Right.  So what you -- I think specifically

4     you said, and I quote, the jury will say, "We are going to

5     execute this guy, meaning you, but they don't do that

6     anymore in Pennsylvania.  So we are going to give this guy

7     life."  Do you remember saying that to him?

8          A.    Something to that effect.

9          Q.    Okay.  But then a few minutes later,

10    approximately thirteen minutes later, you told Mr. Jones

11    that, "Technically under the law in Pennsylvania, you can

12    still get the debt -- death penalty."  Do you remember

13    telling him that?

14         A.    Yes.

15         Q.    You also -- you and Detective Bartol also

16    had said to Mr. Jones things like, there's going to be --

17    after he's convicted, some other motherfucker is going to

18    raise your kid and sleep with your girl.  Do you remember

19    that?

20         A.    Yes.

21         Q.    Do you remember also telling Mr. Jones that

22    after he's convicted, that he will have his -- the other

23    fucker will have -- his girlfriend will be licking the

24    other fucker, who's raising his kid's, dick.  Do you

25    remember saying that?

1           A.   Yes.

2           Q.   All right.  You also called Mr. Jones a

3      cold-blooded killer.  Do you remember saying that?

4           A.   I sure do.  Yes.

5           Q.   A fuck up?

6           A.   Yes, I did.

7           Q.   A loser?

8           A.   I did.

9           Q.   Too lazy.  Fucking lazy to earn -- earn his

10     own living?

11          A.   Yes.

12          Q.   And not a real man?

13          A.   Correct.  Yes.

14          Q.   Okay.  Now during this time period, you

15     pretty much remain stationary, I believe.  Well, actually,

16     I'm sorry.  Who -- who is --

17          A.   You got us mixed up.

18          Q.   I apologize.

19          A.   I'm -- I'm the one moving around.  I'm on

20     the way.

21          Q.   Okay.  Okay.  So during the -- during the

22     course of the -- of the interrogation, over the ninety

23     minutes, you do move closer to Mr. Jones.  Is that right?

24          A.   Yes.

25          Q.   And you often move closer to him, you turn

1    your chair around and sometimes at times you're sitting

2    right next to him.  Is that right?

3              A.    Correct.

4              Q.    And you're sitting within inches of him.

5    Is that right?

6              A.    Yes, I am.

7              Q.    Okay.  And this would occur specifically

8    when Mr. Jones was giving you information that you felt

9    was not correct.  Is that right?

10             A.    No.

11             Q.    All right.  Well, is it true that on

12   approximately eight occasions during the ninety-minute

13   interview, you felt compelled to move your chair closer to

14   him and sit within a couple of inches of him?

15             A.    I don't know what you mean by felt

16   compelled to, but I did move myself closer to him when I

17   was attempted to elicit information, and I thought I might

18   be able to get information at different points.

19             Q.    Okay.  So at the time when you were moving

20   closer to him, the goal was to get more information from

21   him.  Is that right?

22             A.    Well, the goal of any interview is to get

23   the truth, and that's what we were trying to get.

24             Q.    And so you would move closer to him when

25   you felt that you wanted to get a statement from him that

1      was true versus the information he was providing to you,

2      which you felt was false?

3                A.    Not necessarily.

4                Q.    Okay.  Now what Mr. Jones did tell you was

5      that, he was in the area of the Exxon station with his

6      girlfriend on the night in question, correct?

7                A.    Yes.

8                Q.    And that, in particular, he was -- he was

9      getting oral sex from his girlfriend.  Is that right?

10                A.    Yes.

11                Q.    Specifically, he was getting his dick

12      licked, correct?

13                A.    Yes, correct.

14                Q.    Now you know that his girlfriend has now

15      been charged in this case, right?

16                A.    I do.

17                Q.    Okay.  And she's now a co-defendant,

18      correct?

19                A.    Correct.

20                Q.    Now at about ten twenty-one, that

21      interrogation ends.  Is that right?

22                A.    I'm sorry, repeat that.

23                Q.    Ten twenty-one a.m., the interrogation

24      ends?

25                A.    Sometime around that, we stopped talking to

1    him, and then we came back and went over the summary with

2    him.

3         Q.   Okay.  So you -- so you and Detective

4    Farley leave the room, and for about approximately, I

5    believe it's about three minutes.

6         A.   Correct.

7         Q.   Is that fair to say?  All right.  And

8    during that time period, you were preparing the -- the

9    written summary?

10        A.   Detective Farley prepared that.

11        Q.   And that is the -- that is the statement

12   that Mr. Jones ended up signing, correct?

13        A.   Correct.

14        Q.   And when he signed the statement to you, he

15   -- he told you he was tired, correct?

16        A.   I don't -- I don't -- I'll have to replay

17   that with the exact words that he was used.  He said

18   something about he just woke up.

19        Q.   He just woke up.  So he indicated to you

20   that he was a little bit disoriented because he was tired

21   or had just woken up, correct?

22        A.   But he didn't just wake up.

23        Q.   I'm sorry?

24        A.   I don't believe he just woke up.

25        Q.   Well, that's not what I'm asking you.  I'm

1    asking you what he told you.

2            A.    He did say that, yes.

3            Q.    Okay.

4            A.    But that -- that -- that's not what

5    happened.

6            Q.    Okay.  I'm just asking you what he told

7    you, correct?  So he did inform you that he had just woken

8    up and he was a little bit tired, correct?

9            A.    We just played it.  He did say when

10   Detective Farley asked him to sign it, he stretched a

11   little bit and said, oh, I'm tired, he said.  We have to

12   replay that, but something to that effect.

13           Q.    Okay.  Now after the interrogation ends,

14   Mr. Jones remains in that interrogation room for six more

15   hours, right?

16           A.    Correct.

17           Q.    And during that time period, he urinated in

18   a cup.  Is that right?

19           A.    He did.

20           Q.    All right.  And that was because nobody

21   responded to his repeated request to go to the bathroom?

22           A.    At some point, he knocked on the door and

23   somebody did not come there fast enough and he urinated in

24   the cup, yes.

25           Q.    Well, in fact, I mean, he was banging on

1     the door, right?  To have somebody let him out and take

2     him to the bathroom and he was not taken, correct?

3            A.    Correct.

4            Q.    All right.  And then later on, he was

5     repeatedly asking for medical assistance.  Is that

6     correct?

7            A.    Yes.  And that's when he was taken down to

8     be processed.  The first part of the process after they

9     check you in is, send you right to the nurse.

10           Q.    Well, specifically, he -- he asked to leave

11    the interrogation room two times.  One was at one fifty

12    p.m. and one was at three ten p.m. because he was asking

13    for medical assistance on both of those occasions.  Do you

14    recall that?

15           A.    I don't know what your definition of asking

16    for medical assistance.  He said that he wanted to leave.

17    Just take me downstairs and - to be processed, I believe.

18           Q.    Well --

19           A.    And then he asked for Tylenol or something.

20    He said he had a headache and I said when we took him

21    downstairs.

22           Q.    Well, specifically at one fifty p.m. and

23    three ten p.m., he -- he says, I need a nurse or medicine

24    because he's not feeling well.  Do you remember that?

25           A.    He did not say that to me.  I don't

1    believe.

2              Q.   Well, he didn't say that to you.  He was

3    banging on the door at one fifty p.m. and three ten p.m.

4    saying, I need a nurse or medicine, I'm not feeling well.

5    You weren't there.  But do you re -- you -- you -- you've

6    watched this video, did you?

7              A.   I did watch the video.

8              Q.   Okay.  So you are aware that at least on

9    two occasions he was asking for medical assistance?

10             A.   I don't recall the exact wording or what

11   happened, but he did knock on the door and he was asking

12   to be taken downstairs when I was going to take him down.

13   He was asked -- and that was at three forty, I believe it

14   was or three forty-two.

15             Q.   Uh-huh.

16             A.   He did say that he had a headache and he

17   was asking for Tylenol or something.

18             Q.   Okay.

19             A.   And that's when he was brought down to the

20   nurse.

21             Q.   So your testimony today is, when you

22   reviewed this video you don't recall Mr. Jones saying at

23   one fifty p.m. and then again at three ten p.m., I need a

24   nurse or I need medicine?

25             A.   I don't remember the exact words.  It's

1     almost twenty hours of video, but at some point, he did

2     say something about wanting to be brought down and that he

3     wanted some medicine because he had a headache.

4           Q.   Okay.  And then it was not until three

5     forty-two p.m. which is when he was taken out and he was

6     then given whatever medicine or Tylenol that he was given.

7     Is that right?

8           A.   I don't know what he was given.  We don't

9     administer any medication that he would be taken down to

10    the cell room down there and there's a nurse on duty that

11    would administer, if necessary, any medication.

12          Q.   Okay.

13          MS. CINQUANTO:  One moment, Your Honor.  That's

14    all I have, Your Honor.  Thank you.

15          THE COURT:  Thank you, Ms. Cinquanto.  Mr.

16    Parisi?

17          MR. PARISI:  Briefly, Your Honor.

18          THE COURT:  Yes.

19          RE-DIRECT EXAMINATION

20          BY MR. PARISI:

21          Q.   Detective Bartol, you mentioned just a

22    minute ago you reviewed the video.  Do you know what the

23    Defendant was doing from roughly twelve thirty a.m. until

24    seven thirty a.m.  So I'm talking about the 25th.

25          A.   He was sleeping on the floor all night.

1          Q.    And during the -- the course of his time in

2     the interview room, do you know how many bathroom breaks

3     the Defendant received?

4          A.    I believe it was at least five.

5          Q.    Mr. Cinquanto asked you about moving closer

6     to the Defendant at various times during the interview.

7     Did you ever put your hands on him when you were

8     questioning him?

9          A.    I did not.

10         Q.    And then the -- the last question I have

11    for you about the request for medical assistance or the

12    Tylenol and -- and the Defendant urinating in a cup, did

13    that happen before or after you had completed your

14    interview with him?

15         A.    Several hours after.

16         MR. PARISI:  Nothing additional, Your Honor.

17         THE COURT:  Thank you, Mr. Parisi.  Ms.

18    Cinquanto?

19         MS. CINQUANTO:  Just briefly, Your Honor.

20         THE COURT:  Brief.

21         MS. CINQUANTO:  All right.  So --

22         THE COURT:  And Ms. Cinquanto, if you could

23    restrain it to what was elicited on cross, so that we're

24    not going --

25         MS. CINQUANTO:  Absolutely, Your Honor.

1          THE COURT:  Thank you.

2          RE-CROSS EXAMINATION

3          BY MS. CINQUANTO:

4          Q.   So Detective, he was laying on the ground

5     in the interrogation room.  You don't know whether or not

6     he was sleeping?

7          A.   He appeared to be sleeping.  He turned

8     around and -- and moved around and appeared to be sleeping

9     on the ground.

10          Q.   Well, you say he appeared to be sleeping,

11     but you don't know if he was sleeping, correct?

12          A.   Looking at the video, it looked to me like

13     he was sleeping.

14          Q.   Okay.  But you can't see his eyes and his

15     clothes and he wasn't snoring or anything like that,

16     correct?

17          A.   I couldn't see his eyes, no.

18          Q.   Okay.  Now also you -- you also testified

19     that he was given at least five-bathroom breaks.

20     Detective, are you sure about that?

21          A.   If I can refer to my notes on that?

22          THE COURT:  You may.

23          THE WITNESS:  At ten thirty -- seven thirty a.m.

24     the next day.  Ten twenty, one fifty, three ten.  That's

25     -- I got at least five, yes.

1          BY MS. CINQUANTO:  (Cont'g.)

2          Q.   Okay.  Well, I want to talk about how often

3     he was able to use the restroom before he signed the

4     statement.  And that was at seven -- was it ten thirty,

5     the night before, correct?

6          A.   Correct.

7          Q.   At seven forty, the next morning, correct?

8          A.   Correct.

9          Q.   And then the statement was taken.  Is that

10    right?  The interrogation happened, correct?

11         A.   Correct.

12         Q.   And then he went to the bathroom for the

13    third time at ten twenty-one, correct?

14         A.   Yes, correct.

15         Q.   So the total times he was able to use the

16    bathroom prior to the time that the statement was taken

17    was twice, correct?

18         A.   Well, I wouldn't frame it that way.  He was

19    requested to use the bathroom.  He could have used the

20    bathroom anytime that he requested.  He requested to use

21    the bathroom two or three times before.

22         Q.   Okay.  I'm -- I'm --I hear you.  That's

23    fine, but my -- I'm just trying to be accurate here.  So

24    prior to the time that the interrogation ended, right?  He

25    went to the bathroom twice.  He left that room twice.  Is

1    that right?

2                    A.   Yes.

3                    Q.   Okay.

4                    MS. CINQUANTO:  One moment, Your Honor.

5                    BY MS. CINQUANTO:  (Cont'g.)

6                    Q.   And the interrogation ended approximately

7    fifteen hours after his initial arrest.  He was arrested

8    at six p.m. and the interrogation ends at ten twenty a.m.?

9                    A.   Yeah, about fourteen --

10                   Q.   So it's about sixteen hours.  Is that

11   correct?

12                   A.   Yeah, roughly.  Yes.

13                   Q.   Okay.

14                   MS. CINQUANTO:  Thank you, Your Honor.  I have

15   nothing further.

16                   THE COURT:  Thank you.  And the Court will

17   correct itself.  I said that to limit your questions to

18   cross.  It was actually to the redirect of the Government.

19   Nothing further?

20                   MR. PARISI:  Nothing further for this witness,

21   and I have no additional evidence on this motion, Your

22   Honor.

23                   THE COURT:  Thank you very much, Mr. Parisi.

24   Detective, thank you very much.

25                   THE WITNESS:  Thank you.

1           THE COURT:  You're welcome to stand down.

2           MS. CINQUANTO:  Again, Your Honor, I would just

3   request that we be allowed to get the transcript, have

4   supplemental briefing, and if required, then have

5   argument.

6           THE COURT:  And Ms. Cinquanto, I was going to

7   ask Mr. Parisi, there are no additional witnesses?  You

8   said that --

9           MR. PARISI:  Nothing, Your Honor.

10          THE COURT:  Okay.  I will take the Government's

11  previous argument as to its preference regarding arguments

12  on the motion and obviously, your response, Ms. Cinquanto

13  to that and carried over from the previous motion is

14  suppressed to this motion as well, and the Court will

15  issue the same ruling, which is that I will hear argument

16  today on the motion.

17          However, the argument will not be closed.  I

18  will also permit counsel to have supplemental briefing and

19  file that with the Court after the oral argument for

20  today.  And then we'll also schedule a date for additional

21  oral argument to be held and allow both counsel to provide

22  that to the Court at that later date, and then close

23  argument then and render my decision thereafter.  So is

24  there anything further, Mr. Parisi, besides argument?

25          MR. PARISI:  No, Your Honor.

1            THE COURT:  Okay.  You are welcome --

2            MR. PARISI:  Thank you, Your Honor.

3            THE COURT:  To present.

4            MR. PARISI:  Your Honor, the -- the issue on

5    this -- this motion to suppress, I won't put words in Ms.

6    Cinquanto's mouth, but I -- I take from her -- her preface

7    of this that she's not contesting a voluntary waiver of

8    Miranda for this statement.

9            Nevertheless, I'd asked the Court to make a

10   finding that the Miranda waiver was voluntary.

11           THE COURT:  Ms. -- Ms. Cinquanto, are you

12   contesting the -- the voluntariness of the waiver?

13           MS. CINQUANTO:  Your Honor -- Your Honor, yes, I

14   am.  I'm contesting the enti -- the voluntariness of the

15   entire proceeding.  So yes, I am.

16           MR. PARISI:  Okay.  I'll address that as well,

17   Your Honor.

18           THE COURT:  Thank you.

19           MR. PARISI:  Your Honor, the Government's burden

20   to show that both the waiver of Miranda was voluntary as

21   well as the statement itself for both analysis, it's a

22   totality of the circumstances review.  And the third

23   circuit tells us with the Miranda waiver that we look at

24   the Defendant's background, his experience, and his

25   conduct, including his criminal history, which is why I --

1    I both entered that stipulation of the Defendant's

2    extensive criminal history and also his prior Miranda

3    waiver with Detective Chavez, which was approximately four

4    months before this interview.

5           Under the totality of the circumstances, you saw

6    an alert adult male with extensive experience with

7    criminal -- with the criminal justice system, who was very

8    recently mirandized, received the warnings after the

9    detectives determined he was not under the influence, and

10   the Defendant very clearly said he understood those --

11   those warnings.

12          So turning to whether the statement was

13   voluntary or not, I want to first address the -- the

14   urinating in the cup and asking for medicine and all that.

15   That is totally irrelevant for today, because it all

16   happened after the statement.

17          It doesn't matter if the Defendant wants to sue

18   the police for having to pee in a cup, maybe that's

19   something he can do.  But it's not something Your Honor

20   needs to concern yourself with, because it has no bearing

21   on whether or not the statement that was already taken was

22   voluntary.

23          What we do look at is, again, the totality of

24   the circumstances in 18 U.S.C. 3501 gives us some factors,

25   but the -- the critical analysis is, was there police

1   coercion, which is a necessary predicate, and was that

2   coercion so awful that it overcame the Defendant's will.

3        Dickinson, the Supreme Court decision, 530 U.S.

4   433 tells us that.  Again, the similar factors, it's --

5   it's the length of the interrogation, the location, the

6   defense maturity, his education, his condition, and his

7   mental health that all comes out of swint, which is a

8   third circuit decision.

9        What we're talking about is a ninety-minute

10  interrogation, which is a brief interrogation conducted in

11  the Defendant's native language in, for the most part,

12  conversational tone.  The Defendant importantly provided

13  no information after the detectives used stronger language

14  with him.

15       All of the information the Defendant provided

16  was during the conversational portion of this -- this

17  interview.  Obviously, he didn't play the full thing, but

18  the Court has it in evidence.  Within the first minute of

19  the interview, beginning, Detective Bartol satisfies all

20  of the 3501 factors by explaining why he's interviewing

21  him and reading him his Miranda warnings.

22       The Defendant's demeanor is calm throughout.  He

23  never raises his voice.  He never gets upset.  He's not

24  crying.  And I believe it's the third circuit case I cited

25  says that that is also a factor in favor of finding

1    voluntariness of a statement.

2            I cited a number of cases.  I won't go over all

3    of them.  But strong language is not enough for coercive

4    police conduct to raise -- rise to a level where it

5    overcomes the voluntariness.  Bottom line is, the

6    Defendant had his faculties about him.  He's an

7    experienced criminal.

8            He'd been through this exact scenario four

9    months before and waived it when he was interviewed.

10   Sure, he was in the interview room for hours beforehand,

11   but for the most part, he was sleeping.  That's not enough

12   to -- to find coercive police conduct that overcomes his

13   will and renders this involuntary.

14           It was a voluntary statement.  There's no

15   constitutional violation, and we'd ask you to deny the

16   motion.

17           THE COURT:  Thank you, Counsel.  Ms. Cinquanto,

18   do you wish to respond now?  I obviously am giving the

19   ability to supplement this at a later date.

20           MS. CINQUANTO:  Your Honor, I'm going to opt to

21   reserve argument and supplement with written brief, Your

22   Honor, if required.

23           THE COURT:  Thank you, Ms. Cinquanto.  Counsel,

24   I believe that would conclude the motions that were

25   presented to the Court today.  Is there anything -- I'm

1    going to go over dates and kind of deadlines and things

2    that are necessary and get into those things in a moment.

3         I also know that the Government asks at the

4    conclusion of the previous motion to suppress that I make

5    the finding that the witnesses are credible, which I will

6    make that finding on the record now.  And so is there

7    anything else before I get into, kind of dates and

8    reminding you of things that are needed that I need to

9    hear from either of you on before we conclude today.  Mr.

10   Parisi?

11        MR. PARISI:  Only that I provided your staff

12   with a drive containing the Government's exhibits that we

13   introduced today, Government's One through Seven.  But

14   otherwise, I have nothing additional.

15        THE COURT:  Thank you.  And that has been

16   received by the Court and is appreciated and obviously

17   will be viewed by the Court following today's hearing as

18   the evidence that I will consider in these motions that

19   have been argued to the Court.

20        Ms. Cinquanto?

21        MS. CINQUANTO:  Nothing from me, Your Honor.

22        THE COURT:  Thank you.  Counsel, what I've noted

23   from our discussions here today is that, the initial thing

24   I will ask of the Government, and it goes to, I believe,

25   the motion that was filed on E.C.F. One fifty-six.  So

1    addressing the grand jury issue, I ask for the -- pause

2    for one second.

3         Thank you.  Okay.  So I'm going to again,

4    continue on from what I -- what we addressed first earlier

5    this morning.  So the Court is going to provide direction

6    to counsel, insofar as E.C.F. One fifty-six, which is

7    addressing the request of defense, insofar as the grand

8    jury information is concerned, and I will provide you with

9    the Court's directive as to who needs to receive that

10   request, so that therefore, what is being requested is

11   being provided by the right entity and is being provided

12   within the scope of what is permitted as outlined by the

13   -- the plan that was referenced by the Government when Mr.

14   Parisi made his argument.

15        So I will take care of that.  I am asking you

16   all to do the following.  I have asked the Government, Mr.

17   Parisi, to provide an example of a jury instruction, and

18   this goes to the motion for severance of the charges of

19   count one from counts three, four, and five.

20        That addresses the specific issue of the

21   Government's argument as to Rule 14 and the unduly

22   prejudicial position that counsel has put forth on behalf

23   of our client, that if he is to testify on one count and

24   does not wish to testify on the other counts, how that has

25   been or could be addressed in a way that would ensure that

1    there was no undue prejudice as to the Defendant, if, in

2    fact, these cases remain together and the count to remain

3    joined.

4              So I will ask for the Government to provide that

5    example to the Court by 07/16/2024, a week from today's

6    date.  I will permit the defense to respond to that by

7    07/23/2024.

8              MS. CINQUANTO:  Yes, Your Honor.  Thank you.

9              THE COURT:  Okay.  And I will also direct that

10   supplemental briefing insofar as the motions to suppress.

11   So that is for E.C.F. One thirty-five and for E.C.F. One

12   forty-three, that those supplemental briefings be filed by

13   the 29th July of 2024.

14             MS. CINQUANTO:  Your Honor, would you -- I will

15   order the transcripts.  Would Your Honor, I'm going to

16   order it expedited, which, if that's okay with Your Honor.

17             THE COURT:  That is permis -- yes.

18             MS. CINQUANTO:  Okay.  Thank you.

19             THE COURT:  I will grant that, yes.  They can be

20   over expedited.  In light of the timeframe, I'm -- I'm

21   keeping in consideration that the trial date that we have

22   already scheduled on the Court's docket, and the Court is

23   looking to make decisions on all of these motions before

24   the end of August.

25             Which is why the next date I'm offering to you

1    is August 20th, '24 at eleven a.m. is when I will schedule

2    oral argument.  If counsel wishes to supplement their

3    initial argument or the -- or provide oral argument based

4    upon the submissions in the briefs, then it will be August

5    20th at eleven a.m.

6              Is that available to you, Ms. Cinquanto?

7              THE COURT:  And is that available to you, Mr.

8    Parisi?

9              MR. PARISI:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MS. CINQUANTO:  I'm supposed to be on -- I -- I

12   can always move this if it's a problem with the Court.

13   I'm -- I'm supposed to be on a college tour with my son on

14   that day, but I am open on the 21st.  And I am open on the

15   22nd and --

16             THE COURT:  Let's look at the 21st.  Mr. Parisi,

17   are you available on the 21st?

18             MR. PARISI:  Yes, Your Honor.  Yes, Your Honor,

19   I am available.

20             THE COURT:  Okay.  Then we will do the 21st, but

21   we will do it at ten a.m.

22             MS. CINQUANTO:  Thank you, Your Honor.

23             THE COURT:  Okay.  So August 21 ten a.m. will be

24   the scheduling of the oral argument.  And counsel, if you

25   don't feel that oral argument is necessary, then please

1    notify the Court at least five days prior and then we can

2    go ahead and release that date.

3         MS. CINQUANTO:  Understood, Your Honor, thank

4    you.

5         THE COURT:  Okay.  I don't believe that there is

6    anything further in terms of dates and/or specific

7    notations or orders that I wanted to make for purposes of

8    the record.  So if there is anything else outstanding, I'm

9    happy to hear from either of you.

10         Otherwise than that, I will adjourn court for

11    today.  So Mr. Parisi, is there anything further?

12         MR. PARISI:  No, Your Honor.  Thank you.

13         THE COURT:  Thank you very much.  Yes, Ms.

14    Cinquanto?

15         MS. CINQUANTO:  I'm so sorry, Your Honor.

16         THE COURT:  No, that's okay.

17         MS. CINQUANTO:  Your Honor, the trial on this

18    matter is scheduled about jury selections on the 12th of

19    September and then the trial is to start on September

20    16th.  I'm going to be asking for continuance of the trial

21    date.  I've already notified the Government that this

22    would be my intention until the beginning of January or

23    maybe the second week in January.

24         And this is the reason why.  As Your Honor

25    knows, I needed to retain, and I've already told the

1     Government this. One of the -- the most important

2     evidence in this case is going to be the cell phone

3     evidence, phone calls, cell site location information.

4          And I needed to retain an expert. So because I

5     saw where this case was going, I had reached out to the

6     third circuit budgeting coordinator, Renee Edelman

7     (phonetic spelling), and she and I have been diligently

8     working on a budget for Your Honor, for at least six

9     weeks, and it was finally just approved.

10          I have identified, and this is just an expert to

11     help me, sort of, you know, sort of sift through all the

12     information, which is we're talking about a lot of cell

13     phones, a lot of communication, a lot of historical

14     (unintelligible) the people involved here.

15          It's going to take me some time to -- to do

16     that. So I'm going to be asking for a continuance of the

17     trial. I don't think that pushing it into January is --

18     is onerous. And of course, that's up to Your Honor. I've

19     spoken with Mr. Jones. He completely understands the

20     situation. He agrees that a continuance of -- of the

21     trial would be helpful to the defense, if not necessary,

22     frankly.

23          In the meantime, these motions will be decided

24     and based upon the information we get back, we can decide

25     different routes to go.

1           THE COURT:  Thank you, Ms. Cinquanto.

2           MS. CINQUANTO:  If that make sense to you, Your

3    Honor.  And --

4           THE COURT:  I -- I appreciate.  No, go ahead,

5    I'm --

6           MS. CINQUANTO:  Oh.

7           THE COURT:  -- I -- I want to let you finish.

8           MS. CINQUANTO:  Oh, in addition, Your Honor, we

9    also, I believe at some point, and thank you so much for

10   taking the labor and figuring out who I have -- who we

11   have to talk to about --

12          THE COURT:  Uh-huh.

13          MS. CINQUANTO:  -- this grand jury stuff.  But

14   once we do get the grand jury information, which I believe

15   all are entitled to get.  It's going to take some time to

16   sort of sift through that and see if there's any merit to

17   that -- to that motion, or if any motion should be filed.

18          So I think a mid-January date would -- would

19   work for the defense.  I -- I believe it works for the

20   Government as long as it works for Your Honor.

21          THE COURT:  Okay.  I would like to hear from the

22   Government and -- and -- in doing, I would like to hear

23   from the Government.  Then I will also potentially want to

24   hear from Mr. Jones or to make sure that the -- if

25   granted, that the waiver of speedy trial is not an issue.

 1    But based upon your representation, Ms. Cinquanto, I -- I

 2    believe that that would be presumptively agreed upon by

 3    your client.

 4         But before doing so, Mr. Parisi?

 5         MR. PARISI:  Yes, Your Honor.  Ms. Cinquanto

 6    mentioned the -- the basis for this to me, I believe

 7    yesterday.  Under the circumstances, I think I'm -- I'm

 8    hard pressed to object.  I think I -- I would have -- have

 9    no objection to a continuance to make sure that she has

10    the time to consult with her expert.

11         But I would just want an opportunity to consult

12    with counsel and with the Court on the new date, which

13    would hopefully be the final date.  And given the number

14    of witnesses, I'd be aiming to maybe move us a little bit

15    out from the holidays, just to make sure we have everybody

16    ready to go.

17         THE COURT:  That all sounds reasonable, Mr.

18    Parisi.  And I think that based upon what both you and Ms.

19    Cinquanto have presented and knowing the thoroughness of

20    your -- of your advocacy and your respective positions, I

21    think it seems prudent and appropriate to do what Ms.

22    Cinquanto is requesting, and for you to have the

23    opportunity, Mr. Parisi, to consult with counsel and then

24    to make a determination on what works well for what will

25    be a number of witnesses and the number of individuals who

 1     will need to make themselves available for what I will

 2     identify as whatever date is given would be the final

 3     date.

 4            And that barring some extenuating circumstances,

 5     there would be no further continuances.  With that being

 6     said, knowing that the continuance date will be granted.

 7     I -- I won't set the date now unless you want me to, I

 8     would allow you both to consult and consult with

 9     witnesses.  I feel like it is premature to set the date.

10            So I will wait to receive from you what date is

11     convenient, and then I will look to issue an order

12     granting the continuance.  Then however, I will ask at

13     this point just to make sure that the Defendant does

14     indicate his waiver on the record to the continuance

15     request and that he is waiving speedy trials.

16            So I will ask for the Defendant to be sworn, so

17     that we can get that waiver on the record, so that that is

18     something that does not need to be taken care of in

19     writing at a later date.

20            COURT CLERK:  Please stand and raise your right

21     hand.  You do swear or affirm that the testimony you shall

22     give to the Court should be the truth, the whole truth and

23     nothing but the truth, so help you God, or you do so

24     affirm?

25            MR. JONES:  I do, Sir.

1                    WITNESS; CHIHEAN JONES; Sworn

2                    THE COURT:  Thank you.  Remain standing.  Mr.

3        Jones, you have heard that your attorney, Ms. Cinquanto

4        has indicated that it would be your best interest in

5        preparation for your defense for your case to be continued

6        from the current scheduled trial date, which is September

7        the 12th to a date that is to be determined, but sometime

8        in January.

9                    She has made this motion based upon the evidence

10       that she anticipates receiving, as well as mitigation

11       information that she is also looking to acquire as well.

12       Do you have any objection to that?  And -- and if so, let

13       me know.  And if you don't, then do you waive the speedy

14       trial?

15                    So do you have any opposition to what your

16       counsel has requested?

17                    THE WITNESS:  No, Your Honor.

18                    THE COURT:  Do you agree that it is in your best

19       interest for the case to be continued, so that Ms.

20       Cinquanto can prepare your defense?

21                    THE WITNESS:  Yes, Your Honor.

22                    THE COURT:  Okay.  And so you do waive any

23       speedy trial considerations that would be normally

24       attached to a case if, in fact, you did not agree to

25       continue.  Do you waive speedy trial?  Do you waive speedy

1    trial?

2             THE WITNESS:  Yes.  Yes.

3             THE COURT:  And I'll explain to you what that

4    means.  That means that you do not oppose or object to the

5    continuance of the case that you are not going to say at a

6    later date I didn't agree with this, and therefore you

7    violated my speedy trial rights by continuing this case

8    out, understanding the basis why your attorney is asking

9    for it.

10            So when I ask for a waiver, it's a bit of a

11    tricky word, but it means that you are not going to, at a

12    later point in time, come back to the Court and say, I

13    didn't agree to that.  So in fact, you do agree to the

14    continuance.  Am I correct?

15             THE WITNESS:  Yes.

16             THE COURT:  Yes.  All right.  Counsel, anything

17    further?

18            MS. CINQUANTO:  Yes, Your Honor.  Your Honor,

19    Mr. Jones is concerned, and I told him I would raise this

20    issue.  And this is -- this is on me.  Mr. Jones, when he

21    was in state custody, had received some discovery.

22    Apparently that discovery differs from, or there is some

23    -- some -- there's some things that are not included in

24    the discovery that I received from the Government.

25            What I would like to do is, I'm not -- the

1    Government's been very, very good about providing the

2    discovery, giving a copy over to the Defendant at the

3    F.T.C.  What I need to do is, I need to go with Mr. Jones

4    and really drill down on what he says is missing and make

5    sure it is missing, and then make sure that there's no

6    reason why the government wouldn't turn over.

7         Like for example, perhaps they turned over a

8    Jenck's statement in the state.  That is not to be turned

9    over now until right before trial.  So this is on me.

10   This is a discovery issue on me.  And I just wanted to let

11   Mr. Jones know that I'm raising it, that he is telling me

12   there's things that are missing.

13        But before I make that representation, I just

14   need to drill down a little bit more on that issue.  Is

15   that fair, Mr. Jones?

16             THE WITNESS:  Okay.

17             THE COURT:  Talk to your -- talk to your

18   attorney first.

19             MS. CINQUANTO:  So -- so this is -- this is the,

20   we've (unintelligible) Mr. Jones about this.  So

21   apparently, when he was charged in the state, he was given

22   -- he was given some discovery.  When he was transferred

23   over to the federal system, that discovery did not come

24   with him.

25        I don't know what's in that discovery.  I

1    contacted C.F.C.F. where he was detained and they don't

2    have a copy.  No one has a copy.  The Government and also

3    said they don't have a copy.  And I believe -- I believe

4    that.

5           So the point is is that, I have to figure out

6    what he's -- he saw that we don't have and then I have to

7    figure out why we don't have it and if we don't have it

8    and that type of thing.  So I just wanted him to know that

9    I'm addressing this issue.

10          Okay.  Okay.  So in any -- in any event, Your

11   Honor, if I could just -- we'll figure that piece out, but

12   I wanted Mr. Jones to know that I'm addressing that issue.

13   Does that make sense, Mr. Jones?

14          THE WITNESS:  Yes.

15          MS. CINQUANTO:  Okay.  All right.  Thank you.

16          THE COURT:  Okay.  Mr. Parisi, you have a

17   response?

18          MR. PARISI:  Yes.  Ms. Cinquanto has mentioned

19   this to me in the past.  I don't know what the discrepancy

20   is.  I suspect it is witness' statements.  He's not

21   entitled to them in the federal system.  I'll remind --

22   the Court knows there is protective order as well,

23   restricting the Defendant's access.

24          To avoid a file by file and a letter by letter

25   review of what he does or does not have, what it may

1     already be done.  I'm waiting.  But I've asked our lit

2     support team to burn a complete set, once again, of the

3     discovery material that the Defendant is entitled to have

4     at this stage.  And I'm going to prevent -- provide --

5     excuse me.

6           I'm going to provide that to him at the F.D.C.

7     That should occur this week, if not today.

8           THE COURT:  Okay.  And that set that you are

9     providing, is this something that you have already

10    previously provided to counsel?

11          MR. PARISI:  It is.  All the material that's

12    previously been provided.

13          THE COURT:  Okay.

14          MR. PARISI:  But rather than worry about does he

15    have this report or that report, I am -- I'm burning a

16    complete set once again, and I'll make sure that gets to

17    the F.D.C., so he will have everything that Ms. Cinquanto

18    has.  What he doesn't have, obviously, is Jencks' material

19    that will be provided later.

20          THE COURT:  Okay.  And for the purposes of you,

21    Mr. Jones, because I know in this conversation you're

22    talking with your lawyer, you're hearing from what the

23    Government is saying.  And what your lawyer has done per

24    your request, it sounds like from conversations that you

25    both have had is make me aware that this is something that

1      she is working on, which is exactly what she should do.

2              So while there may be information materials that

3      you may have received or seen previously that you

4      remember, you're like, I remember this and I'm not seeing

5      it now, is maybe what I'm -- I'm guessing you were looking

6      at those because you are now in the federal court as

7      opposed to state court.

8              Certain information may not be available at the

9      time that you would have expected it to be available.  And

10     Ms. Cinquanto is going to talk about that with you after

11     the Government is -- is saying we're going to actually

12     reissue that information again.

13             Everything you're entitled to now, you're going

14     to get.  It may not match up with what you've seen before.

15     Ms. Cinquanto is going to ask you what those things are.

16     She's going to take those particular things and either

17     explain to you why you are not entitled to them yet, or

18     what those circumstances may be surrounding that

19     particular document, or, you know, statements or whatever

20     it is, and then she will explain it to you.

21             And if it's something that you are entitled to,

22     she'll do just what she did today, which is make a motion.

23     If she cannot resolve it with the Government

24     independently, bring it to my attention, and then I will

25     go ahead and make a decision on that.  Okay?  You

1      understand?

2                      THE WITNESS:  Yes.

3                      THE COURT:  Great.  Anything further?

4                      MR. PARISI:  No, Your Honor.

5                      THE COURT:  All right.

6                      MS. CINQUANTO:  Nothing from the Defense, Your

7          Honor.  Thank you.

8                      THE COURT:  All right.  Okay.  With that,

9          Counsel, thank you very much.  As I stated, for very, very

10         good arguments and presentation today of all the evidence.

11         Court will stand adjourn for today and there's no further

12         business.

13                     COURT CLERK:  All rise.

14                     (Off the record.)

15                     (The hearing concluded at 1:55 p.m.)

16                     CERTIFICATION

17     I, Judith Spriggs, court approved transcriber, certify that

18     the foregoing is a correct transcription from the official

19     electronic sound recording of the proceeding in the above-

20     entitled matter.

21

22     _____/
       Judith Spriggs
23     Associated Reporters Int'l., Inc.   17th day of August, 2024

24

25

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 1

**A**

**a.m** 1:6  3:1  131:14  135:9  136:6  144:9  147:7  151:23  156:23,24  158:23  160:8  169:1,5,21,23
**A.T.F** 4:14
**ability** 27:13  34:6  120:13  165:19
**able** 28:5  57:23  74:15,18  75:10  91:1,5  92:2  93:1  98:4,7,7,21  98:22  150:18  159:3,15
**above-** 181:18
**absence** 62:16
**absolute** 35:19
**absolutely** 27:9  55:18  157:25
**abundantly** 88:24
**acceptable** 9:14
**accepted** 64:1  118:4
**access** 66:5  178:23
**accommodate** 105:17
**accuracy** 67:1,10
**accurate** 66:7  67:8  71:12  101:10  114:19  159:23
**accurately** 85:14  131:2
**accused** 45:10,11  48:7  49:5,15
**acquire** 175:11
**Act** 117:24
**acting** 99:9  110:10
**action** 3:4  27:19  111:5
**activate** 83:10
**activated** 87:5  108:5  130:17
**activates** 87:7
**actively** 73:5  74:23
**activities** 132:3
**activity** 107:4  138:25
**actual** 44:20  73:24  126:17
**Adams** 108:7
**addition** 15:25  25:23  46:16  172:8
**additional** 8:4  13:18  25:11  27:21  78:25  103:9  122:16  157:16  160:21  161:7,20  166:14
**address** 4:24  6:13  8:7  9:4  20:16  42:17  61:6,9  106:17  162:16  163:13
**addressed** 116:4  167:4,25
**addresses** 167:20
**addressing** 167:1,7  178:9,12
**adduced** 30:1
**adjourn** 170:10  181:11

**administer** 156:9,11
**administratively** 5:2
**admissibility** 5:23
**admissible** 43:24  63:2
**admission** 63:3
**admits** 26:16
**admitted** 83:14  86:9  121:1  134:7
**adult** 163:6
**advance** 5:4
**advances** 110:21
**adverse** 18:8
**advise** 60:23
**advocacy** 173:20
**affirm** 64:6,8  77:5,7  118:7,9  122:25  123:4  128:16,18  174:21  174:24
**afoot** 107:4
**afternoon** 118:16,18  123:12  128:25  129:1  139:25  140:1
**age** 16:8
**Agent** 4:14
**aggressively** 117:8
**ago** 115:11  156:22
**agree** 10:4  12:10,15  14:23  52:13  52:14  53:11,13  120:15  175:18  175:24  176:6,13,13
**agreed** 9:20  17:2,2  138:3  173:2
**agreeing** 14:3,4
**agreement** 10:23  18:15  62:25
**agrees** 171:20
**ahead** 11:25  17:21  18:16,17,20  58:22  60:17  99:4,14  101:17  105:25  135:6  137:13  138:9  170:2  172:4  180:25
**aid** 40:11
**aids** 34:5  35:1
**aiming** 173:14
**Alan** 1:22  4:19
**alarm** 65:15,16,16  66:11
**alcohol** 120:1  132:16,24
**alert** 124:11  129:25  163:6
**alibi** 27:3,7  49:7,7  56:24
**allegation** 57:20
**allegations** 44:3
**alleged** 21:19  22:21,25  51:4,8
**allegedly** 20:18  22:11  47:3  57:13
**allow** 10:22  49:18  73:17  105:14  105:19  106:3,6,7,10,12  115:11  161:21  174:8

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 2

allowance 8:24
allowed 29:1 106:5 144:2 161:3
alongside 4:7
alternative 20:2
Amanda 1:12 4:13
amanda.mccool@usdoj.gov 1:16
Amendment 27:4 49:9
AMERICA 1:3,11
amount 25:15
analysis 38:18 110:18 111:7
 162:21 163:25
and/or 10:23 19:8 54:21 58:14
 122:25 170:6
answer 14:3 35:25 57:20
answered 73:15
answers 120:18
anticipate 41:6 58:13
anticipates 41:1 175:10
anybody 42:20 142:25
anymore 148:6
anytime 159:20
anyway 28:1
apologize 43:19 149:18
apparently 176:22 177:21
appear 133:5
appearance 3:25 119:22 133:5
APPEARANCES 1:9
appeared 52:4 82:22 158:7,8,10
appears 23:25 65:17 67:15 86:13
apples 53:11,11
application 10:2 13:5,15
appreciate 8:3 19:1 58:7 59:4
 118:5 172:4
appreciated 166:16
apprehended 32:20 113:18
approach 125:17
approached 125:18,20
appropriate 11:21 14:25 15:18
 16:13 18:14 36:10,15 37:16
 38:18 40:6 120:19 173:21
appropriately 18:13
approved 171:9 181:16
approximate 93:2
approximately 80:25 85:17 86:18
 99:22 109:25 117:2 127:6
 128:7 131:12 134:18 135:7
 136:14 138:13 140:4,15 141:18
 144:8 145:23 147:7 148:10
 150:12 152:4 160:6 163:3
approximation 140:23

area 26:17,17,18,18 31:23 32:6
 33:1 42:14 62:12 70:17 72:19
 72:21 73:1 74:1,12 79:11,23
 80:3 100:15 101:14 112:20
 124:20 151:5
areas 125:6
argue 7:14 9:7 105:9 115:15
argued 105:18 166:19
arguing 61:23
argument 5:3 7:16 8:10,21 9:8
 19:5,6 35:10,12 36:2 40:13
 89:17 103:11,18,21,24,25
 104:8,25 105:1,3,7,19 106:2,8
 106:9,10,16 112:3 115:12,18
 161:5,11,15,17,19,21,23,24
 165:21 167:14,21 169:2,3,3,24
 169:25
arguments 59:15 161:11 181:10
arising 55:25 56:2
arrest 29:16 116:22 126:11
 143:22 144:10 160:7
arrested 21:3 22:17 30:10 42:5
 42:6 117:3 140:3 142:23 143:4
 160:7
arrival 110:17
arrive 83:2 109:13 110:24
arrived 80:22 102:17
arrow 69:22
articulate 61:18 107:3
aside 103:9 126:6
asked 21:7 73:15 125:22 139:11
 153:10 154:10,19 155:13 157:5
 162:9 167:16 179:1
asking 6:24 7:3 15:15,25 16:1
 23:21,22 114:22 152:25 153:1
 153:6 154:5,12,15 155:9,11,17
 163:14 167:15 170:20 171:16
 176:8
asks 166:3
assaults 35:4
assigned 10:11 11:3,7 77:13,25
 118:14 119:6 123:11 129:11,18
assistance 154:5,13,16 155:9
 157:11
Associated 2:1 181:22
assume 79:11 94:5
assuming 43:4 145:8
ate 145:8
attached 12:13 36:5 175:24
attempt 14:10 73:18

800.523.7887        7-9-2024, WORD INDEX, Jones case        Associated Reporters Int'l., Inc.

Page 3

**attempted** 150:17
**attention** 78:4 82:11,15 99:2
  119:5 123:25 129:15 180:24
**attorney** 175:3 176:8 177:18
**attorney's** 132:1
**ATTORNEY'S** 1:13
**audio** 87:4,20 121:15 130:22
  135:20
**August** 2:23 5:14 20:17 22:23
  23:17 24:15 25:2,7 26:6,16
  27:20 28:7,17,22 29:3 30:7,21
  30:23 31:6,19 32:7,20 34:7
  35:17,22 36:21 37:3,11 41:3
  42:5 43:11,25 44:2 45:3 46:19
  47:1 48:20 51:19 52:2,19 53:3
  53:5 56:4 57:7,17 61:14 62:1
  63:12,15,18,19,22 78:4 79:21
  83:7 84:1,9 86:12 119:6 121:8
  122:9 168:24 169:1,4,23
  181:22
**AUSA** 1:12,12
**authority** 13:14
**available** 12:12 13:20,24 61:5
  106:4 115:13 169:6,7,17,19
  174:1 180:8,9
**Avenue** 78:21 80:14 108:7 119:8
  129:17
**avoid** 178:24
**aware** 3:20 71:9 80:6 124:16,18
  147:24 155:8 179:25
**awful** 164:2

---

**B**

**B** 1:7 2:21 3:3
**B-A-R-T-O-** 128:23
**back** 26:9 29:15 35:12 40:12
  41:23 43:13 55:6 56:8,9 57:20
  87:7 88:17 89:11 98:19 101:6
  103:21 104:24 105:7,8 115:25
  116:5,10 119:6 123:25 125:24
  135:25 142:7 152:1 171:24
  176:12
**background** 162:24
**backseat** 21:9 30:11 43:15 83:1
  83:11 89:8
**bad** 50:12
**badge** 77:13 78:14 118:14 124:8
**band** 66:16,16,17 79:1
**banging** 153:25 155:3
**Baptist** 109:3

**Baron** 4:14,15
**barring** 174:4
**Bartol** 2:18 128:14,19,20,23
  129:8 134:10 135:9 136:5
  137:14 138:12,23,25 139:18
  148:15 156:21 164:19
**based** 7:10 8:8 10:18 17:23
  19:24 39:15 54:18,20 61:4
  74:19 79:25 82:17 84:16
  103:22 115:14,14 134:1 169:3
  171:24 173:1,18 175:9
**basically** 12:18 21:6 24:14
**basis** 18:14 33:18 38:23 39:15
  54:24 60:11,15,16 95:25 107:4
  173:6 176:8
**Batch** 123:10 128:24
**bathroom** 135:1 143:11 144:2
  153:21 154:2 157:2 159:12,16
  159:19,20,21,25
**Baylson** 14:18
**bear** 69:16
**bearing** 163:20
**beat** 33:1
**began** 85:19 117:2 131:10,13,19
  133:18
**beginning** 40:19 69:7,10,20 90:2
  108:1 136:8 164:19 170:22
**begins** 108:1
**begs** 51:22
**begun** 89:7
**behalf** 4:11,13,18,19 167:22
**belief** 10:8
**believe** 4:3 6:15 7:14,25 9:3,20
  9:20 10:4 11:9,13,13 13:4,5
  13:14 14:20 17:25 18:1 20:3
  21:16,16 30:25 31:9 33:4 35:6
  38:6 39:16,17 44:23 45:15,21
  46:14 49:11 50:9 51:24 55:10
  79:23,25 84:2 88:8 92:20
  99:20 100:12 105:17 107:5
  112:22 116:14 120:7 122:12
  124:5 125:6,8 127:1 130:12
  132:23 134:3 135:13 140:3
  141:2 145:9 149:15 152:5,24
  154:17 155:1,13 157:4 164:24
  165:24 166:24 170:5 172:9,14
  172:19 173:2,6 178:3,3
**believed** 19:17 81:14 95:21
**believes** 39:13 48:23
**believing** 96:1

800.523.7887          7-9-2024, WORD INDEX, Jones case     Associated Reporters Int'l., Inc.

Page 4

**belittled** 117:8
**benefit** 18:9,9
**BENSALEM** 1:20
**berated** 117:8
**best** 27:18 136:15 175:4,18
**better** 27:7 53:18 96:22
**beyond** 37:13,23
**bicycle** 66:23
**big** 39:18 72:21 73:11 75:3
   83:22 134:10 140:19
**bigger** 37:24 41:17 42:21,25
   54:7 140:18 141:12
**biographical** 126:10
**bit** 39:10 47:8 65:12 87:17
   114:12 140:18 145:6 146:24
   152:20 153:8,11 173:14 176:10
   177:14
**black** 16:22 90:10,17,20,21,21
   112:19 135:24
**block** 72:16,16 73:12 76:5,10
   79:19 80:20,23 124:19
**blocked** 96:25 97:1
**blocking** 113:13
**blocks** 79:17
**blue** 90:16 98:18
**bodies** 92:11
**body** 2:23 63:16,19,20 83:7,16
   83:25 84:15 85:10,10,23 86:4
   86:12 102:22 104:6,12 109:11
   109:20 110:6 111:24
**bottom** 139:4 165:5
**Boulevard** 1:23 108:10,13,17
**bounce** 67:17 70:14,15 72:7,13
   72:18
**bounces** 72:15
**bouncing** 68:21 70:14,22 71:2,7
   72:4,15
**bounds** 35:6
**bragged** 40:21 42:20
**brake** 88:19
**Bransfield** 119:20 121:18
**break** 132:6
**breaks** 135:1 157:2 158:19
**brief** 40:13 102:11 105:1 111:3
   115:24 157:20 164:10 165:21
**briefing** 7:25 8:24 9:4 103:19
   103:25 105:6 106:6,12 111:14
   112:3 113:25 115:12,19 161:4
   161:18 168:10
**briefings** 168:12

**briefly** 15:6 128:1 156:17
   157:19
**briefs** 48:7 103:20 169:4
**bring** 25:2 52:5 107:23 130:1
   134:6 137:19 180:24
**bringing** 51:22
**Bristol** 108:16
**Broad** 61:17 80:13,21 87:3,25
   93:14,22,23,23 94:7,17,17,18
   94:21,25 95:10,14,20 96:4
   102:16,18,20 108:13,14,14,19
   108:22 109:2,7,7,10,19 112:11
   112:17,23 113:5,13,17 119:19
**broadcast** 78:24 80:19 104:5
   107:8 108:2,12,17,18,23 109:2
   109:9,14,18 110:1 111:1
**broadcasting** 66:12 79:7
**broadcasts** 63:14 79:13,22
   104:11 108:24 109:5 114:20
   115:2
**brought** 119:13 125:24 126:8
   140:7 155:19 156:2
**Brown** 21:22 22:4,15 47:15,16,17
   51:25 110:18
**budget** 171:8
**budgeting** 171:6
**buffer** 87:5
**burden** 23:23 33:18 34:23 54:25
   60:13 162:19
**burn** 179:2
**burning** 179:15
**bus** 62:13 80:2,6 96:12,16
   108:25,25 112:21
**business** 181:12
**Butler** 108:22

---

**C**

**C** 2:7 12:24 13:9 45:5
**C-A-P-P-E-L-L-A-N-O** 78:14
**C-E-I-N** 77:12
**C-H-A-** 118:13
**C.F.C.F** 178:1
**calculations** 109:25
**call** 16:15 27:2,6 57:2 62:24
   63:23 66:16 78:8,20 85:2
   89:17 90:3 92:13 108:2,8
   110:15 112:21 113:2 131:18
   138:10
**called** 41:15 149:2
**calls** 63:14 78:25 102:15 107:23

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 5

114:1,9,19 171:3
**calm** 164:22
**cam** 63:19,21 85:23 86:4,12
  104:6,12 109:11,20 110:6
  111:24
**camera** 2:23 63:16 83:8,16,25
  87:5 135:25
**cameras** 33:2 84:15
**cams** 85:10,10
**Cappellano** 63:17 78:14,17 80:12
  85:11 87:2,21 89:7 109:13
**Cappellano's** 86:4,12
**capture** 85:15 86:5 131:2
**captured** 137:22
**car** 21:12 27:10,10 29:18 30:11
  30:23 31:1,4 32:8,22 33:8
  41:21 43:12,13,15 61:14 66:22
  66:25 68:6 80:10 81:19,20
  84:4 85:20 86:19 87:21 88:7
  88:22 89:11 90:25 91:1,3
  94:11,12 97:25 98:8 101:2
  103:8 107:2,5 110:6,9,16,25
  111:11 115:3 119:11 125:3,9
  125:14,17,21,25
**card** 133:21
**care** 4:4 5:2,4 6:15 8:14 45:19
  167:15 174:18
**career** 124:21 132:14
**Carlisle** 108:17,18
**Caroline** 1:17,18 4:18
**carrie@cclegal.com** 1:21
**carried** 161:13
**cars** 62:15 94:15,16,24 101:12
  101:25 102:24 110:12 112:24
  113:9,14
**cartoon** 90:21
**case** 1:3 5:20 13:3 14:7,16
  16:22 18:3,12 20:12 22:14
  25:4,13 26:3,5 27:1,4,8,19
  28:22 29:7,7,10,22 30:6 33:19
  33:25 34:4,19,25 35:7 40:2
  44:9,11 46:7,8,10,10 48:4,11
  49:8,17,20 50:2,3,10,12,19
  52:4,7 55:17,19,23,25 56:2,17
  57:2 61:10,23 72:1 75:11
  91:15 107:7 151:15 164:24
  171:2,5 175:5,19,24 176:5,7
**cases** 19:17 20:7 24:20 25:17
  26:1 32:11 34:9 35:2 40:2
  49:24,24,25 50:11,25 51:18

58:16 165:2 168:2
**catch** 132:7
**categories** 12:18
**category** 13:7,19 15:3
**Cein** 2:11 76:24 77:9,12
**cell** 20:20 21:9,17,18,21,25
  22:2,7 23:11 25:6 30:8,13,15
  30:15 31:18,19,25 32:8 34:7
  40:23 43:1,2,14 52:24 53:19
  54:8 67:17 70:23 71:9 72:6,7
  72:12 78:8 79:1,3 89:11 90:2
  92:25 95:9,18,19 122:11
  156:10 171:2,3,12
**center** 1:23 42:12
**certain** 14:25 18:24 30:2 57:9
  68:17 180:8
**certainly** 9:4 29:3 35:7 57:9,9
**CERTIFICATION** 181:16
**certify** 181:16
**chain** 52:9
**chair** 134:15 138:16 150:1,13
**changed** 139:9
**changes** 85:8
**characters** 90:21
**charge** 29:14 43:24 45:10,13
  47:13,13 49:3 50:17,21 57:12
  117:25
**charged** 20:9 22:13 26:25 33:16
  42:5,7 44:18 47:24 49:8 50:20
  51:5,9,24 57:2,12 58:25
  151:15 177:21
**charges** 167:18
**charging** 39:8
**Charlie** 12:24 13:9
**chart** 46:24
**Chavez** 2:13 117:19,20 118:1,10
  118:11,13,17,24 121:6,17
  122:4 140:4 163:3
**check** 58:1 94:24 112:24 154:9
**checked** 111:25
**checking** 127:20
**checkpoint** 111:8
**CHESTNUT** 1:13
**Chevrolet** 124:24
**chief** 10:11,12 11:2,6 13:11
  15:4 17:24,25 18:22
**Chihean** 1:5,17 3:4,16 81:15
  119:11 120:7 121:7 124:11
  125:22 129:22 175:1
**child** 50:5

800.523.7887        7-9-2024, WORD INDEX, Jones case        Associated Reporters Int'l., Inc.

Page 6

**choose** 27:5 35:21 41:9 105:22
  105:23
**chooses** 35:20 38:3,8 39:5
  103:21
**chose** 47:12,13
**Christian** 2:13 117:19 118:13
**Christopher** 1:12 4:11 118:11
**Christopher.parisi@usdoj.gov**
  1:16
**Church** 109:4
**Cinquanto** 1:17,18 2:10,12,14,17
  2:19 3:24 4:17,18 5:15 6:14
  6:22 7:2,13,18 8:7,19 9:2,5
  9:14,16 10:21 11:4,9,11,17
  12:3,6 13:22 14:14,22 15:5,8
  16:19,25 17:14 19:1,10 35:11
  40:3,15,16,17 42:17 48:6
  49:23 51:2,16,21 52:14,17
  53:13,16,23 54:2 55:2 56:16
  58:4,5,6,9,10,24 59:24 60:3,7
  60:15,20,21 61:8 62:21 67:22
  67:24 69:19 70:7 71:21,24
  73:17 74:2,3,13,14 75:17,19
  76:7,15,16 84:18,20 87:11
  89:19,20,22 102:5,7,8 103:13
  103:14,15 104:1,17,18 105:14
  105:22 106:3,14 107:15 112:2
  116:6,17,19,20 117:16 122:1,3
  122:14,15 127:25 128:1,3,8,9
  139:20,21,24 147:1,6,9,10
  156:13,15 157:5,18,19,21,22
  157:25 158:3 159:1 160:4,5,14
  161:2,6,12 162:11,13 165:17
  165:20,23 166:20,21 168:8,14
  168:18 169:6,11,22 170:3,14
  170:15,17 172:1,2,6,8,13
  173:1,5,19,22 175:3,20 176:18
  177:19 178:15,18 179:17
  180:10,15 181:6
**Cinquanto's** 162:6
**circle** 70:18 73:6 74:24
**circuit** 34:3,9,15,24 38:19
  39:13 48:2,3,11,17 50:1 56:18
  107:6 162:23 164:8,24 171:6
**circumstances** 56:7 117:13
  162:22 163:5,24 173:7 174:4
  180:18
**cited** 34:3 35:3 40:2 110:19
  164:24 165:2
**city** 72:6 82:16,24

**citywide** 66:16
**civilians** 66:13
**clarification** 59:4
**clarify** 10:23 11:11 16:14 59:3
**clear** 13:10 16:2 24:3 30:23
  31:16 33:20 38:19 48:12 56:18
  60:24 68:22 83:24 88:24
  101:11 112:7 115:3 121:18
**clearly** 48:9 101:25 163:10
**clerk** 3:2,10 14:1,2 16:12 44:14
  45:11,12 49:15 64:5,11 77:4
  77:10 116:10 118:6,12 122:24
  123:4,7 128:15,21 174:20
  181:13
**clerk's** 9:24 10:6 11:1 15:16
**client** 15:11 17:7 18:8,9 21:4,5
  21:18,24 22:12 23:9 28:5
  42:20 51:5 53:2 97:12 167:23
  173:3
**cliff** 9:9
**clip** 93:20 94:13
**close** 72:6 92:1 98:3 106:2
  161:22
**closed** 106:9 161:17
**closely** 40:16
**closer** 91:4,25 98:13,21 149:23
  149:25 150:13,16,20,24 157:5
**cloth** 56:6
**clothes** 158:15
**clothing** 98:20
**co-** 110:13
**co-conspirators** 110:8
**co-counsel** 58:1
**co-defendant** 151:17
**co-defendants** 56:8 144:20
**code** 82:17
**coercion** 164:1,2
**coercive** 165:3,12
**cold-blooded** 149:3
**collection** 63:13
**collectively** 107:10
**college** 169:13
**color** 32:5,22,24
**colors** 91:7
**combined** 50:13
**come** 29:21 33:10,15 39:8 79:17
  97:25 103:21 105:7 115:25
  145:13 153:23 176:12 177:23
**comes** 8:1 44:9 92:13 164:7
**comfortable** 15:22

800.523.7887 7-9-2024, WORD INDEX, Jones case Associated Reporters Int'l., Inc.

Page 7

**coming** 51:23 56:6 94:1 105:8 109:2
**commenced** 3:1
**commentary** 12:4
**comments** 8:21
**commit** 22:16 30:21 42:13
**committed** 122:10
**committing** 42:13
**common** 19:23 20:6 22:20 23:16 40:7 51:2,3,25 52:1,9,10,12 52:20 53:8,12 55:7,10 82:24
**commonality** 54:17
**communicating** 70:24 71:2 144:21
**communication** 171:13
**companies** 66:2
**company** 65:25 72:9 108:4
**compare** 28:4
**comparing** 102:22
**compartmentalize** 33:23 34:6,11 34:17 39:1
**compartmentalizing** 35:1
**compass** 16:4
**compelled** 150:13,16
**compelling** 26:11
**competing** 108:24
**complete** 21:1 59:16 63:13 114:9 179:2,16
**completed** 19:4 157:13
**completely** 52:14 110:10 171:19
**complies** 14:23
**compliments** 32:13
**composition** 9:22 10:20 16:4,8 16:11 17:12
**comprised** 10:20
**compromised** 33:20
**conceded** 19:16 55:5
**concern** 28:4 39:22 56:3 163:20
**concerned** 12:3 14:9 18:6 51:12 59:6 61:18 167:8 176:19
**concerning** 61:19 78:25
**concerns** 14:7 17:16 41:12 71:25 110:20
**conclude** 116:2 165:24 166:9
**concluded** 35:11 106:11 181:15
**concluding** 35:12
**conclusion** 9:5 115:21 166:4
**concurs** 12:5
**condition** 164:6
**conduct** 19:23 20:6 22:20 23:16 162:25 165:4,12

**conducted** 54:16 164:10
**conference** 39:9
**conferring** 4:1
**confirm** 98:9
**confirmed** 112:13,15
**confuse** 72:25
**confused** 69:9
**confusing** 66:24
**connecting** 47:6
**connection** 53:20
**consecutive** 45:5
**consecutively** 47:18
**consider** 34:13 166:18
**consideration** 168:21
**considerations** 17:17 175:23
**considered** 7:6
**consolidated** 25:17
**conspirators** 110:14
**Constitution** 17:6 60:12
**constitutional** 61:20 111:12 165:15
**constitutionally** 61:20
**constraints** 137:10
**consult** 173:10,11,23 174:8,8
**Cont'g** 70:7 71:24 74:3 75:19 83:18 84:21 86:10,25 87:14 121:5,16 123:18 134:8 135:18 136:4 137:12 138:11,22 147:10 159:1 160:5
**contact** 130:4
**contacted** 178:1
**containing** 166:12
**contesting** 162:7,12,14
**continuance** 170:20 171:16,20 173:9 174:6,12,14 176:5,14
**continuances** 174:5
**continue** 75:16 106:25 167:4 175:25
**continued** 62:14 106:10 112:16 175:5,19
**continues** 70:4
**continuing** 19:22 20:6 22:20 23:7,15 176:7
**continuous** 69:24 100:5
**controlled** 65:25 117:23
**convenient** 54:3 174:11
**conversation** 9:18 126:19 147:19 179:21
**conversational** 164:12,16
**conversations** 7:11 179:24

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 8

**conveyed** 147:13
**convict** 24:10
**convicted** 117:22  147:18,22
  148:17,22
**conviction** 43:23  44:16  57:6,6
**convincing** 48:14
**cooperating** 44:3  53:17
**coordinator** 171:6
**copy** 5:17  177:2  178:2,2,3
**corner** 125:10
**Corporal** 2:8  64:4,21  65:23
  74:15  76:20
**correct** 7:1  8:11  10:9,13  11:4
  36:13  42:8,9  52:13  56:15
  58:24  64:25  66:6  68:24  75:8,9
  75:13,14,15  76:11  79:9  80:11
  83:6  85:23,25  86:20  87:4,9,23
  88:13,15  89:1,9  90:11,14  91:5
  91:20  92:8,19  93:8  94:18,19
  94:21,22  95:12,16,23,24  96:23
  97:17,21,22,24  98:3,11,24
  99:5,25  116:15,18  119:9
  121:20  128:6  134:20  137:18
  138:13,14  139:10  140:9  141:22
  141:23,25  142:5,19,23  143:5,9
  143:16,19,20,25  144:6,7  145:3
  145:16,19  146:1,2,8,13,14,17
  146:18,20,21  147:14,25  149:13
  150:3,9  151:6,12,13,18,19
  152:6,12,13,15,21  153:7,8,16
  154:2,3,6  158:11,16  159:5,6,7
  159:8,10,11,13,14,17  160:11
  160:17  176:14  181:17
**correction** 6:8  139:7
**correctly** 7:20  33:17  87:22
**correspond** 84:23
**corroborate** 27:6  32:10  49:8
  57:3
**corroborates** 48:22
**counsel** 3:12,20  4:6,7,23  6:4,17
  10:17  13:15  28:11,19  33:17
  36:2  37:1  38:8  53:11  59:16,18
  60:10  62:25  89:19  104:9
  105:21  110:2  115:10  116:13
  161:18,21  165:17,23  166:22
  167:6,22  169:2,24  173:12,23
  175:16  176:16  179:10  181:9
**counsel's** 34:19
**count** 5:7  19:9  25:25  26:1  27:19
  27:20,20  32:14  34:14  38:18,23

**counter** 60:14
**counts** 5:8  19:22  24:1  27:25
  30:1  33:16,25  34:11  40:5  41:4
  51:6  59:5  167:19,24
**couple** 60:23  68:2  101:5  136:20
  150:14
**course** 19:23  20:6  22:20  23:7,15
  27:18  58:3  136:11  147:11
  149:22  157:1  171:18
**court** 1:1,8  2:1  3:2,5,9,10,12
  3:14,19  4:16,21  5:16  6:21  7:1
  7:12,17  8:6,13  9:8,12,14
  10:21  11:5,10,16,20,24  12:9
  12:11,18,22,25  13:10  14:21
  15:7,10  16:9,13,18,24  17:15
  18:4,17  19:3,25  24:1  25:12
  28:11  31:3,6,11  32:17  33:3,6
  34:2,16  35:5,8  36:7,10,13,15
  36:20,24  37:6,8,9,16,18,22
  38:4,19,25  39:16,21  40:1,11
  40:18  41:10,11,13  42:4,16
  43:19  46:21  48:5,7,11,12
  49:22  50:15  51:2,11,20  52:11
  52:16  53:10,15,22  54:1,10
  55:14  56:15  58:3,5,8,10,22
  59:1,4,8,11,14,15,21  60:2,5,8
  60:22  61:3  62:21  63:25  64:5,7
  64:11,14,16,18  67:21  69:18,20
  70:1,3,5  73:16  74:13,15,22
  75:1,4,7,10,14,16  76:9,13,17
  76:20,22  77:1,3,4,6,10,15
  83:17  86:24  87:13  89:19  102:7
  102:10,12  103:4,6,12,14  104:1
  104:6,10,17  105:13,16  106:13
  106:15,21  107:1,6,21  110:11
  111:8,16,18,22  112:1  113:24
  114:15,18  115:10  116:8,10,10
  116:12,18  117:16  118:3,6,8,12
  118:16,19  121:4,14,25  122:15
  122:17,20,24  123:1,4,7,12,15
  127:24  128:9,12,15,17,21,25
  129:2,4  135:17  137:11  139:19
  139:22  147:1,8  156:15,18
  157:17,20,22  158:1,22  160:16
  160:16,23  161:1,6,10,14,19,22
  162:1,3,9,11,18  164:3,18
  165:17,23,25  166:15,16,17,19
  166:22  167:5  168:5,9,17,19,22

  48:15  56:20  58:25  59:12
  167:19,23  168:2

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 9

169:7,10,12,16,20,23 170:1,5
170:10,13,16 172:1,4,7,12,21
173:12,17 174:20,22 175:2,18
175:22 176:3,12,16 177:17
178:16,22 179:8,13,20 180:6,7
181:3,5,8,11,13,16
**Court's** 6:4 37:24 51:20 167:9
168:22
**Courtroom** 60:20
**courts** 14:1,2 24:5 25:20,24
**covered** 58:4
**Crafter** 21:15,22 22:4,11,15
30:19 41:20 47:15,16,17,21
51:25 53:2
**crafts** 39:10
**create** 52:8,9 96:20
**credibility** 106:23
**credible** 166:5
**credibly** 106:25
**crime** 57:12 111:2 131:7
**crimes** 35:3
**criminal** 3:4,19 19:11,12,14
51:13 107:4 162:25 163:2,7,7
165:7
**critical** 163:25
**cross** 28:23 37:12 57:11 67:23
89:21 122:2 128:2 139:23
157:23 160:18
**cross-examination** 57:5 67:21
**crossed** 37:20
**crossing** 109:7
**cruiser** 113:8
**crying** 137:6 164:24
**cuffed** 125:24
**culpable** 30:3
**cup** 153:18,24 157:12 163:14,18
**curative** 36:25 44:23 45:16 46:7
**cure** 35:23 36:7 37:25 38:7
57:25 58:14
**curious** 72:25 141:11
**current** 73:24 175:6
**Currently** 118:14
**Curtis** 20:20,23 21:7,8 30:8,24
47:3 52:22 109:21
**custodial** 116:25 117:1
**custody** 100:25 128:5 176:21
**CX** 2:10,12,14,17,19
**cycles** 111:19

---

**D**

**D** 2:7,7,21
**D.A.'s** 144:19,22
**D.C** 48:11
**D.U.I** 111:8
**damaging** 30:3
**dark** 90:16
**dash** 133:22
**data** 17:13 66:5 67:8 87:8
**date** 59:19,22 84:7 106:7,8,11
115:21 116:22 138:5 139:5
161:20,22 165:19 168:6,21,25
170:2,21 172:18 173:12,13
174:2,3,6,7,9,10,19 175:6,7
176:6
**dates** 166:1,7 170:6
**day** 22:1,5,14 27:21,22 28:3
30:15 78:5,11 116:2 122:20
124:2,7,22 131:16 132:10
158:24 169:14 181:22
**days** 33:7 170:1
**deadlines** 166:1
**deal** 41:17 115:25
**dealing** 55:3 104:20
**dealt** 6:20
**death** 57:18 117:10,11 147:24
148:12
**Deborah** 64:13
**Debra** 2:8 64:4,10
**debt** 148:12
**deceiving** 68:12
**decide** 94:23 103:20 105:6
171:24
**decided** 95:13 171:23
**decides** 36:14 38:9 50:6,8
**decision** 29:5 38:12,23 59:17
161:23 163:8 180:25
**decisions** 48:12 168:23
**deeply** 14:9
**defect** 133:2
**defendant** 1:5,16 12:11 13:2,4
14:16 20:19 24:1,10 25:24
28:16,22 29:2,2,20 30:2,4,7
30:12,14,18,22 31:2,14,15,21
32:20,23 33:8,11,14 35:19,25
36:12 37:2,10 38:2,3,9 39:4,5
39:24 40:21 41:15 42:11,11
44:24 46:11 47:2,3,21 48:2,13
49:11 50:4,10 52:21 53:2,17
55:15 56:19 57:18 58:17 63:11
75:8 81:15,22 102:23 110:7,13

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 10

117:22 119:11,13,21 120:6,23
121:7 124:11,14 125:3,12,16
126:2,8,9,14,18,22 127:5,13
127:19 129:22 130:1,5,7,13,16
130:20 131:5,9,13 132:11,21
133:5,12,17,23 134:3,14,22,24
136:22 137:3,20,25 138:3
139:1,8,12,15 146:4,7,7
156:23 157:3,6,12 163:10,17
164:12,15 165:6 168:1 174:13
174:16 177:2 179:3
**defendant's** 5:7,10,11,13,17,19
5:21,23,25 6:2,16 14:13,15
28:14 29:8 31:18 33:16,19
36:17 38:6 41:21 60:11 63:5,8
125:4 131:3 136:9 138:15
139:5 162:24 164:2,11,22
178:23
**Defendant's** 163:1
**defendants** 14:10 15:15 29:12
30:2 33:13 44:4 53:1 56:8
59:11
**defense** 6:11 10:17 24:2 38:8,16
42:18 43:9,10,17 44:8 56:3,3
56:5,7 57:25 60:10 64:2
105:20 116:20 164:6 167:7
168:6 171:21 172:19 175:5,20
181:6
**defense's** 23:23 35:10 115:14,20
**Definitely** 134:5
**definition** 154:15
**degree** 110:20
**delay** 23:8 110:24 111:3
**deliberate** 27:24,25 33:24
**deliberation** 40:11 59:17
**deliberations** 27:23,24
**delve** 37:14
**demeanor** 81:19,22 102:22 119:23
132:12 136:9,10 137:4 164:22
**demographic** 16:5 17:13
**denial** 24:2
**deny** 15:13 16:20 165:15
**department** 63:17 64:24 65:2,3
66:4 107:10
**depended** 85:5
**depending** 15:2 18:23
**depends** 67:9 75:2 85:7
**deposition** 29:2
**deprived** 117:5
**describe** 70:16

**described** 67:15 90:15,20
**description** 81:14 90:13 91:2,3
91:13 92:15,22 93:9 97:4
102:19 107:8 112:14,20 113:22
114:23
**descriptions** 81:7 91:23 92:7
98:10
**design** 40:7 51:3 52:12 53:12
**designated** 10:12 11:3 13:13
**designee** 13:12 17:25
**desire** 115:15
**despite** 94:23 95:13,17 96:1
**detail** 98:13
**details** 17:8
**detained** 178:1
**detective** 2:18 117:9,19,20
118:1,13,17,24 119:2,20 121:6
121:8,17,18 122:4,17 128:13
128:23,25 129:8 134:9 135:9
135:21,22 136:5 137:1,14,14
137:19,24 138:2,12,23,25
139:8,11,18,25 140:2 145:25
147:13,25 148:15 152:3,10
153:10 156:21 158:4,20 160:24
163:3 164:19
**detectives** 31:22 63:11 118:15
119:3,19 127:17 131:7 144:25
163:9 164:13
**determination** 18:4,18,25 29:8
173:24
**determine** 5:11,22 25:21 91:1
**determined** 163:9 175:7
**determining** 13:21
**device** 65:10,21,21 67:5 79:8,23
**device's** 66:12
**devices** 65:19 67:7 92:25
**dialogue** 54:21
**diameter** 73:2,2
**Diamond** 13:3,5,25 15:3 18:2,3
18:23
**dick** 148:24 151:11
**Dickinson** 164:3
**die** 45:11
**difference** 84:15 85:1
**different** 10:1 11:14,23 23:10
25:6,9,9 33:2 38:11 48:23
52:6,6,7 53:1 55:3,24 65:19
70:20 71:9 85:8 99:23 104:23
150:18 171:25
**differently** 110:10

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 11

differing 12:5
differs 176:22
dig 58:21
diligently 107:13 171:7
direct 18:5 28:23 35:15 36:21
  37:8,13,21 64:19 77:20 118:22
  123:17 129:6 168:9
directed 18:18 37:1 39:1 59:16
direction 16:12 18:20 65:21
  167:5
directions 66:21 67:2
directive 167:9
directly 82:2
discernible 68:16
disclosed 12:25
discovery 176:21,22,24 177:2,10
  177:22,23,25 179:3
discrepancy 178:19
discretion 55:14
discussed 10:24 17:1 103:16
  137:16
discussion 19:4 20:12 54:21
discussions 6:6 166:23
disease 133:2
disingenuous 114:12
dismiss 5:19,20 6:19 8:9 10:19
dismissal 8:11
dismissed 7:7 8:13
disoriented 152:20
disparate 34:5,10 35:3
dispatch 66:17 79:7 91:24 92:14
  93:1,21 95:3 100:4 102:1
  112:10,13,14,18,25 113:4,17
dispatcher 90:8 94:1
displayed 147:3
disposed 7:10 28:15
dispositive 8:2 29:21
distance 24:21,21 70:13 74:10
  96:9
distinct 48:9 50:23
distinction 31:13
distinctive 32:24
distribute 117:23
district 1:1,1,8 12:11,17,22
  13:10 77:14 123:11 125:6
  131:25
division 121:8 126:4,8 130:4
  134:12
divorce 50:4
docket 168:22

docketed 14:17
document 180:19
Dodge 47:19
doing 36:24 67:25 81:6 97:20
  99:13 131:20 144:18 156:23
  172:22 173:4
dollars 43:2 54:9
dominoes 22:18
don't 89:13
door 88:17 92:6 98:9 141:25
  144:5 146:7,22 153:22 154:1
  155:3,11
dot 69:22
downstairs 154:17,21 155:12
Drank 145:11
draw 39:3
drew 82:10,15 99:2
drill 73:18 177:4,14
drink 117:5 134:24 135:12 142:3
  142:10 143:8,18
drinking 142:15
drive 2:2 21:2,7 126:17 127:9
  166:12
driven 21:4 81:15 87:16 119:11
driver 21:6 26:7,8,19 27:15
  47:19 62:2 122:10
driver's 125:12,18
driving 47:4 78:16,17,18 94:20
  97:12
dropped 126:22 127:13
drove 30:7,18 125:10
drugs 120:1 132:16,23
due 59:22
due-process 60:11
duplicative 4:4
duty 156:10
DX 2:9,12,14,16,19

————————————— E —————————————
E 2:7,7,7,21,21
E-I-B-E-L 10:7
E-R-I-C 123:9
E.C.F 5:6,9,16,18,21,25 6:1,8,8
  6:8,9,15,19 7:15 8:8 9:18
  12:3 19:4,6 40:18 60:9,10
  61:9 116:15 166:25 167:6
  168:11,11
earlier 31:23 43:18 46:22 58:12
  90:24 103:16 167:4
earn 149:9,9

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 12

easier 16:16
easily 28:15 35:14 68:15
East 78:21 96:4 119:8
EASTERN 1:1
easy 120:20
eat 145:9
eaten 142:9,15
economy 25:4,5,22 28:4 104:20
Edelman 171:6
education 164:6
effect 148:8 153:12
Eibel 10:7,25
eight 19:12 40:18 118:14,14
  123:11 131:14 135:8 136:6,16
  141:5,14,14,15,17 143:5,18
  144:8,8 145:14,20,20,21
  150:12
eighteen 87:16,22 88:6 109:12
eighth 123:21
eighty- 123:10
either 13:15 15:3 61:19 79:16
  79:18,18 91:9 95:10 111:10
  166:9 170:9 180:16
electronic 2:4 181:18
elements 54:23
elevator 127:2
eleven 13:9,23 143:23 169:1,5
elicit 150:17
elicited 157:23
Email 1:15,21
embark 46:12
emerge 24:6
emitting 75:11
emphasized 51:7
employee 79:7
encounter 127:11
encountered 65:7 67:4,13 119:25
  132:15,18
encourage 113:24
ended 26:8 29:2 97:12 152:12
  159:24 160:6
ends 50:5 151:21,24 153:13
  160:8
enforcement 142:14
engaged 40:24
English 133:13
ensure 167:25
entered 163:1
entertaining 17:4
enti 162:14

entice 38:17
entire 12:16 100:2 101:11
  130:19 134:1 145:22 162:15
entirety 107:22 130:24 136:14
entitled 7:5 9:21 10:4 12:13,15
  15:11,14 16:20,23 17:6 172:15
  178:21 179:3 180:13,17,21
  181:19
entity 18:7,22 167:11
equal 60:12
Eric 2:15 122:23 123:6,9
escape 50:19
escaped 62:12
escapes 35:4 50:20
especially 36:4 103:23
ESQ 1:17,22
essence 17:9 18:6 29:25
essential 56:18
essentially 6:24 25:14 49:15
  84:13
established 140:2
establishment 61:17
estimate 127:10
EV 2:22
evaluation 107:7
event 178:10
everybody 3:6 82:3 110:11
  173:15
evidence 5:2 8:23 25:10,16,19
  29:10,25 30:3,17 31:1 32:9,13
  32:13,17 33:12,15,15 34:17,18
  34:22 40:19 41:1 46:25 48:10
  48:22 56:19 59:20,23 60:14
  62:16 64:1 89:17 103:9 104:7
  160:21 164:18 166:18 171:2,3
  175:9 181:10
evidentiary 5:10,22 61:11
exact 81:1 140:25 152:17 155:10
  155:25 165:8
exactly 26:19 34:8 54:2 112:8
  180:1
exam 28:23
examination 2:9,10,12,12,14,14
  2:16,17,19,19 35:16 37:12
  57:11 64:19 67:23 77:20 89:21
  102:13 118:22 122:2 123:17
  128:2 129:6 139:23 156:19
  158:2
examine 33:22
examining 107:11

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 13

**example** 42:3 47:1 50:1 147:4
  167:17 168:5 177:7
**excise** 113:25
**exculpatory** 30:12 31:22 43:8,10
  43:17
**excuse** 26:4 117:1 120:8 179:5
**execute** 148:5
**executed** 147:17,22
**executing** 49:15
**exercise** 38:21
**exhibit** 84:18
**exhibits** 2:22 63:1,25 166:12
**exit** 81:2
**expected** 36:3 180:9
**expedited** 168:16,20
**experience** 74:6,9,17 75:22 76:2
  134:1 162:24 163:6
**experienced** 76:3 165:7
**expert** 171:4,10 173:10
**explain** 27:9 100:15 176:3
  180:17,20
**explained** 15:17 56:14
**explaining** 43:12 164:20
**explicit** 106:22 108:11
**exposed** 117:9
**extensive** 108:23 163:2,6
**extent** 14:22 41:10
**extenuating** 174:4
**extremely** 27:17
**Exxon** 54:11 151:5
**eyes** 158:14,17

---
**F**

**F** 1:23 2:7
**F.D.C** 14:20 15:15 179:6,17
**F.T.C** 177:3
**F2nd** 48:6
**faces** 98:20
**facing** 45:13 46:11
**fact** 19:21 20:8 23:12 26:23
  27:12 29:22 33:14 34:6 35:1
  35:13 43:20 49:10 50:21 56:1
  62:8 82:1 92:5 93:20 95:10
  96:1 147:17 153:25 168:2
  175:24 176:13
**factor** 164:25
**factors** 163:24 164:4,20
**facts** 39:10
**faculties** 165:6
**failed** 50:5

**fair** 69:12 71:14 72:3,5 89:25
  90:8 92:5 96:24 127:10 140:16
  141:3 144:16 152:7 177:15
**fairly** 10:20 13:10 32:24 57:16
  85:14 131:2
**fake** 82:22 97:16,21
**false** 30:12 31:22 32:1 43:7,9
  43:16 151:2
**familiar** 80:2 90:17 124:24
**fanciful** 34:20
**far** 12:3 59:6 70:13 72:12,17,18
  96:7 99:11
**Farley** 135:22 137:1,14,19,24
  138:2 139:9,11 145:25 146:15
  147:13 152:4,10 153:10
**fashion** 9:15
**fast** 30:17 52:25 68:8 134:22
  153:23
**favor** 164:25
**federal** 19:11,14 51:13 177:23
  178:21 180:6
**feel** 15:22,22 169:25 174:9
**feeling** 154:24 155:4
**feels** 9:5
**feet** 70:15,16 73:1,2,20 140:15
  140:16,23,24 141:2,2,3,3,5
**fell** 22:18
**felony** 43:23 57:6
**felt** 150:8,13,15,25 151:2
**fiction** 44:23 46:6
**fictional** 46:12
**fifteen** 13:9 68:17 108:18,20
  112:9,10,10,14,18 113:3,6,10
  113:10,11,15,16 115:24 138:9
  138:10 160:7
**Fifth** 27:3 49:9
**fifty** 117:6 154:11,22 155:3,23
  158:24
**fifty-** 135:8
**fifty-five** 136:6 138:13
**fifty-one** 144:8,9 145:14,20,20
**fifty-six** 166:25 167:6
**fifty-two** 136:16 145:21
**figure** 82:4 178:5,7,11
**figures** 98:8
**figuring** 172:10
**file** 10:8 11:14 12:16,21 14:4
  16:16 17:21 105:1,5,11 107:23
  108:3 161:19 178:24,24
**filed** 3:15,21,23 5:6 6:4,7,17

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 14

10:5,11 11:6,23 17:24 18:19
  18:21 60:9,10 166:25 168:12
  172:17
**files** 107:25
**filing** 3:24 11:2 14:16,18
**filings** 14:13,15
**filling** 126:10
**filming** 121:21
**final** 6:2 173:13 174:2
**finally** 57:15 101:10 171:9
**find** 14:10 29:24 33:8 81:13
  127:5 165:12
**finding** 20:1 106:23 162:10
  164:25 166:5,6
**findings** 19:25
**finds** 23:20
**fine** 3:12 9:2 11:20 38:15 55:11
  58:8 105:1 112:1 135:17
  159:23
**finish** 70:2 172:7
**Firearms** 117:24
**first** 7:9 12:20 20:12,17 27:8
  27:19 32:14 36:11 42:18 46:3
  61:7 62:25 63:23 64:3 66:19
  82:14 84:6 90:2,9 92:12 97:11
  104:20 108:8 117:5,19 136:9
  142:7,8 154:8 163:13 164:18
  167:4 177:18
**fit** 81:14
**fitting** 102:18
**five** 5:8 6:20,23,23 7:3,3,8,20
  8:7,8,15,16,25 20:11 21:13,17
  22:24 40:18 41:4 50:23 51:7
  52:23,25 63:16 73:2 78:15
  86:9 90:16 116:15 124:8,9
  128:24 141:2,2,5 157:4 158:25
  167:19 170:1
**five-bathroom** 158:19
**five-foot** 73:12
**five-hour** 85:1
**flagged** 21:6
**flash** 81:7,11 93:17 102:19
  107:8 109:20 112:15 114:22
**fled** 92:18 93:5
**fleeing** 31:17
**flesh** 114:8
**flipping** 109:11
**floor** 127:2 141:6 156:25
**flush** 17:7
**focus** 24:7,8 78:3 84:6 99:3

129:15 132:9 136:8
**focused** 82:5
**focusing** 65:7 82:9
**folks** 16:5 22:17 25:20 26:8
  27:10 91:13 99:13,17 146:3,11
**follow** 39:13,14,17 76:9,13
  120:20
**followed** 109:3
**following** 6:6 16:12 80:17 106:8
  131:16,17 166:17 167:16
**follows** 12:11 14:5
**folly** 45:15 49:16
**food** 117:5 134:24 142:3 143:8
  143:18
**foot** 62:11 70:11,12 79:24 92:18
  93:5 96:3,5 97:4 109:6 113:1
  115:1
**footage** 2:23 63:16 83:25
**foregoing** 181:17
**form** 10:13
**formally** 63:3
**forth** 48:7 112:8 167:22
**forty** 88:6 155:13 159:7
**forty-four** 89:6
**forty-one** 144:1
**forty-three** 109:8 168:12
**forty-two** 155:14 156:5
**forum** 10:6,9 14:25 15:19,20
  16:3,13
**forward** 5:4 6:11 18:12 30:17
  52:25 81:25 82:5 115:22
  125:23 134:23
**found** 21:8 24:5 25:24 44:6
  50:15 56:9 111:12 125:11
  130:5
**four** 5:8 6:22,23 7:20 8:16,16
  8:25 20:8,9 41:4 45:6 63:13
  77:24 78:15 84:15 90:16
  107:22 109:25 116:15,15
  117:22 124:5,9 138:10 144:3
  163:3 165:8 167:19
**fourteen** 13:9,23 19:14 108:16
  117:2 144:9 160:9
**frame** 159:18
**frankly** 44:25 45:1,19 171:22
**free** 29:3 61:21
**frequently** 124:20
**frequents** 125:6
**friends** 29:11 42:13
**friendship** 29:12

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 15

**front** 11:19 15:23 16:16 36:11
  59:12 68:23 71:17,18 73:4
  82:19 83:23 101:12 113:8
  134:11
**fruits** 62:19
**fuck** 149:5
**fucker** 148:23,24
**Fucking** 149:9
**full** 137:10 164:17
**fulsome** 9:8
**further** 40:20 58:7 98:19 99:7
  115:18 122:14 128:8,10 160:15
  160:19,20 161:24 170:6,11
  174:5 176:17 181:3,11
**Furthermore** 57:4
**future** 102:10 107:16

---

**G**

**G** 2:7 130:10 134:11
**G.M.T** 84:13
**G.P.S** 65:9,14,24 67:5,7,18
  108:4,9 109:1,24
**gas** 22:10,23 23:11 25:8 30:20
  31:14,20,24 34:8 40:22 41:21
  42:24 53:6,19 54:6 57:21
**general** 67:11 74:1,12
**germane** 30:1
**getaway** 47:19
**getting** 3:10 50:4 94:10 96:2
  100:3 102:1 117:20 151:9,11
**girl** 148:18
**girlfriend** 26:24,25 27:6 31:23
  57:1 148:23 151:6,9,14
**give** 7:24 9:9 18:20 34:12 36:10
  36:16 38:5 48:15,19 56:20
  67:1 75:22 77:5 93:2 104:10
  104:15 107:21 114:8 118:7
  122:25 128:16 140:22 148:6
  174:22
**given** 45:16 62:9 81:12 91:3
  92:22 93:10 103:19 134:24
  135:1 143:24 156:6,6,8 158:19
  173:13 174:2 177:21,22
**gives** 31:21 34:16 55:14 70:19
  163:24
**giving** 150:8 165:18 177:2
**glass** 143:24
**glean** 35:24
**go** 3:21 4:22 11:25 17:21,24
  18:5,16,17,20 22:8 29:6 35:2

37:13 45:22,24,24 55:11 56:16
  58:22 60:17 66:20 70:9,9
  73:17 80:9 96:4 101:17 104:24
  105:3,25 132:7 142:7 144:17
  153:21 165:2 166:1 170:2
  171:25 172:4 173:16 177:3
  180:25
**goal** 150:20,22
**God** 64:8 77:7 118:9 123:2
  128:18 174:23
**goes** 20:15 65:15,16,16,20 66:11
  66:17 69:11 70:18 72:15 76:1
  87:7 109:24 166:24 167:18
**going** 4:22 7:21 14:19 18:11
  19:24,25 20:16 24:7,8 25:16
  26:11 27:24,25 29:15 33:15
  36:11,17,21 41:1,8,16 43:16
  44:25 45:9,12,17 46:10,13
  48:19 49:11,11,14 50:6,8
  53:25 54:1,6,7 55:8 57:18,19
  61:9 63:23 65:22 66:21,22
  68:8,9 71:18 73:5,22 75:3
  78:3 82:4 83:19 85:22 86:22
  87:2 88:2,12 89:2 90:6 94:24
  99:23 103:2 104:4,6 105:3,8
  105:10 106:21 107:19,20
  112:24 114:7 120:25 121:12
  125:9 134:6,22 135:6 136:5
  137:9 138:8 146:10 148:2,4,6
  148:16,17 155:12 157:24 161:6
  165:20 166:1 167:3,5 168:15
  170:20 171:2,5,15,16 172:15
  176:5,11 179:4,6 180:10,11,13
  180:15,16
**Goldberg** 13:16 15:4,9,23 16:17
  18:23
**GOLDNER** 1:17,18
**good** 3:5,5,7,8,12,13,17,17,18
  4:10,12,15,16,17,20,21 64:14
  64:15,21 77:1,2 89:23,24,24
  89:25 96:9 97:1 118:5,16,18
  122:20 123:12 128:25 129:1
  132:4 133:5 135:20 139:25
  140:1 177:1 181:10
**goods** 30:10
**gotten** 96:11,15 108:25
**government** 2:23 3:16 4:8,11,13
  6:12 7:11 8:11 9:3,17,19 10:1
  12:4 15:22 18:10,21 23:6
  24:15,25 37:11 40:4,21 41:1

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 16

44:17 45:20,22 46:9,13 47:12
47:25 49:18 51:4,11 52:8
54:18,23 55:5 57:11 58:13,20
59:25 60:13,17 63:16 103:18
104:22 105:9,20 106:1,5 112:5
113:20 114:3,11 115:17 160:18
166:3,24 167:13,16 168:4
170:21 171:1 172:20,22,23
176:24 177:6 178:2 179:23
180:11,23
**government's** 19:18,20 20:5
23:23 40:19 46:16 61:4 63:1,4
63:5,7,10,13,19,20 83:15
84:19 86:9 107:22 115:15
121:3 122:23 134:7 138:24
161:10 162:19 166:12,13
167:21 177:1
**governs** 19:13
**grainy** 47:7
**grand** 5:18 6:1,3,16 7:2,4 9:22
10:20 12:16,20 13:1,2,4,7
14:11,11 15:3 16:1,11 18:2
167:1,7 172:13,14
**grant** 168:19
**granted** 172:25 174:6
**granting** 174:12
**gravity** 110:19
**gray** 90:16
**great** 38:9 98:13 181:3
**GREENWOOD** 1:19
**ground** 158:4,9
**group** 29:11,17 32:15 40:23
42:11,12 101:25
**guess** 11:5 69:17 71:11 73:10
98:7 101:1
**guessing** 180:5
**guidance** 61:1
**guideline** 46:8,12
**guidelines** 45:2
**guilt** 57:23
**guilty** 24:10
**gun** 30:23,24,25 31:1,3,6,8,9,16
44:4,5,5,6,12,13 49:4,13 57:6
57:6,7,12,13
**gunman** 32:2
**gunpoint** 111:1
**guy** 148:5,6
**guys** 110:10 122:21

---

**H**

---

**H** 2:21
**hack** 21:6 26:6,8,19 27:15 48:21
48:22 122:10
**half** 27:22 77:24 92:8,10 104:5
104:6 111:4 136:18
**hand** 26:10,21 47:10 64:5 77:4
84:7 118:6 122:24 128:15
174:21
**handcuffed** 126:7
**handcuffs** 83:1
**handled** 55:17
**hands** 125:19,20,23 157:7
**happen** 36:11 111:18 148:2
157:13
**happened** 50:5 110:16 136:25
153:5 155:11 159:10 163:16
**happens** 39:7 66:10
**happy** 15:8,9 58:11 170:9
**hard** 98:19 173:8
**harm** 57:18
**hat** 90:22
**haul** 54:8
**Hawthorne** 124:20 125:7,9 126:3
127:6
**headache** 154:20 155:16 156:3
**health** 133:6 164:7
**hear** 3:20 6:10,12 8:17 9:8 19:6
28:12 36:4 39:2 58:11 59:20
59:22 94:16 109:5 114:21
116:13 159:22 161:15 166:9
170:9 172:21,22,24
**heard** 59:14 95:6,7 103:23 106:8
110:9 139:8 175:3
**hearing** 1:7 3:1 5:3,10,22,22
8:5 11:8,12 35:24 39:4 61:11
166:17 179:22 181:15
**heck** 45:17
**held** 117:3,4 161:21
**help** 64:8 77:7 118:9 123:2
128:18 171:11 174:23
**helpful** 46:21 171:21
**helps** 34:10
**hey** 27:14 45:8 49:13 112:23
**Hi** 68:1
**highlight** 36:16
**highly** 44:15
**hire** 50:7,8,13
**historical** 171:13
**history** 162:25 163:2
**hit** 45:5 72:10 85:10 86:22 88:2

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 17

88:10 121:12 134:9 135:11,16
**hitman** 50:7,8,13
**hitting** 67:18
**Hodge** 1:7 3:3
**hold** 38:15 59:21 103:18
**holidays** 173:15
**home** 132:7 145:2
**homicide** 31:21 36:5 42:8 63:6,8
  126:4,8,23,25 127:2,9,14,16
  129:11,13,16,19 130:4,8 131:6
  134:11 140:7 147:18,22,25
**honor** 3:7,8,10,13 4:10,12,15,17
  4:20 5:15 6:14,14,23 7:3,8,13
  7:18,19,20,23,24 8:5,12 9:1
  9:16,17 10:9,14,15,16 11:4,11
  11:12,18 12:7 14:1,25 15:5,6
  15:18,21,22,25 19:2,10,10,16
  19:24 20:3,8,13,16 21:13 22:2
  22:6,13,19 23:2,15,19,20
  24:14,23 25:10,23 26:3,5,10
  27:5,8,12,18,21 28:7,9,10,13
  28:13,23 30:6 31:5 33:19
  34:12,18 37:5 38:17 40:10
  41:8,22 42:17,18 43:5,18
  44:21,22 46:5,20 47:10 48:4
  48:18 49:1,10,20,21,23 50:3
  51:16 52:4,15 53:13,14 54:3
  55:2,8,9,19,22 56:12,14,21
  57:4,15 58:6,21 59:24 60:4
  61:8,8,9,15,23 62:23,23 63:24
  64:3,15,17 67:20,22 71:21
  75:18 76:7,16,19,21,23,25
  77:19 83:15 86:8,23 87:11
  89:15 102:5 103:3,8,15,20,20
  104:11,19 105:6,7 106:14,19
  106:19 111:15,17 112:2,3,8
  114:8,17 116:6,17,20,23
  117:18 118:21 121:2,13,23
  122:16,22 123:16 127:23
  128:13 129:1,3 134:7 135:5,15
  137:9 138:8 139:17 147:6
  156:13,14,17 157:16,19,25
  160:4,14,22 161:2,9,25 162:2
  162:4,13,13,17,19 163:19
  165:20,22 166:21 168:8,14,15
  168:16 169:9,18,18,22 170:3
  170:12,15,17,24 171:8,18
  172:3,8,20 173:5 175:17,21
  176:18,18 178:11 181:4,7
**Honorable** 1:7 3:2

**hoodie** 90:16
**hope** 46:13
**hopefully** 173:13
**hour** 54:13 68:18 104:6 127:12
  136:18
**hours** 54:13 84:11,16,23 117:2,5
  134:18 140:22 142:4 143:8,18
  143:22,23 144:9,10 153:15
  156:1 157:15 160:7,10 165:10
**hours'** 104:5
**hundred** 70:15 79:17,19 89:12
**hundreds** 43:1
**Hunting** 108:14,17,18
**hypothetical** 38:16 39:15

---

**I**

**icon** 68:25
**ID** 2:22
**idea** 34:19 38:9 67:11 72:11,14
  142:14
**ideas** 10:1
**identical** 14:16 53:11
**identification** 113:19
**identified** 5:12,24 6:8 17:23
  32:19 59:9 81:17 85:18 110:7
  110:25 171:10
**identify** 8:9 23:3 73:19 74:16
  74:18 83:2 88:21 129:22 147:2
  174:2
**identifying** 16:7 41:3 47:9
**identities** 32:16
**identity** 32:1 62:2
**illegal** 82:16 91:12
**illness** 120:4,9 132:19
**imagine** 28:25 37:11,21 101:5
  110:11
**immediate** 106:1
**immediately** 109:1 125:11
**impacted** 120:12
**impaneled** 13:1,3
**impeach** 57:11
**impeached** 44:16 49:4
**impediment** 18:12
**impermissible** 62:19
**important** 20:13,25 21:12 26:15
  26:25 31:12 47:12 48:15,19
  73:14 112:4 171:1
**importantly** 25:23 30:22 33:9
  164:12
**inadmissible** 24:12

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 18

**inches** 150:4,14
**incident** 42:7 73:7 119:17
**incidents** 51:8
**include** 130:22
**included** 12:21 23:18 24:15 62:5
 90:15 176:23
**including** 62:11 162:25
**incorporate** 107:9
**incorrect** 19:21 52:13
**incredible** 53:7
**incriminating** 126:13
**incur** 25:12 27:21
**independently** 60:25 180:24
**indicate** 99:17 174:14
**indicated** 10:25 19:5 35:14
 152:19 175:4
**indicates** 17:25
**indicating** 40:5 79:14
**indication** 61:24 62:3
**indicative** 8:1
**indicators** 133:1
**indicted** 13:2 51:6
**indictment** 5:7,20 19:9 20:10
 22:3 23:25 52:3
**indictments** 51:12
**individual** 42:5 83:5
**individualized** 61:18
**individuals** 119:25 120:3 134:2
 173:25
**inextricably** 32:11 49:19,25
 50:15
**infer** 36:18
**inference** 39:3 45:21 46:1 57:23
**inferences** 35:23
**inferred** 36:3
**inferring** 114:3
**infirmities** 120:12
**influence** 120:1,8,8 132:15,23
 163:9
**inform** 18:19 143:3,4 153:7
**information** 6:3,16 7:2 8:1,4
 9:21 10:3,17,18 11:15 13:7,8
 13:16 14:23 15:11,13 16:5,7
 16:20,21,23 17:15,19,22 24:11
 42:19,19 43:3 47:9 54:4 59:18
 62:10,11 65:13 79:2 81:7 90:7
 90:9 92:14,18 93:17 94:4,6,11
 96:2,10,15 97:3 100:4 102:1
 103:22 104:25 107:9,17 111:19
 112:15 114:10 126:11 142:8

 150:8,17,18,20 151:1 164:13
 164:15 167:8 171:3,12,24
 172:14 175:11 180:2,8,12
**informed** 10:7 92:24 112:10,18
 112:25 113:4,12,16
**initial** 36:9 61:14,16 78:24
 160:7 166:23 169:3
**initially** 80:22
**injuries** 120:12 133:8
**innocuous** 57:16
**inserted** 47:20
**inside** 91:2,5,22 98:1,4,8,8,22
**insofar** 8:18,22 167:6,7 168:10
**inspect** 6:3 10:17
**inspection** 5:18 13:20
**instance** 75:4
**instances** 33:24 74:10
**instruct** 35:14
**instruction** 36:10,16,25 38:5
 39:7 40:9 44:23 45:16 46:7
 57:24 58:14,15 167:17
**instructions** 34:12,13,16 38:1
 39:13,14,17
**Int'l** 2:1 181:22
**intends** 26:12
**intent** 60:19 117:23
**intention** 170:22
**interact** 127:19
**interest** 175:4,19
**interesting** 22:14
**interests** 110:21
**interference** 110:22
**interim** 106:12 117:3 134:23
**interrogated** 119:18,19 122:5
**interrogation** 116:25 117:1,7
 122:8,9 126:24 127:3 133:21
 140:10,12 144:11,12 145:22
 147:12 149:22 151:21,23
 153:13,14 154:11 158:5 159:10
 159:24 160:6,8 164:5,10,10
**interrupt** 101:17
**intersection** 72:23 79:19 80:13
 80:23 82:7 87:24 102:17,25
 109:4,13 110:2,13,25 111:20
**intersections** 67:2 79:14,16
**intertwined** 32:11 34:23 42:1
 46:17,18,18 47:23,23 48:1
 49:25 50:22,22
**interview** 63:11 119:17 121:21
 130:7,10,14,17 131:3,10,13,19

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 19

132:10,14 133:11 134:11 136:8
136:11,13 137:17 138:3,6
150:13,22 157:2,6,14 163:4
164:17,19 165:10
**interviewed** 121:9 127:16 132:21
135:2 165:9
**interviewing** 131:23 164:20
**interwoven** 49:19
**introduce** 4:7 32:2
**introduced** 166:13
**investigate** 111:5 119:7 129:18
**investigating** 50:9
**investigation** 97:20 119:10
127:15 129:21 131:21
**investigators** 63:6,8
**invite** 4:23
**inviting** 3:25
**involuntary** 116:24 117:14
165:13
**involve** 49:25
**involved** 20:18,19 21:19,24 22:5
22:22,25 23:1,9,12 24:22
46:25 47:15 49:5,13 51:9
52:25 53:3,4 54:17,18 57:8
81:8 90:1 99:17 107:5 110:8
171:14
**involvement** 41:24
**involves** 21:15,21 22:11 53:7
**involving** 51:5 75:8
**irrelevant** 163:15
**isolation** 117:4
**issue** 6:20 7:9,25 8:2 40:12
43:7 55:12,13 62:24 72:5
103:8 106:20,20 107:1 117:21
129:25 161:15 162:4 167:1,20
172:25 174:11 176:20 177:10
177:14 178:9,12
**it'll** 68:8 79:18,19
**items** 43:14 61:13

---

**J**

**J** 66:16 79:1
**jail** 50:6
**Jan** 116:22
**January** 21:14,20 22:8,8,24 23:1
23:1,1,2 24:16 26:13,15,21
28:18 29:16 30:17 31:13 32:18
34:8 36:1 41:4 42:7,8 43:22
44:11 51:19 52:19 58:24 63:5
63:8 116:23 122:5,6 124:1,10

124:15 125:1 128:5 129:16
130:3 134:17 135:8 142:10
170:22,23 171:17 175:8
**Jeff** 2:1
**Jenck's** 177:8
**Jencks** 7:6 43:4 179:18
**Jerome** 108:19 112:12
**John** 1:23 2:18 128:14,20,23
**Johnson** 14:17
**joinder** 19:8,13 20:15 23:24
40:5
**joined** 19:17,19 20:2,3,7 23:20
34:25 35:5 40:8 54:24 55:11
58:19,20 168:3
**joining** 19:22 25:3
**joint** 48:9
**Jones** 1:5,17 3:4,16,17,18,23
4:1,18,20 6:5 22:21 26:5,16
26:22 27:2,5,9,12 37:3 43:21
44:8,16 56:3 59:6 61:13,16
62:18 81:15 116:21 117:3,8,12
119:11 120:7 121:7 122:5,9
124:12 125:23 129:22 140:3
141:4 145:15 146:17 147:3
148:10,16,21 149:2,23 150:8
151:4 152:12 153:14 155:22
171:19 172:24 174:25 175:1,3
176:19,20 177:3,11,15,20
178:12,13 179:21
**Joseph** 78:14
**judge** 1:8 10:11,11,12,12 11:2,3
11:5,7,7 13:1,3,5,11,15,16,25
14:18 15:3,4,4,9,23 16:17
17:24,25 18:1,3,22,23 55:18
65:12
**judges** 11:14,23 13:14
**judicial** 25:4,5,21 28:4 104:19
**Judith** 181:16,22
**July** 1:6 168:13
**jump** 85:22 135:6 138:9
**jumping** 67:19
**jumps** 67:16
**June** 57:5
**juries** 39:12,14,16
**juror** 13:4
**jurors** 12:20 16:1,9 36:3
**jury** 5:18 6:1,3,16 7:2,4 9:22
10:20 12:16 13:1,2,8,21 14:11
14:11 15:4 16:11 18:2 25:12
27:17,22,23,24 28:2 33:23

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 20

34:10,12,17 35:1,13,14,24
38:1,10,25 45:21 46:1 48:23
49:11 57:22 58:15 148:4 167:1
167:8,17 170:18 172:13,14
**jury's** 34:6 45:17 46:13
**justice** 163:7
**justify** 62:17
**justifying** 91:22

---

### K

**K-I-K-E-R** 64:13
**Keante** 109:21
**keep** 66:15 132:3 136:2
**keeping** 168:21
**keeps** 69:13
**KELLEY** 1:7
**Kelly** 3:3
**KENNEDY** 1:23
**Keon** 29:12 30:7,18,23 41:20
42:4,12 85:19 86:19 88:21
109:21 139:12
**Keontae** 30:8,24
**Kevin** 10:7,25 14:17
**key** 33:22
**kicks** 87:20
**kid** 148:18
**kid's** 148:24
**Kiker** 2:8 64:4,9,10,13,21 65:23
**kill** 49:5 50:7,9,16 57:14
**killer** 149:3
**kind** 18:1 67:16,19 71:18 79:18
80:18 91:9 120:9 133:2 147:3
166:1,7
**knew** 61:25 93:1 111:10,11
147:23
**knock** 155:11
**knocked** 153:22
**know** 12:17,23 13:13,24 16:6,7
16:14 17:21 18:25 23:11 24:24
27:10,11 29:14,15 39:12 43:7
44:22,22 45:1,2,25 47:7 50:11
50:12,14,19 51:7 53:6,18 54:1
54:2,3 55:6,8,10,21 56:1
57:16 59:2 68:12 69:6,8 70:19
71:4,5,6,6,11,12,15 72:8,9,10
73:1,16,22,24 89:10,13 90:5
91:7,7 93:25 99:9 104:9,19
105:15 107:14,14 109:25 110:2
111:13,18 112:23 114:4 115:2
115:8 124:1 130:13 141:9

142:17 143:1 144:18 150:15
151:14 154:15 156:8,22 157:2
158:5,11 166:3 171:11 175:13
177:11,25 178:8,12,19 179:21
180:19
**knowing** 59:15 173:19 174:6
**knowledge** 41:24 126:20
**known** 107:10 124:14
**knows** 47:25 107:25 170:25
178:22

---

### L

**L** 128:24
**label** 104:4
**labeled** 108:1,3
**labor** 172:10
**lack** 27:7 96:21
**lacked** 59:11
**lanes** 88:9
**Langelier** 50:2
**language** 102:23 164:11,13 165:3
**large** 73:19 74:18,20
**larger** 135:21
**laser** 82:5 99:3
**Lastly** 34:11
**law** 1:18,22 16:23 18:14 29:7,7
34:4 49:21 55:23 56:17 142:14
148:11
**lawfulness** 5:11
**lawyer** 179:22,23
**laying** 141:5 158:4
**lazy** 149:9,9
**lead** 24:3
**lean** 57:3 125:23
**leave** 21:3 61:25 152:4 154:10
154:16
**led** 17:1 18:15 35:9 116:25
117:1 120:7 132:22
**left** 4:14 30:9 70:11 112:20
115:1 159:25
**left-hand** 135:21
**legal** 7:16 19:5 44:23
**length** 81:1 127:8 164:5
**Lennox** 109:6
**let's** 29:10 35:21 36:25 51:17
51:18 55:11 56:1 74:8 104:19
104:19 112:7 132:9 169:16
**letter** 16:23 178:24,24
**level** 165:4
**liaison** 57:1

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 21

**liberty** 110:22
**license** 47:8
**licked** 151:12
**licking** 148:23
**life** 45:14 46:8,12 148:7
**lift** 34:20
**light** 6:6,18 34:19 88:19 111:4
  111:19 168:20
**Likewise** 62:3
**limit** 28:23 160:17
**limited** 27:13 37:12
**limits** 107:12
**linchpin** 29:11
**line** 37:20 69:6,7,8,25 70:9
  165:5
**lines** 69:3,3,5
**link** 41:2 42:10
**linked** 50:16
**list** 4:22 5:18
**listen** 40:16 114:2,21
**listening** 79:10 101:23
**lit** 179:1
**literal** 108:11
**little** 12:7 33:10 36:19 39:10
  47:8 65:12 66:24 68:25 69:1
  74:24 87:17 140:17 145:6
  146:24 152:20 153:8,11 173:14
  177:14
**living** 149:10
**located** 79:15
**location** 50:23 54:10,15 66:12
  67:1,8 79:7 80:18 81:2 93:2
  107:9 126:3 164:5 171:3
**locations** 52:6 79:9,10 80:5
  115:4
**locked** 141:25 142:3 144:5,10
**log** 65:17 66:8
**logical** 42:24
**London** 84:14
**long** 12:11 65:1,4 77:22 80:25
  100:23,23 111:19 118:24 119:2
  123:19 129:8,13 136:15 142:15
  172:20
**look** 12:1 36:19 52:18,19 65:18
  68:25 95:14 110:19 140:21
  162:23 163:23 169:16 174:11
**looked** 158:12
**looking** 8:15 12:17 13:22 17:11
  17:12 25:20,21 32:25 51:13
  59:5 73:5 75:21 79:23 80:10

81:4 82:2,5 86:11 95:22 97:9
  97:19,22,24 99:4 109:15
  111:11,11 113:14 115:3 121:6
  141:1 158:12 168:23 175:11
  180:5
**looks** 47:7 49:20 67:19 87:21
**loser** 149:7
**lot** 25:18 53:16 54:5 110:12
  144:18 171:12,13,13
**low** 45:3
**lower** 92:8,10
**lucid** 120:20
**Lucini** 2:1

---

**M**

**ma'am** 77:2 90:23
**Ma'am** 77:17 89:24 90:18 93:3
  95:24 102:9 103:5,7
**maintain** 136:10
**maintains** 21:5 26:22 43:9,10
**making** 39:23 50:14 60:25
**male** 83:3 90:15,19 109:19
  112:19 113:18 163:6
**males** 81:12 97:4,22,25
**man** 45:7 83:11 84:3,4 85:19
  113:8 135:21 149:12
**manifest** 24:4
**manifestly** 24:4 28:8
**map** 65:17,20 67:10,14 68:22
  69:4,6,11,23
**mark** 18:12 39:19
**marry** 104:24
**mask** 90:17,21
**masks** 23:3
**Massena** 2:2
**master** 12:21
**match** 180:14
**matched** 91:3,23 92:7 98:10
**matches** 109:19
**matching** 112:19
**material** 7:6 12:19 179:3,11,18
**materials** 180:2
**Matt** 135:22
**matter** 3:3 15:16 36:9 45:4
  55:14 75:7 163:17 170:18
  181:19
**matters** 8:19 54:25 58:19
**maturity** 164:6
**max** 45:6
**McCOOL** 1:12 3:7 4:12,13

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 22

**mean** 15:8 16:22 33:13 46:1
  54:12 57:25 68:8 70:13 71:9
  71:11 72:20 91:8,9 92:5 97:19
  99:12 101:16 140:21 150:15
  153:25
**meaning** 148:5
**means** 12:17 13:25,25 14:1 176:4
  176:4,11
**meant** 37:10
**measurements** 140:25
**medical** 154:5,13,16 155:9
  157:11
**medication** 156:9,11
**medicine** 154:23 155:4,24 156:3
  156:6 163:14
**meeting** 4:1
**men** 20:22 21:1 43:12 81:14,22
  82:25 90:10,13 91:2 97:5
  102:23 122:10
**mental** 120:4,9 132:19 133:2
  164:7
**mention** 14:13 43:18 108:11,20
  108:21 109:9 112:5,6,9 113:21
  113:21 114:13 122:12
**mentioned** 14:6 77:25 108:15
  114:11 125:4 134:21 137:14
  156:21 173:6 178:18
**merit** 172:16
**met** 34:23 119:21
**meters** 75:25 76:1
**method** 11:21 24:22 54:16
**Metro** 78:21 119:7
**mid-January** 172:18
**middle** 145:10
**miles** 68:18 96:8 109:25
**military** 84:13
**mind** 57:7 81:25 105:25
**minute** 81:18 87:8 156:22 164:18
**minutes** 86:18 96:5 101:5,8
  104:15 109:23 110:7,16 111:3
  115:25 117:6 127:9 136:7,15
  136:18,20 143:14 144:3,14
  145:14,23 148:9,10 149:23
  152:5
**Miranda** 121:19 126:15 133:18
  145:15,18 162:8,10,20,23
  163:2 164:21
**mirandized** 119:20 163:8
**Miscellaneous** 133:22
**mischaracterizes** 107:17

**misfile** 18:6
**missing** 177:4,5,12
**misspoke** 37:4
**mister** 21:16,22 23:6 42:19
  43:20 47:3 61:12 100:23,24
**misunderstood** 71:22
**mitigation** 175:10
**mixed** 149:17
**MK** 2:22
**mode** 24:22 87:6
**model** 32:25
**modus** 24:23
**moment** 28:9 45:1 75:17 87:11
  95:17 99:21 102:4 115:11
  116:23 156:13 160:4 166:2
**moments** 88:21
**money** 29:13 40:22
**monitor** 66:8
**monitored** 65:24
**months** 21:13,13,18 22:24 42:15
  52:23,25 163:4 165:9
**moot** 6:19 7:7 8:9,9
**moratorium** 117:10 147:23
**morning** 3:5,5,7,8,12,13,14,17
  3:18 4:10,12,15,16,17,20,21
  42:25 54:7 64:14,15,21 76:25
  77:1 89:23,24,24,25 118:5
  131:17 134:22 143:5,22 159:7
  167:5
**motherfucker** 148:17
**motion** 5:7,10,13,17,19,20,21,24
  5:25 6:2,3,18 7:13,15 9:24
  10:10,19 15:9 19:7,8,16,20
  35:10,12 59:15 60:16 61:15
  104:21 106:17,18,21 107:16
  112:7 115:15 116:1,14 160:21
  161:12,13,14,16 162:5 165:16
  166:4,25 167:18 172:17,17
  175:9 180:22
**motions** 1:7 3:15,21 4:2,23,25
  5:3,5 6:7,11 7:19 9:7,10
  59:20,23 60:8 63:1 104:16
  115:23 165:24 166:18 168:10
  168:23 171:23
**mouth** 162:6
**move** 23:19 62:15 63:3 101:13,20
  102:2 106:17 113:9 149:23,25
  150:13,16,24 169:12 173:14
**moved** 64:1 88:6,8 103:10 158:8
**movement** 71:23 100:15

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 23

**movements** 99:7
**moves** 116:21
**moving** 5:4 6:11 18:12 19:4 60:8
  61:10 66:18 67:15 69:21 70:10
  70:11 80:1 93:14 94:16 102:1
  108:7 112:11 115:22 146:16
  149:19 150:19 157:5
**multiple** 42:9 58:19 72:10
  109:10
**murder** 32:2,6,8,14,18 33:11
  44:13,25 45:9,10 56:12

---

### N

**N** 2:7,7,21
**N-O-V-A-S-A-K** 123:10
**name** 4:8 64:11 77:10 118:12
  123:7,10 124:16 125:5,22
  126:7 128:21
**named** 85:12
**names** 12:20,24 13:4 16:1,3
  17:11
**nap** 132:7
**native** 164:11
**nature** 19:18 56:19
**near** 30:15 31:24 108:15 112:12
**necessarily** 44:10 53:10 151:3
**necessary** 9:4 17:7 40:6 103:25
  105:11 111:14 156:11 164:1
  166:2 169:25 171:21
**need** 5:1 11:22 16:4,6 43:6
  48:16 53:10 62:10 72:4 105:10
  111:13 154:23 155:4,23,24
  166:8 174:1,18 177:3,3,14
**needed** 15:18 29:18,18 166:8
  170:25 171:4
**needs** 16:10 17:24 18:5,18,19
  116:4 163:20 167:9
**negative** 39:3
**never** 24:18 44:5,5 58:25 69:16
  92:21 93:9 164:23,23
**nevertheless** 102:17 162:9
**new** 2:2 33:9 173:12
**Nice** 64:16
**night** 33:5 41:15 132:4 145:10
  151:6 156:25 159:5
**nine** 12:24 44:18 45:5 63:14
  77:13 88:13 90:3 92:12 107:23
  108:8,9 128:24 141:17 147:7
**nineteen** 84:11,22 86:16 87:15
  87:16,22 88:5,13 89:5 94:12

99:24 109:13,17 113:6,11
  134:18
**ninety** 136:15 145:23 149:22
**ninety-minute** 117:7 147:12
  150:12 164:9
**normally** 68:7 74:11 175:23
**north** 108:13 109:6,18 113:17
  119:19
**Northwest** 118:15 119:3,18 121:8
**notations** 170:7
**note** 14:12 40:13,14
**noted** 8:14 93:21 139:8 166:22
**notes** 9:9 96:18 158:21
**notice** 81:19 97:11 133:8
**noticed** 99:13
**notified** 93:13 95:3,3 101:11
  170:21
**notify** 66:20 170:1
**Novasak** 2:15 122:23 123:3,5,6,9
  123:19
**nuance** 12:8
**nudge** 14:1
**nullify** 62:10
**number** 3:4,15,19,22 5:6,9,16,18
  5:21 13:8 33:3,5 35:3 44:18
  49:3 55:24 56:13 75:22 123:10
  140:22 165:2 173:13,25,25
**numbered** 12:23 13:23
**numeric** 75:22
**numerous** 147:12
**nurse** 154:9,23 155:4,20,24
  156:10

---

### O

**O** 2:7,7
**o'clock** 42:25 54:7 85:2 92:13
**O.P.S** 108:3
**object** 69:22 173:8 176:4
**objection** 37:21 64:2 73:15
  173:9 175:12
**observe** 119:22 132:11
**observed** 132:22 137:4
**obtained** 117:14
**obvious** 94:5 115:4
**obviously** 3:20,25 8:10,14 11:21
  16:25 17:7,15 27:13 37:13
  60:14,15,25 105:24 137:9
  161:12 164:17 165:18 166:16
  179:18
**occasion** 39:25

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 24

**occasions** 150:12 154:13 155:9
**occur** 24:9 72:15 150:7 179:7
**occurred** 20:13,17 47:18 52:6
  90:7 116:22 129:16
**occurs** 21:14,17 52:23 57:17
  65:9
**offense** 24:10,11,13 35:16 55:16
**offenses** 19:13 23:25 25:3 34:5
  34:21 40:6 48:9 51:14 52:12
**offer** 46:9 142:3 143:19
**offered** 31:2,10
**offering** 168:25
**offers** 25:9
**office** 1:13,18 9:24 10:6 11:1
  15:17 119:14 132:1 144:19,22
**officer** 2:11,15 50:9 63:17,20
  63:21 71:17,22 76:24 77:12,15
  77:22,23 78:12,14,17 80:12
  83:4,15,19 85:11 86:4,11,12
  87:1,2,21 88:20 89:7,16,23
  94:1 102:8,15 103:4 104:22
  109:9,14 112:22 118:25 122:23
  123:9,12,19,20 124:8 128:4
  129:9 134:2 140:3 143:1
  146:15
**officers** 11:23 48:21 62:9 66:11
  66:13,20 73:25 80:13 81:13
  85:11 109:12 113:1,16 114:22
  130:4 142:9
**official** 181:17
**oh** 44:4,24 46:14,17 53:17 65:16
  114:3 153:11 172:6,8
**okay** 6:21 7:12 8:6,13 9:12
  11:10,16,20 19:3 31:6,11 33:6
  37:6,9,18 42:16 46:14 49:23
  51:21,21 52:16,24 53:1 55:2,3
  55:5,20 56:6,21 58:8 60:4
  66:14 68:10,20 69:5,5,14,15
  70:5,6 71:1,6 74:22 75:1,24
  76:2,2,6,13,17,20 79:21 82:18
  83:4,13 85:6,17 86:1,4,18
  87:10 88:10 89:2,13,20 90:5
  90:12,19,24 91:6,15,21 92:12
  92:21 93:4,9,12 94:3,10,15,20
  94:23 95:9,13,17,17,25 96:20
  97:1,7,15,18,24 99:6,16,20
  100:1,13,20 101:3,10,21,24
  102:4 103:12 106:13 111:22
  116:13,20 119:21 120:22 122:7
  122:19 124:6 127:13,18,22

134:21 135:14 136:2 137:2
  140:6,15 141:1,16,18 142:6,18
  142:21 143:3,7 144:1,14
  145:11,13,22 146:25 147:8,16
  148:9 149:14,21,21 150:7,19
  151:4,17 152:3 153:3,6,13
  155:8,18 156:4,12 158:14,18
  159:2,22 160:3,13 161:10
  162:1,16 167:3 168:9,16,18
  169:10,20,23 170:5,16 172:21
  175:22 177:16 178:10,10,15,16
  179:8,13,20 180:25 181:8
**older** 32:25
**Olney** 20:21 78:21 96:4 119:8
**once** 18:20 30:18 31:18 87:7
  92:1,1 98:21 105:11 115:13
  125:8 172:14 179:2,16
**oncoming** 87:17
**one's** 117:24,25
**onerous** 171:18
**ongoing** 14:7
**open** 14:3 54:12 92:6 106:10
  169:14,14
**open-** 29:1
**opened** 98:9 101:6
**opens** 57:5
**operandi** 24:23
**operation** 62:17
**opportunity** 8:3 74:17 103:19
  104:14 105:2 107:15 115:18
  119:16,22 132:11 173:11,23
**oppose** 176:4
**opposed** 180:7
**opposing** 8:21
**opposition** 175:15
**opt** 165:20
**oral** 105:2,7 151:9 161:19,21
  169:2,3,24,25
**orally** 105:10
**order** 4:24 7:14,24 8:17,19 9:2
  9:11,13 10:14,16 11:15 12:25
  13:11 15:1 16:2,10 17:21 24:1
  25:1,15 27:6 53:12 59:16,25
  60:18 61:3 168:15,16 174:11
  178:22
**ordering** 8:23 10:16
**orders** 170:7
**original** 50:17
**originally** 55:4
**outer** 35:6

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 25

**outlined** 167:12
**outside** 3:11 41:21 98:14
**outstanding** 116:14 170:8
**overcame** 164:2
**overcome** 57:23
**overcomes** 165:5,12
**overlapping** 25:19
**oversaw** 18:2

---

**P**

**p** 2:7 144:9
**P.C.S** 78:21 119:7
**p.m** 78:7,19 84:25 85:18 86:17
   108:3 116:9 127:6 128:5
   130:15 134:19 140:4 142:10,19
   143:10,14 154:12,12,22,23
   155:3,3,23,23 156:5 160:8
   181:15
**PA** 1:14,20,24
**page** 13:23 40:18
**pages** 12:23 13:9
**pants** 90:16,21
**papers** 13:19,19 105:6,11
**paragraph** 12:24 13:8,23 40:19
**paraphrasing** 41:18
**parenthetically** 5:12,24
**Parisi** 1:12 2:9,12,14,16,19 3:8
   4:9,10,11 8:12,18 9:1 10:22
   12:2,7,10 16:25 17:9,16,22
   28:11,13 31:5,8,12 32:21 33:4
   33:7 34:3 35:9 36:9,14,23
   37:4,7,10,19 39:6,20 40:10
   41:8,11,14 42:9,16 51:10
   58:11,21,23 59:2,7,10,13
   62:22,23 64:3,17,20 67:20
   73:15 76:17,18,23 77:18,18,19
   77:21 83:14,18 84:19,21 86:8
   86:10,22,25 87:12,14 89:15
   102:10,11,14 103:3,8 104:2,3
   106:19 111:17,21,23 114:16,19
   116:7 117:17,18 118:21,23
   121:2,5,12,16,23 122:16,17,22
   123:15,16,18 127:23,24 128:13
   129:3,5,7 134:6,8 135:5,15,18
   136:4 137:9,12 138:8,11,22
   139:17,19 156:16,17,20 157:16
   157:17 160:20,23 161:7,9,24
   161:25 162:2,4,16,19 166:10
   166:11 167:14,17 169:8,9,16
   169:18 170:11,12 173:4,5,18
   173:23 178:16,18 179:11,14
   181:4
**Park** 108:14,17,18
**parked** 31:14 125:9
**part** 13:16 38:4 107:1 119:10
   124:22 133:11 136:12 146:13
   154:8 164:11 165:11
**participants** 50:24
**participate** 41:19
**particular** 8:19 16:8 40:25 72:1
   72:1 79:14 108:2 124:4 151:8
   180:16,19
**partner** 78:13 85:11 124:6
   125:21
**passengers** 89:8
**passing** 108:10
**path** 80:7
**Patro** 129:17
**patrol** 88:7 119:10 124:11
   129:25 130:3
**patrolled** 124:20
**patroller** 125:2,4
**pattern** 37:25 38:5 39:9 58:15
**pause** 83:19 87:12,13,20 88:5,12
   136:5 167:1
**paused** 98:17
**pay** 50:5
**paying** 81:25
**pedestrians** 62:5
**pee** 163:18
**penalty** 18:8 117:10,11 147:24
   148:12
**PENN** 1:23
**Pennsylvania** 1:1,5 82:12,23
   117:11 147:24 148:6,11
**people** 20:19 22:5 24:21 32:10
   32:15 41:15,19 50:16 62:4,4
   81:8 84:24 98:12,23,24 101:19
   102:24 110:8,12 132:15,18
   171:14
**percent** 89:12
**perfect** 42:3
**period** 95:2 100:7 136:21 149:14
   152:8 153:17
**permis** 168:17
**permissible** 35:7
**permission** 135:15
**permissive** 8:24
**permit** 161:18 168:6
**permits** 14:5

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 26

**permitted** 37:2 167:12
**perpetrators** 62:11,12 95:20
  96:3 100:11,14 112:20 113:1,3
  113:12
**Perry** 33:25
**person** 33:11 79:24 81:10 94:3,5
  133:9
**personal** 74:8
**perspective** 6:4
**Philadelphia** 1:1,5,14,22,24
  42:14 63:17 64:24 65:9 66:4
  77:23 78:22 80:14 82:17
  118:15 119:8
**phone** 20:20 21:17,18,21,25 22:2
  22:7 23:11 25:6 30:8,13,15,16
  31:18,19,25 32:9 34:7 40:23
  43:1,14 52:24 53:19 54:8
  67:17 72:12 78:8 79:2,3 90:2
  92:25 122:11 171:2,3
**phones** 21:9 43:2 62:15 89:11
  93:13 95:9,19,19 112:11,16
  171:13
**phonetic** 30:19 33:25 63:21
  109:21 129:17 171:7
**photograph** 139:12
**photos** 32:21
**physical** 120:11 133:4,9
**picture** 140:14,20
**pictures** 141:6
**piece** 26:15 54:4 55:9,19,20
  178:11
**pieces** 32:3 33:10
**pinging** 80:20
**place** 16:10 18:21 20:20 35:16
  48:10 54:14 62:8 68:21 83:1
  100:3,24 126:24
**placed** 130:7,14,16 131:5 135:2
  140:6,10 142:8,13,21,22
  143:23
**places** 52:7
**Plaintiff** 1:3,10 2:22
**plan** 12:11,12,14,18,22 13:10,23
  13:24 14:5,5,23 17:9,23 19:23
  20:6 23:16 40:7 51:3,25 52:1
  52:9,10,12,20 53:9,12 55:7,10
  167:13
**planned** 22:20 31:15
**plate** 33:3,4,9 47:8
**play** 19:12 85:10 86:22 88:2,10
  89:2 104:5,6 107:19,20 121:12

  134:9 135:11,16 137:10 164:17
**played** 109:12 121:15 153:9
**players** 20:14
**playing** 87:1 136:2,3 138:21
**plays** 88:4,11 89:4
**Plaza** 20:21
**please** 64:5,11 77:4,10 118:6,12
  122:24 123:7 128:15,21 142:12
  169:25 174:20
**point** 4:22 17:5 22:19 24:23
  28:14 35:9 37:24 39:23 41:22
  45:20,21 46:5 47:22 68:13
  69:21 83:10 85:24 87:15 88:16
  89:3,6 93:13 95:2 96:11,14
  103:21,22 114:6,16 116:1
  132:6 145:1 153:22 156:1
  172:9 174:13 176:12 178:5
**points** 150:18
**police** 21:5 26:20 30:10,14 31:8
  33:7 48:21 56:5,6,25 61:25
  63:14,17 64:23,24 65:1,3,4,8
  65:13 66:4,11 77:12,23 78:13
  79:6 82:1 94:1 104:5 107:2,10
  107:13,18 108:6,22 109:9
  110:6,12 111:5,10 118:25
  123:20 129:9 133:21 134:2
  139:12 143:1 144:24 163:18,25
  165:4,12
**polishing** 14:14
**pops** 65:20
**portion** 132:4 134:23 135:20
  164:16
**posed** 28:17
**position** 6:11 10:13 12:5 20:5
  28:10 58:1 104:2 105:12
  167:22
**positions** 105:19 173:20
**possession** 117:23
**possibility** 96:6
**Possibly** 101:9
**post-arrest** 5:23
**potential** 27:3 35:23 37:25 38:7
**potentially** 18:3 100:17 125:10
  172:23
**powerful** 34:16
**precedes** 40:1
**precise** 71:7
**predicate** 164:1
**preemptive** 36:25
**preemptively** 36:8

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 27

preface 162:6
prefer 103:16,24 105:4
preference 7:23 8:5 9:1 61:3
  105:16 161:11
prejudice 23:25 24:3,6,8 28:5,8
  28:20,21 29:6,8 30:4 33:14,18
  33:21 34:24 36:2 37:25 38:7
  38:11,20 39:24 55:15,24 168:1
prejudicial 27:18 44:10,15
  167:22
premature 174:9
preparation 175:5
prepare 136:24 175:20
prepared 3:20 9:7 26:7 103:24
  137:15 152:10
preparing 152:8
present 4:24 31:7 54:19 56:19
  60:14,17,20,20 122:4 162:3
presentation 8:18 181:10
presented 4:6 17:22 25:10 35:15
  35:18 41:7 51:12 54:21,24
  58:15,16 105:18 165:25 173:19
presenting 33:15
presents 17:16 41:2
preserve 59:24
presiding 3:3
pressed 173:8
presume 12:21
presuming 11:22
presumptively 8:10 62:19 173:2
pretty 33:1 68:22 82:5 104:12
  126:20 149:15
prevent 179:4
previous 3:25 40:23 41:2,24
  58:16 161:11,13 166:4
previously 117:22 119:25 124:14
  179:10,12 180:3
prior 3:24 23:12,13 35:11 43:5
  43:23 44:16 86:7 117:21
  124:15 131:5 132:14 142:6,10
  142:13,21 159:16,24 163:2
  170:1
prison 45:14 50:21
private 65:25
pro 3:23 5:17,19,25 6:7 14:13
  14:18
probably 126:19 127:11 145:12
problem 15:24 55:18,20 57:10
  169:12
problems 110:9

procedural 18:11
Procedure 19:11,12,14 51:14
proceed 7:8 9:10,14 61:5 64:17
  116:18 118:20 129:3
proceeded 79:11
proceeding 79:22 162:15 181:18
proceedings 2:4 115:21
process 80:9 85:20 154:8
processed 154:8,17
produced 2:5
product 54:9
productive 9:17
proffer 126:12
prompt 76:14
proof 24:9
proper 20:15
properly 19:17,19 20:1,3 23:20
  35:4 55:11
property 31:21 127:21
prosecution 58:20
prostitutes 117:25
protected 61:21
protection 60:12
protective 178:22
prove 25:15 30:6 32:1,1,12
  34:18,20,21,22
provide 12:4 40:13 46:24 59:16
  106:5,6,11 115:19,20 126:14
  133:17 161:21 167:5,8,17
  168:4 169:3 179:4,6
provided 8:4 17:3 91:24 92:18
  100:4 106:13 107:18 164:12,15
  166:11 167:11,11 179:10,12,19
provides 12:14 61:1 92:14
providing 59:22 94:4,5 151:1
  177:1 179:9
prudent 173:21
public 13:20 80:3 110:19,21,22
publicly 12:12 13:24
publish 83:15 121:2
pull 88:22
pulled 81:17 84:4 87:19 91:18
  94:11,12 99:21,22 100:1
pulling 109:21 111:1
purely 115:6
purpose 13:20 25:3
purposes 60:22 147:1 170:7
  179:20
pursuant 17:9
pursuing 90:1 107:14

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 28

**pushing** 171:17
**put** 25:16 62:8 125:19,23,25
  138:6 157:7 162:5 167:22
**puts** 59:25 73:5 74:24
**putting** 71:16,16 126:6

---

## Q

**question** 9:23 10:5,22 14:3
  15:12 16:19 18:12 21:10 28:2
  33:22 35:8 37:2,2 38:11 39:19
  40:15 42:18 56:11 61:16 69:17
  69:18 70:21 73:10,13 74:5
  75:16 76:14,14 96:13 111:16
  122:8 141:10 151:6 157:10
**questioned** 36:21 131:6
**questioning** 119:14 130:1 133:18
  157:8
**questions** 28:18 35:15,18 45:20
  68:2 75:20 89:16 120:18,19
  121:23,25 126:9 128:8 139:18
  160:17
**quick** 76:9
**quickly** 111:12
**quiet** 126:21
**quite** 81:24 124:20
**quote** 29:24 148:4
**quoted** 29:22
**quotes** 114:9

---

## R

**R** 2:7
**racial** 16:4,7 17:12
**radio** 63:14 64:23 65:4,8,13
  66:11 78:8,20,25 79:6 81:7
  85:2 89:17 94:2 96:18 100:18
  101:22 102:15 104:5,11 107:18
  107:22 108:22 112:21 113:2
**radius** 67:10,11,14 70:19,20
  73:3,6,11,11,12,12,12,19,19
  73:23,25 74:10,19,21,25 75:3
  75:11,21 76:3
**raise** 64:5 77:4 118:6 122:24
  128:15 148:18 165:4 174:20
  176:19
**raises** 164:23
**raising** 148:24 177:11
**range** 46:8,12 141:19
**ranges** 16:8
**rare** 55:16
**rarely** 34:25

**RE-CROSS** 158:2
**RE-DIRECT** 156:19
**re-file** 15:9,20,23
**reached** 171:5
**read** 9:24 13:10 121:19 137:24
  145:15,18
**readily** 7:10
**reading** 87:22 164:21
**ready** 9:10 14:2 19:6 116:13
  173:16
**real** 55:11,12,13 106:20 149:12
**really** 14:21 20:15 22:9 28:2,3
  50:12 114:12 177:4
**rear** 82:13
**reason** 23:21 26:1,11 50:12
  51:22 56:10 116:3 126:15
  131:10 143:4 170:24 177:6
**reasonable** 107:2,3 110:15 111:5
  111:6 173:17
**reasons** 28:19 43:20 48:25 49:1
  56:13,21,23 91:18,21 117:12
**recall** 3:25 78:16 80:25 95:7
  96:17,19 99:8 101:6 130:11
  131:12 154:14 155:10,22
**receipt** 8:22
**receive** 17:5,6,22 59:20,23 78:8
  78:25 79:13 124:11 167:9
  174:10
**received** 10:18 14:15 78:20 90:9
  96:10 115:13 125:2 157:3
  163:8 166:16 176:21,24 180:3
**receiving** 58:13 59:18 79:22
  80:6 81:7 90:7 175:10
**recess** 115:24 116:4
**recollection** 136:15
**recommended** 9:13
**record** 4:8 8:15 60:16,22 63:4
  64:12 70:11 77:11 116:9 118:5
  121:18 123:8 128:22 135:6,20
  136:6 147:2 166:6 170:8
  174:14,17 181:14
**recorded** 2:4
**Recorder** 2:1
**recording** 2:4 63:10 130:17
  181:18
**records** 13:19
**recovered** 21:11 31:3,9 44:5
  54:19
**red** 111:4
**redirect** 76:18 102:11,13 160:18

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 29

**refer** 61:9 89:16 158:21
**reference** 103:10 125:2
**referenced** 51:11 167:13
**referred** 51:10
**referring** 37:23 48:10 104:21,22
**refers** 115:6
**reflect** 70:11
**refrain** 43:7 48:16
**refuse** 139:15
**refused** 30:24
**regard** 39:22
**regarding** 5:13,17 8:24 9:22,25
  19:6 25:25 26:13 35:16 41:7
  44:8 48:15,20,24 49:6 56:19
  57:10 68:20 161:11
**regardless** 54:10,15
**regards** 4:2
**regular** 84:24
**regulations** 9:25
**reissue** 180:12
**related** 35:25
**relatively** 45:3
**relayed** 79:1
**release** 10:16 170:2
**relevant** 20:12
**Reliana** 30:19 33:8 41:20
**remain** 27:4,5 40:8 43:21,22
  44:21,24 45:9,13 46:14 49:1,9
  49:14 56:12 106:10 149:15
  168:2,2 175:2
**remained** 142:2 143:17
**remaining** 59:20 106:18 116:1,13
**remains** 143:7 153:14
**remember** 44:2 81:1 90:6 101:18
  126:20 148:7,12,18,21,25
  149:3 154:24 155:25 180:4,4
**remind** 178:21
**reminding** 166:8
**remove** 82:25 83:4 89:7
**removed** 83:3,11 86:19
**render** 161:23
**renders** 165:13
**rendezvous** 26:23
**Renee** 171:6
**repeat** 142:12 145:17 146:9,10
  151:22
**repeated** 153:21
**repeatedly** 62:9 93:5 95:18
  110:1 114:22 154:5
**replay** 152:16 153:12

**report** 179:15,15
**reported** 115:1
**Reporters** 2:1 181:22
**reporting** 108:4
**reports** 126:11
**represent** 40:7
**representation** 12:2 173:1
  177:13
**represented** 69:23,24
**represents** 41:4
**reproduction** 5:17
**request** 6:16 13:17 18:13 103:17
  103:17 105:2 115:14 153:21
  157:11 161:3 167:7,10 174:15
  179:24
**requested** 12:16 18:7 61:10
  106:3 159:19,20,20 167:10
  175:16
**requesting** 15:14 173:22
**requests** 143:11
**required** 24:2 161:4 165:22
**requirements** 12:12
**requires** 48:13 112:4
**research** 8:4
**reserve** 104:9 105:1,23 165:21
**resolve** 46:6,9 180:23
**respect** 14:24
**respectfully** 62:18 103:17
  117:12
**respective** 105:18 173:20
**respond** 10:23 12:1 15:5 36:6
  40:15 59:25 60:3,6 105:10
  107:15 114:16 165:18 168:6
**responded** 153:21
**responding** 112:10,22,25 113:4
**response** 19:20 28:12 29:22 86:1
  86:5 106:1 110:19 115:15,20
  161:12 178:17
**responsibilities** 65:5 66:12
**rest** 38:4 55:8 82:3 105:4 115:9
**restrain** 157:23
**restricting** 178:23
**restroom** 159:3
**resubmitting** 14:15
**result** 28:8 61:11 129:21
**resulting** 24:4
**results** 45:10
**retain** 170:25 171:4
**return** 116:5 143:17
**returned** 143:13 144:2

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 30

**reveal** 17:18
**reversal** 16:22
**review** 35:5 137:20 162:22
  178:25
**reviewed** 18:13 85:9 130:24
  139:1 155:22 156:22
**Richter** 48:4
**ride** 126:21
**right** 10:6 17:14 30:16 31:20
  33:20 35:19 38:20,22,22 43:22
  44:24 46:14 48:2 49:9 50:16
  51:18 54:4 55:4 59:7,25 60:5
  61:20,21 64:5 68:6,13,16,23
  70:12,21,23 72:1,3,6 73:8
  74:11 75:17 76:6 77:4 78:3,7
  78:19 84:6,22 85:9,17 86:8,21
  87:20,24 88:2,12,18,25 89:5
  90:13,22 91:3,4,8,9,11,13,14
  91:19,24,25 92:1,22 93:4,7,12
  93:12,15,16,18,24 94:8,9,12
  94:14,25 95:1,5,11 96:12 97:7
  97:13,16 98:2,17 99:1,4,7,9
  99:10,15,16,24 100:3,5,7,11
  100:16 101:13 102:2,3 109:4
  118:6 119:5 121:11,17 122:13
  122:24 125:1 128:15 129:15
  131:12 132:9 135:5,11,19,25
  136:19 138:8,20,23 140:8,13
  141:19,24 142:2,4,11,16 143:8
  143:10,13,15,21,24 144:3,16
  144:19 146:4,11,15,16,23,24
  147:9,11,18 148:1,3 149:2,23
  150:2,2,5,9,11,21 151:9,15,21
  152:7 153:15,18,20 154:1,4,9
  156:7 157:21 159:10,24 160:1
  167:11 174:20 176:16 177:9
  178:15 181:5,8
**rights** 27:4 29:9 60:11 145:15
  145:18 176:7
**ripped** 90:16,21
**rise** 116:10 165:4 181:13
**Rising** 108:10
**River** 2:2
**road** 1:19 79:14,16 96:25 101:5
  108:7 113:7
**roadblock** 61:17,24 62:5,7,8,9
  62:10,16,17 96:21,24 100:3,24
  110:3,5,17 111:7 113:7,7,8,9
**rob** 29:12 30:9 53:19 54:6
**robbed** 90:10

**robberies** 20:9,11 22:21 23:13
  23:14 24:17 25:1 29:20 30:22
  33:13 40:23 41:25 42:10,13,14
  46:17 47:10,10,18,22 48:1
  49:19 50:23 51:5 52:5 53:21
**robbers** 90:1 93:5
**robbery** 20:13,17,18,20,22,24
  21:1,14,15,19,20,24 22:2,6,7
  22:10,16,22 23:2,2,5,10,14,18
  24:16,16,25,25 25:2,15 26:6
  26:14,22 27:16 29:14,18 30:21
  30:21 31:15,17 32:2,18 35:21
  35:22 36:1 37:3 39:2 41:2,3,3
  41:5 42:6,6,7,7 43:11,22 44:1
  44:2,12 45:1,2 46:19,25 47:7
  47:11,20 49:12,14 51:7 52:21
  52:24 53:3,5,6 54:11,14,16,19
  54:22 56:4 57:17 58:24 62:1
  63:12,15 65:9 78:8,20,25 79:4
  81:8 97:23,25 99:18 102:19
  107:5 109:24 110:8 111:2
  119:7 122:11
**robbing** 42:24 43:1
**Robert** 30:19 41:20
**roles** 50:24
**romantic** 26:23 57:1
**room** 117:4 126:24 130:8,10,14
  130:17,20 131:3,6 132:10
  134:11 135:2 140:10,12 141:7
  141:22 142:3,8,13,18,22,22
  143:7,13,18,23 144:3,11,17
  145:13 146:1 152:4 153:14
  154:11 156:10 157:2 158:5
  159:25 165:10
**rooms** 127:3
**Roosevelt** 108:10
**roughly** 92:13 130:13 131:18
  136:7,23 143:22 144:13 156:23
  160:12
**routes** 80:2,3,6 171:25
**routinely** 34:25
**rubbernecking** 110:12
**Ruiz** 30:19 33:9 41:20 53:4 57:1
**rule** 10:24 11:19 19:12,14 20:4
  20:4 23:17,21,22,24 24:17
  51:13 55:4,10,13 167:21
**rules** 9:24 10:10 19:11 55:4
**ruling** 12:1 37:16 60:25 107:1
  161:15
**run** 130:19

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 31

**runtime** 135:7 138:9

---

## S

**S-T-R-A-N-G-E** 77:13
**S.U.V** 30:8,20 31:14 32:4,5,6
 81:14,23 82:9,10 88:17,25
 102:24
**safe** 128:4
**safety** 17:16
**Sanchez** 13:15
**Sander** 21:22
**Sanders** 21:23 22:4,15 47:15,16
 47:17,19 51:25
**sandwich** 135:12
**sandwiches** 135:13 138:18 143:24
**sat** 81:24
**satisfies** 164:19
**Savage** 29:22
**saw** 93:20 94:13 110:6 125:8
 163:5 171:5 178:6
**saying** 17:1 24:14 26:17 30:13
 31:22 37:1 46:3,16 48:18
 53:17 55:6,9 69:8 70:10 71:1
 101:19 114:13 148:7,25 149:3
 155:4,22 179:23 180:11
**says** 12:22 13:24 15:11 16:9
 17:9,10 29:23 40:20 49:18
 51:14 55:23 73:6 74:25 84:9
 84:11 108:24 109:15 112:5
 113:20 115:7 154:23 164:25
 177:4
**scared** 99:10
**scenario** 28:25 39:11 165:8
**scene** 21:3,8 30:9 31:17,20
 32:18 61:25 85:12
**schedule** 161:20 169:1
**scheduled** 168:22 170:18 175:6
**scheduling** 169:24
**scheme** 19:23 20:7 22:20 23:7,16
 40:7 51:3,25 52:1,9,10,12,20
 53:9,12 55:7,10
**Schmill** 55:18
**scope** 37:13,23 167:12
**score** 41:16 42:21,25 53:18
**screen** 65:18 71:18 72:13 74:19
 74:20 83:20,22 85:19 107:24
 121:7 134:10 138:25
**screenshot** 98:16
**scrolling** 139:4
**se** 3:23 5:17,19,25 6:7 14:13,18

**search** 5:11,14 62:19
**searches** 61:21
**seat** 43:13 56:9,9 77:16 84:4
 125:12
**seated** 3:9 4:13 35:13 116:12
 123:13 125:11 129:2 146:3,8
 146:19 147:5
**seats** 146:3
**second** 3:11 7:13 24:11,13 40:20
 46:4 54:13 61:7 88:5 90:19
 110:5 167:2 170:23
**Secondary** 17:20
**seconds** 84:12 88:6,14 89:6
 109:8,17
**security** 14:7 66:2
**see** 3:17 6:4 32:23 36:12 39:14
 40:9 42:23 64:16 70:17 73:18
 73:21 75:5 81:19,20 83:20
 91:10,13,13,22,23 92:2,7 98:1
 98:4,7,8,12,12,14,17,22
 102:18 114:25 115:6 120:6,11
 132:22 133:3 134:10 135:9
 141:6 158:14,17 172:16
**seeing** 180:4
**seeking** 17:18
**seeks** 57:11 58:17
**seemingly** 30:2
**seen** 69:16 125:20 180:3,14
**seized** 61:13
**seizure** 5:12,14 61:14,16,22
 62:18 110:20,21
**selecting** 28:2
**selection** 13:21 25:12 27:22
**selections** 170:18
**send** 154:9
**sense** 54:5 172:2 178:13
**sentence** 40:20 41:7
**separate** 24:1,12,20 25:5,11
 26:3 33:23 34:5 40:6 48:1
 50:22,23
**separated** 26:2
**separately** 28:1 34:14,20 51:1
 61:6
**SEPTA** 62:13 96:12,16 112:21
**September** 170:19,19 175:6
**serious** 46:8 49:17
**seriously** 14:21
**served** 110:20
**serves** 45:22
**service** 2:1,5

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 32

**services** 55:19
**session** 3:2 116:11
**set** 38:23 48:6 59:19 104:23
  106:7 112:8 174:7,9 179:2,8
  179:16
**seven** 63:4,20 65:6 108:3 109:14
  130:15 131:19 134:19 140:23
  140:24 141:13,13,14 142:10,19
  144:1 156:24 158:23 159:4,7
  166:13
**seventeen** 86:16,16 87:15 94:12
  96:5 99:24 101:4 108:22 109:8
  109:23 112:18 113:4,10
**sever** 5:7 7:15 27:19,20 33:19
  38:17 39:15 50:11 55:14
**severance** 19:8,15 20:15 23:21
  23:22 24:3 48:13 167:18
**severe** 14:6 111:2
**severed** 20:4 34:25 52:4,7
**severing** 55:19
**severity** 110:21
**sex** 31:23 151:9
**she'll** 180:22
**sheet** 138:25
**shift** 124:4
**shirt** 90:20 98:18 135:24
**shooter** 44:20
**shooting** 44:19 129:23
**shortly** 7:5 78:19 92:17
**shot** 45:12 57:20
**show** 24:2 30:7,18 32:3 33:11,18
  33:20 34:23 40:20,21 41:1
  62:14 120:25 138:24 162:20
**showed** 112:19
**shower** 132:7 145:4
**showing** 48:14
**shows** 30:14,16 31:19,25 32:14
  32:15,15 41:24 65:21 109:20
**shut** 125:21
**side** 88:18 125:18 135:21
**sift** 171:11 172:16
**sign** 10:16 14:25 138:5 139:12
  153:10
**signature** 139:5
**signed** 152:14 159:3
**signing** 152:12
**silent** 27:4,5 43:21,22 44:21,24
  45:9,13 46:15 49:2,9,14 56:12
**similar** 19:18 164:4
**simply** 49:17 57:22 122:10

**Sir** 3:17 78:2 174:25
**sit** 104:4 150:14
**site** 171:3
**sitting** 33:8 56:8 124:21 127:5
  134:14 138:16 146:11 150:1,4
**situation** 15:17 23:5 24:6,9
  27:11 52:18,21 57:16 65:8
  67:4,9 74:10 111:9 171:20
**situations** 58:16 67:13
**Sivaram** 129:17
**six** 2:23 6:20 7:8 8:7,8,15
  21:13 44:18 58:25 63:19 77:13
  77:13 83:15 84:16,19,20 124:9
  127:6 128:5 140:4,15,15 141:3
  141:3,5,12,12 143:21 153:14
  160:8 171:8
**sixteen** 108:21 112:14 160:10
**size** 140:14,20
**skinned** 90:16
**skip** 137:13
**Skyler** 4:14
**sleep** 148:18
**sleeping** 156:25 158:6,7,8,10,11
  158:13 165:11
**Slept** 145:6
**small** 75:3 76:3 117:3,4 140:12
**snoring** 158:15
**solicitation** 118:3
**soliciting** 117:25
**solicits** 41:19
**somebody** 14:8 57:14 68:5 91:8
  153:23 154:1
**someone's** 50:20
**Somewhat** 80:4
**son** 169:13
**soon** 142:22 146:16
**sophisticated** 39:1,18
**sorry** 6:22 23:23 84:18 92:14
  100:2 101:16 116:15 118:4
  145:17 146:9 149:16 151:22
  152:23 170:15
**sort** 14:14 20:14 22:18 36:16
  42:12 70:9,14 93:1 104:24
  113:25 114:3,11 120:11 127:4
  132:19 171:11,11 172:16
**sound** 2:4 90:17 101:8 181:18
**sounds** 65:15 173:17 179:24
**south** 93:22,22,23 94:7,17,17,18
  95:10,20 100:11 101:19 102:16
  102:19 108:9,12,14,19 109:2,7

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 33

**southbound** 93:14 112:11 113:12
**southeast** 108:7
**span** 109:23
**speak** 9:19 41:6 56:24 57:19
  86:2 102:15 105:24 114:20,20
  119:16 120:16 125:16,17
  126:18 131:9 134:21
**speaking** 131:25 134:2 136:14,22
  144:24
**Special** 4:14
**specific** 4:2,25 8:21 34:11 41:7
  60:15 75:7,8 104:11 106:17
  167:20 170:6
**specifically** 29:23 33:24 40:4
  96:19 101:6,18 125:3 147:21
  148:3 150:7 151:11 154:10,22
**specificity** 17:8
**specifies** 12:25
**speculating** 113:2
**speed** 66:21 68:7,17 80:1 115:4
**speedy** 172:25 174:15 175:13,23
  175:25,25 176:7
**spell** 64:11 77:10 118:12 123:7
  128:21
**spelling** 30:20 33:25 63:21
  109:22 129:18 171:7
**spoke** 10:7,25 120:15 133:12
  137:2
**spoken** 171:19
**spot** 44:22
**Spriggs** 181:16,22
**SQUARE** 1:19
**staff** 166:11
**stage** 179:4
**stamp** 84:7
**stamps** 127:5
**stand** 27:14 28:17 45:8 49:12
  82:6 102:25 118:2 161:1
  174:20 181:11
**standard** 34:13 111:6 133:21
**standby** 87:6
**standing** 24:17,24 175:2
**staring** 81:24 99:14
**start** 28:14 35:9 61:2 69:25
  81:4 97:9 137:6 170:19
**started** 14:12 144:11
**state** 3:3 4:8 60:16 64:11 77:10
  118:12 123:7 128:21 176:21
  177:8,21 180:7
**stated** 12:6 17:20 33:17 54:18

**58:12 61:15 115:11 181:9**
**statement** 5:23 22:18 26:20
  30:12 31:21 40:25 41:23 43:8
  43:10,11,17 56:25 61:12 63:5
  63:8 116:21 117:2,14,14,21
  120:23 137:15 150:25 152:11
  152:14 159:4,9,16 162:8,21
  163:12,16,21 165:1,14 177:8
**statements** 126:12 178:20 180:19
**states** 1:1,3,8,11 3:16 15:10
  23:24 40:7 60:12 106:1
**stating** 17:17
**station** 22:10,23 23:11 25:8
  30:20 31:15,20,24 34:8 40:22
  41:21 42:24 53:6,19 54:6
  57:21 151:5
**stationary** 67:5,7,14 68:20 70:8
  70:14 72:12 75:12 76:11 94:15
  94:21 95:14 101:12 109:3,18
  149:15
**steering** 125:19,20
**step** 40:12 76:22 103:6 122:20
**stepped** 3:11 37:19
**stepping** 35:11
**stipulation** 117:20,21 118:4
  163:1
**stolen** 21:10 30:10 43:14 89:10
  92:25 109:24
**stood** 82:8
**stop** 28:16 32:23 62:5 89:3
  96:22 100:14 103:9 107:2,12
  108:25 109:19 110:15 113:7
  119:11
**stoppage** 110:5
**stopped** 32:7 62:4,4,15 94:25
  100:8,22 101:25 109:16 113:17
  151:25
**stopping** 91:22
**store** 20:20,22 21:17,18,21,21
  21:25 22:1,7 23:4 25:6 29:19
  30:9,15,25 34:8 40:23 43:14
  44:14 49:15 52:24 53:19 54:8
  69:10,20 78:9,21 90:2,10
  108:8 114:25 119:7 122:11
**stores** 29:13 33:2 43:1
**story** 42:2 48:24
**straight** 81:25 99:4,14
**Strange** 2:11 63:20 76:24,25
  77:2,8,9,13,22 83:19 86:11
  87:1 89:16,23 102:15 103:4

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 34

109:12
**Strange's** 83:16
**strategic** 28:19 29:5 38:12
**strategy** 38:16
**street** 1:13,19 31:14 33:2 61:17
68:15 80:14,21 93:14,22,23,23
94:7,17,18,18,21 95:10,20
102:16,20 108:13 112:11,12,17
113:18 119:19 125:7 126:3
127:6
**streets** 26:24 67:2 79:20
**stretched** 153:10
**strict** 107:12
**string** 25:1
**stripped** 29:9 38:22
**stripping** 38:20
**strong** 48:16 165:3
**stronger** 164:13
**strongly** 9:5 103:17
**stuff** 41:17 56:9 144:18 172:13
**styled** 7:19
**subjects** 37:12
**submission** 115:20
**submissions** 115:9 169:4
**submit** 16:3 106:24 111:7 112:2
**submits** 62:18 117:13
**submitted** 18:14 59:21
**subsequent** 14:14 48:12 59:17
**subsequently** 3:24
**substance** 5:5
**substances** 117:24
**substantial** 24:3 28:7 33:21
55:15,23
**substantially** 40:22
**Suburban** 32:19,22,24 124:24
**subway** 95:4,11 100:14,21 113:3
**successfully** 21:1
**sue** 163:17
**suffer** 28:5
**suffering** 120:3,9 132:19 133:2
**sufficient** 38:6 51:15,17 62:16
67:1
**suggest** 36:7 54:24 115:24
**suggested** 8:20 9:2,13 58:14
117:9
**suggesting** 37:7
**suggestion** 7:9
**SUITE** 1:13,19,23
**sum** 34:18
**summarized** 17:10

**summary** 63:7 136:17,24 137:15
138:3,24 139:1 152:1,9
**Sun** 108:10
**supervised** 13:3
**supervises** 15:3
**supplement** 115:18 165:19,21
169:2
**supplemental** 7:25 8:24 9:3
103:19,25 105:5 106:6,7,12
111:14 113:25 115:12,19 161:4
161:18 168:10,12
**support** 18:14 50:5 179:2
**supposed** 10:2 169:11,13
**suppress** 5:13,24 59:23 60:9
106:18,21 116:1,14,21 162:5
166:4 168:10
**suppressed** 62:20 117:15 161:14
**suppression** 61:12 63:1
**Supreme** 15:10,10 16:9 38:19
107:6 164:3
**sure** 11:18 36:9,15 38:4 39:20
39:23 40:1 49:21 58:2 60:19
68:22 74:2 89:12 96:8 100:18
101:1 140:17,25 141:8 149:4
158:20 165:10 172:24 173:9,15
174:13 177:5,5 179:16
**surrounding** 63:14 180:18
**surveillance** 112:19
**suspect** 28:21 32:9 34:12 54:20
129:22 178:20
**suspects** 96:11,15
**suspicion** 61:18 107:3,3 110:15
111:6
**suspicions** 107:14 111:5
**sustain** 37:22
**Swaitaj** 63:21 85:12
**swear** 64:6 77:5 118:7 122:25
128:16 174:21
**swint** 164:7
**sworn** 64:10 77:9 118:11 123:6
128:20 174:16 175:1
**system** 65:17 66:8 130:17 163:7
177:23 178:21

---
**T**
---

**T** 2:21
**T-Mobiles** 54:12
**table** 135:12 146:19
**tag** 82:13,21,22,23 84:14 97:16
97:21

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 35

**take** 4:4 5:1,4 6:15 7:9,21,23
8:17 14:21 27:14 28:3 43:6
45:7 49:12 51:18,19 55:23
61:3,6 105:20 106:16 115:24
118:2 132:6 154:1,17 155:12
161:10 162:6 167:15 171:15
172:15 180:16
**taken** 8:14 30:25 61:13 65:10,14
66:18 79:3 89:11 100:25
120:23 128:4 154:2,7 155:12
156:5,9 159:9,16 163:21
174:18
**takes** 39:9 87:8
**talk** 14:8 27:14 29:10 74:8
104:19 113:13 114:4,5 146:15
159:2 172:11 177:17,17 180:10
**talked** 100:9 147:15,16
**talking** 34:7 38:12,21 45:3,5,7
72:22 88:25 110:23 115:5
133:4 144:19,20 151:25 156:24
164:9 171:12 179:22
**talks** 19:14 29:22
**tall** 91:8
**taller** 90:20
**Tauber** 1:22,22 3:11,13 4:19,19
**taunted** 117:8
**team** 179:2
**Technically** 148:11
**tedious** 113:23
**tell** 34:9 42:2 54:25 65:12
66:21,22,24 67:10 68:4,8 73:3
73:25 74:20,24 91:7 107:6
108:6 122:9 130:4 133:15,23
141:21 151:4
**telling** 93:21 94:6 126:6 148:13
148:21 177:11
**tells** 14:19 29:7,7 34:4,15,24
73:6,24 162:23 164:4
**temp** 82:13
**temporary** 82:20,22,23,23 97:16
**ten** 73:1 110:12 115:24 117:5
136:17,23 138:13 143:10,14
151:20,23 154:12,23 155:3,23
158:23,24,24 159:4,13 160:8
169:21,23
**tend** 72:7
**tens** 43:1 54:8
**term** 27:7 96:22
**terms** 35:9 58:14 73:20 75:11
170:6

**testified** 14:11 37:20 58:17
68:4 70:22 74:5 90:24 91:15
95:22 99:2,13 106:25 144:17
145:1 158:18
**testifies** 28:22 37:11 54:3 57:4
**testify** 25:24,25 26:6,7,11,12
26:12,13 27:9,13 28:6 29:3
35:19,20,21 36:14,17 38:2,3
39:5 42:23 43:16,25 44:8,16
44:25 45:8 48:2,8,19,24 49:6
49:12 53:25 54:1 56:10,11
57:3 58:17 167:23,24
**testifying** 28:17 48:16,25 56:22
56:23 57:24 71:25
**testimony** 7:21,24 8:22 28:15
31:9,13 32:9 38:6 41:14 48:15
48:19 53:24 56:20 57:10 64:6
77:5 98:6 118:7 122:25 128:16
155:21 174:21
**Texas** 110:18
**thank** 4:21 8:6 9:12,16 10:21
16:24 19:2 28:10,11 42:16
58:5,6,10 59:1,12 60:4,7
62:21 64:2,14 66:14 67:21
69:14 70:3 76:8,9,18,20,21,25
77:2,3,15,17,19 84:20 89:19
102:6,7,8,9 103:4,5,7,12
104:1 106:14 111:22 112:1
114:14,15 115:10 116:6,7,8,12
117:15,16 118:3,16,19,21
121:25 122:13,15,17,18,21
123:14,15,16 127:24 128:9,11
128:12,13 129:5 139:19 147:8
147:9 156:14,15 157:17 158:1
160:14,16,23,24,25 162:2,18
165:17,23 166:15,22 167:3
168:8,18 169:22 170:3,12,13
172:1,9 175:2 178:15 181:7,9
**Thanks** 103:4 122:21
**theft** 55:20
**theory** 19:18 20:2 51:3
**thereof** 143:19
**they'd** 130:5
**they're** 55:11
**thing** 6:24 43:6 55:21 58:12,23
69:1 72:15 97:11 99:12 104:13
115:8 164:17 166:23 178:8
**things** 4:4 17:2 35:4 53:10
79:20 91:7 97:10 99:1 103:9
131:20 147:12,16 148:16 166:1

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 36

166:2,8 176:23 177:12 180:15
180:16
**think** 6:18,23 7:7,10 16:18,24
16:25 17:7 20:14 28:15 31:12
36:11 37:15 38:25 39:6,12,12
39:25 41:11 42:22 46:20 54:15
55:7 58:11 61:11 95:22 98:6
99:2,22 112:4 136:16 140:17
140:19,23 144:17 148:3 171:17
172:18 173:7,8,18,21
**thinking** 38:10 80:5
**thinks** 29:5 54:6
**third** 34:3,9,15,24 38:19 39:13
48:2,3,17 50:1 56:17 107:6
159:13 162:22 164:8,24 171:6
**thirteen** 12:23 101:8 135:7
144:10 148:10
**thirty** 110:5 113:15,16 127:9
129:10 130:15 131:14,19
142:10,19 143:5,10,21 156:23
156:24 158:23,23 159:4
**thirty-five** 109:17 115:25 116:5
168:11
**Thirty-four** 123:10
**thirty-one** 134:18,19
**thirty-two** 84:12 143:14
**thoroughness** 173:19
**thought** 71:22 80:9 150:17
**thoughts** 104:15
**thousands** 43:1,2 54:9
**threatened** 14:9
**threats** 50:14,16
**three** 5:8 7:20,20 8:16,16,16,25
8:25 11:14,23 12:18 20:18
24:5 41:4 45:6 47:10,17 63:10
71:9 78:7,19 85:2,3,18 86:16
86:18 92:13 93:21 94:16 98:23
100:25 108:2,7,8,9,12,16,17
108:19,21,22 109:8,12,13,17
109:20 116:16 117:18 121:3
133:22 139:9 142:4 143:8,14
152:5 154:12,23 155:3,13,14
155:23 156:4 158:24 159:21
167:19
**tie** 32:3 41:22
**ties** 32:8
**time** 4:22 14:8 23:4,8 24:21
25:11,15 26:7,24 47:5 48:9
50:24 61:24 65:8 70:20 73:7
73:23,25 78:1 81:1 84:7,10,13

84:14,14,15,16,22,24 85:1,7
86:2,14 92:21 95:2 96:20
100:2,7 101:11 107:12 108:1
113:2 115:19 116:2 117:11
123:23 126:6,7 127:4,8 130:13
130:19 131:3,18 135:2 136:21
137:2,10 138:6,6 139:5 140:5
140:6 142:9 144:14 146:1,5,6
147:23 149:14 150:19 152:8
153:17 157:1 159:13,16,24
171:15 172:15 173:10 176:12
180:9
**timeframe** 168:20
**times** 34:5 52:6 79:15 85:8
93:21 94:16 99:23 104:21,23
107:17 117:22 150:1 154:11
157:6 159:15,21
**timestamp** 86:14 88:13 134:17
135:6,8 138:12 147:3
**timestamps** 104:11 107:21
**timing** 34:10
**tint** 82:14,15,16 90:25 91:6,10
91:16 97:13 98:15,18
**tinted** 82:12,19 97:20 98:1,2
**tired** 152:15,20 153:8,11
**titled** 5:10
**today** 3:2 4:5 6:13 7:22 8:22
9:7 10:6 11:12 19:25 103:18
103:23 104:14,25 105:19,23
106:10 107:16,19,20 115:16
155:21 161:16,20 163:15
165:25 166:9,13,23 170:11
179:7 180:22 181:10,11
**today's** 106:8 166:17 168:5
**told** 15:17 21:5 26:19 35:20
48:21 56:5,6,21 93:5 95:18
100:9,13 114:24 125:19,21
142:23 143:1 148:1,10 152:15
153:1,6 170:25 176:19
**tone** 164:12
**top** 84:6 105:24
**Torresdale** 129:17
**total** 159:15
**totality** 107:7,11 162:22 163:5
163:23
**totally** 163:15
**tour** 169:13
**tower** 70:23 71:3,7 72:7,10
**towers** 67:18,18 70:25 71:2,9
72:6,10

800.523.7887     7-9-2024, WORD INDEX, Jones case     Associated Reporters Int'l., Inc.

Page 37

**track** 68:14 69:1 74:17 76:4
**tracked** 93:14 112:11,16
**tracker** 62:14 65:14,20 66:17
  67:11,12,14 68:5,8,15 69:22
  70:19,20,22 71:23 72:2,5,12
  73:3,22 74:12,16,16 75:2,7,11
  75:12 76:10 79:2,3,14 80:1,17
  81:4 100:10 101:13 102:2
  103:23 108:5 109:24
**trackers** 65:24 72:9 74:6,9 76:4
  94:7
**tracking** 65:9,17 69:2 74:6,9,23
  79:8 80:5 92:25 108:4,9 109:2
**traffic** 68:11 80:23 82:3,17
  87:17 88:7 109:15 110:5,24
  111:3
**transcriber** 181:16
**transcript** 1:7 2:5 7:24 106:4
  115:13 161:3
**transcription** 2:1,5 181:17
**transcripts** 6:1 7:4,5 8:23
  105:5 168:15
**transferred** 177:22
**transit** 80:3
**transmissions** 101:22
**transport** 126:2,17
**travel** 67:2
**traveling** 68:17 95:4,11 113:1,3
**trial** 7:5 24:4,12 25:16 28:9
  29:9 33:19 41:7 43:5 46:10
  48:20 168:21 170:17,19,20
  171:17,21 172:25 175:6,14,23
  175:25 176:1,7 177:9
**trials** 24:1,18 25:5,11 30:5
  174:15
**triangulated** 71:3,8
**tricky** 176:11
**tried** 24:18 37:14 50:25 51:1
**true** 150:11 151:1
**truth** 64:7,7 77:6,6,7 118:8,8,9
  123:1,1,2 128:17,17,18 150:23
  174:22,22,23
**try** 4:4 83:2
**trying** 25:1,21 52:8 72:14,24,25
  73:17 82:4 113:9 150:23
  159:23
**turn** 18:1 60:17 85:23 115:17
  119:5 123:25 149:25 177:6
**turned** 43:5 158:7 177:7,8
**turning** 86:7 163:12

**twelve** 12:23 108:12 115:23,25
  116:5 124:5 143:22 156:23
**twenty** 68:18 84:11,23,25 85:3
  85:18 88:13 89:6 101:4,7
  109:20 127:9 135:7 136:17,23
  156:1 158:24 160:8
**twenty-eight** 65:3 138:10
**twenty-five** 68:9 138:9
**twenty-four** 45:5
**twenty-one** 115:23 151:20,23
  159:13
**twenty-two** 136:17
**twice** 159:17,25,25
**two** 1:23 6:23 7:19 19:11,25
  20:22 22:21 23:13,13 24:7,17
  25:5 29:20 33:16,23 40:6 41:3
  42:7,10,24 43:12 47:10 48:8
  51:4,4,9,9,14,15,16,16,18
  52:5,12 53:6,21 54:7,11 55:3
  56:7 62:24 63:7 75:20 77:13
  78:15,15 81:12,22 82:25 84:25
  90:10 97:4 98:24 102:23
  104:15 108:3 110:7,16 111:3
  122:10,22 135:13 138:18,24
  139:9 143:24 146:3,7 154:11
  155:9 159:21
**two-block** 73:11
**two-minute** 110:23
**Tylenol** 154:19 155:17 156:6
  157:12
**type** 17:18 23:10 34:10,25 40:8
  45:16 62:1 74:6 111:9 147:19
  178:8
**types** 24:6
**typical** 28:24
**typically** 40:24

---

## U

**U.S** 1:13 164:3
**U.S.C** 163:24
**Uh-huh** 7:17 12:9 34:2 40:17
  48:5 49:22 53:15 68:3 69:19
  74:14 92:16 144:23 155:15
  172:12
**ultimately** 16:21 80:12 81:13
  82:25 89:10 119:17 120:22
  138:5
**unable** 27:2
**unconstitutional** 15:14
**uncorroborated** 53:24

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 38

**underlying** 9:21
**underneath** 100:14
**understand** 7:4 20:14 65:24
  105:16 120:13 181:1
**understanding** 7:21 10:23 11:17
  176:8
**understands** 41:12 171:19
**understood** 70:1 133:12,24 134:3
  163:10 170:3
**undue** 39:23 168:1
**unduly** 167:21
**unfair** 24:4 28:8
**Uniform** 117:24
**unintelligible** 38:17 55:17 64:6
  65:23 79:16 82:2 86:7 98:18
  108:15 112:9 139:21 171:14
  177:20
**unit** 65:13 66:11 112:22 126:23
  129:11 130:8 140:7
**United** 1:1,3,8,11 3:3,16 15:10
  60:12
**units** 112:10,25 113:4 119:11
**unknown** 55:21
**unreasonable** 61:21
**unusual** 81:21 82:8,15
**updated** 79:9
**updates** 100:5
**upright** 81:24
**upset** 164:23
**urinated** 153:17,23
**urinating** 157:12 163:14
**use** 29:1 30:24 54:22 62:17
  84:13 143:11 144:2 159:3,15
  159:19,20
**uses** 53:7
**usually** 41:17 66:22,24 70:17
  72:19 75:25,25 76:5 79:17
  124:19,21 145:9

**V**

**v** 1:4 3:3 110:18
**V-E-Z** 118:14
**vacuum** 51:18 52:18
**valid** 16:10 17:16
**validity** 13:21
**varies** 73:7
**various** 79:15 157:6
**vehicle** 21:2,4,9 26:9 32:19
  44:7 47:4,4,6,9 61:19,25 62:1
  68:16,17 79:24,25 81:2,18

91:5,23 92:1,2,22 93:10,18
  95:21,22 96:1 97:2,11 98:4,12
  98:13,19,20,20,22,23 99:21
  100:9 108:11,15,20,21 109:15
  110:1,1 112:6,6,9,14,16
  113:17,21,21,22,22 114:4,5,5
  114:10,11,13,14,23,23,24,25
  115:2,5,6,6,7 124:21 125:5,5
  125:11,19,24
**vehicles** 62:4 82:3 95:14 96:22
  97:10 98:5 99:22 100:1,8,22
  109:9,10 113:5 124:23
**Venango** 80:14 87:3,25 94:25
  95:15 96:5 102:18 109:3,6,7
  109:10,19 112:23 113:5,14,18
**verbal** 137:16
**verbatim** 14:18
**verify** 66:18,19
**Verizon** 21:21
**Verizon's** 54:12
**versa** 32:14
**versions** 9:9
**versus** 3:16 23:11 68:16 151:1
**vice** 32:14
**vicinity** 62:6,6
**victim** 83:1 115:6 129:17
**victims** 114:25 115:1
**video** 32:5,17,21 47:7 63:10
  87:8 88:4,11 89:4 95:6,8
  98:16 112:19 120:22 130:22,25
  135:7 136:3,7 137:10,22
  138:21 139:2 147:3 155:6,7,22
  156:1,22 158:12
**view** 38:5 91:5
**viewed** 166:17
**viewing** 74:19
**Vincent** 20:19,23 21:7,8,16,23
  22:4,11,15 29:12 30:8,18,24
  41:20 42:4,4,12 47:2,15,16,17
  47:21 52:1,22 53:5,22,23
  85:19 86:19 88:22 109:21
  139:13
**Vincent's** 53:24
**violate** 61:19
**violated** 61:20 176:7
**violation** 111:13 117:24 165:15
**violations** 60:11
**violence** 53:8
**violent** 111:2
**visible** 111:24

800.523.7887    7-9-2024, WORD INDEX, Jones case    Associated Reporters Int'l., Inc.

Page 39

**voice** 164:23
**voluntariness** 162:12,14 165:1,5
**voluntary** 117:15 162:7,10,20
  163:13,22 165:14
**VUFA** 43:23 44:9,17 49:3

---

**W**

**W-A-L-S-H** 124:8
**wait** 174:10
**waiting** 179:1
**waive** 175:13,22,25,25
**waived** 165:9
**waiver** 162:7,10,12,20,23 163:3
  172:25 174:14,17 176:10
**waiving** 174:15
**wake** 152:22
**walk** 91:4
**walked** 91:1 127:1
**walking** 66:23,25 68:5,9,15
  93:22,22,23 94:7,16,17,18,20
  95:10,20 98:11 100:11 101:19
  102:16,19 113:12
**wall** 113:5,5
**Walsh** 124:8 140:4
**want** 3:21 4:4 9:18 16:3,7,14
  17:4,21 25:25 27:9 28:14,20
  38:14,21 60:23 84:6 90:5 94:4
  104:3,10 105:24,25 115:8
  119:5 123:25 129:15 136:8
  159:2 163:13 172:7,23 173:11
  174:7
**wanted** 19:5 50:10,10 58:23 59:3
  150:25 154:16 156:3 170:7
  177:10 178:8,12
**wanting** 50:13 156:2
**wants** 9:8 13:4 14:22 25:24 29:3
  56:12 104:9,10 110:3 163:17
**warnings** 121:19 126:15 133:18
  133:24 134:4 163:8,11 164:21
**wasn't** 26:18 37:7 44:6 45:8
  51:24 92:6 98:9 99:6 114:14
  142:22 158:15
**watch** 74:18 155:7
**watched** 136:7 139:2 155:6
**watching** 71:18,23
**water** 134:24 143:24
**way** 11:7,25 18:8 22:9 23:3,6
  29:15,17 30:6 32:12 34:18,21
  42:2,24 55:25 56:2 60:24
  72:16,16 88:7 99:10 105:3,17
  107:25 111:10 127:19 149:20
  159:18 167:25
**ways** 55:25
**we'll** 18:24 20:1 81:18 89:3,3
  115:25 131:18 138:10 146:15
  161:20 178:11
**we're** 3:10,14 9:10 10:4 15:25
  16:1 17:10,12 26:3 33:15 34:7
  38:12 45:3,5,7 48:18 51:17,22
  52:2,2 60:8 84:16 88:24,25
  89:5 104:20 105:8 109:15
  110:23 112:24 117:19 157:23
  164:9 171:12 180:11
**we've** 10:18 19:4 49:3 50:22
  53:2,4,5 56:21 61:10 109:19
  115:22 137:4 140:2 177:20
**weapon** 20:24,25 21:11 44:10
  52:25 53:7 54:19,22,22 57:17
**wearing** 23:3 83:7 90:20 98:18
**week** 168:5 170:23 179:7
**weeks** 139:9,9 171:9
**weigh** 9:19
**welcome** 19:3 61:5 106:15 118:19
  161:1 162:1
**went** 10:6 15:16 20:22 31:16
  73:23 132:10 136:24 145:2
  152:1 159:12,25
**weren't** 81:25 82:2 91:1 97:20
  99:9 155:5
**West** 113:18
**whatsoever** 55:20
**wheel** 13:8 32:7,23 125:19,21
**whichever** 11:21
**why'd** 80:16
**widely** 35:3
**wife** 50:4,7,14
**willing** 18:4 42:23 45:7 57:19
**win** 110:4,17
**wind** 98:8
**windowless** 117:4
**windows** 82:12,19 90:25 91:10,16
  92:4 97:20 98:1,14 141:22
**wise** 96:8
**wish** 4:24 26:13 43:21 165:18
  167:24
**wished** 48:8
**wishes** 15:21 26:5 43:21 49:1
  56:20 169:2
**witness** 27:2,3 41:14 42:22
  63:24 64:3,10,13,15 69:24

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 40

70:2,4,6  73:21  74:20,23  75:2
75:6,9,13,15  76:12,21,23  77:9
77:12,17  102:9  103:5,7  118:2
118:11,13,18  121:24  122:19,21
122:23  123:6,9,14  128:11,20
128:23  129:1  158:23  160:20,25
175:1,17,21  176:2,15  177:16
178:14  181:2
**witness'** 178:20
**witnesses** 2:7  25:6,7  60:19  61:4
62:24  106:22,24  117:18  131:23
144:21  161:7  166:5  173:14,25
174:9
**woke** 152:18,19,24
**woken** 152:21  153:7
**woman** 86:6  125:14
**wondering** 103:1
**word** 27:16  176:11
**wording** 155:10
**words** 41:9  152:17  155:25  162:5
**work** 30:5  51:3  64:22  71:4  72:8
172:19
**worked** 29:17
**working** 78:4,11,13  124:1,4,6,10
171:8  180:1
**works** 72:2  172:19,20  173:24
**worried** 38:10
**worry** 179:14
**worth** 43:2  104:5
**wouldn't** 37:17  141:4  159:18
177:6
**writing** 174:19
**written** 63:7  107:16  136:24
137:15  138:6,24  139:1  152:9
165:21
**wrong** 18:7  133:9
**Wyoming** 108:13

---

### X

**X** 2:7,21,21

---

### Y

**yeah** 41:11  53:17  59:10,13  66:8
67:6,16  70:17,24  83:24  85:4,4
85:4  89:9  93:25  94:9  95:6,7
96:18  100:17  101:14,22  125:18
127:11  160:9,12
**year** 84:16,22  123:21
**years** 45:4,6  65:3  77:24  129:10
**yelling** 137:6

**yesterday** 9:18  10:24  173:7
**yield** 40:22  42:25
**York** 2:2

---

### Z

**Z** 84:12
**zero** 44:18  108:3,3,8,9  109:14
128:24
**Zion** 109:3
**zone** 84:14  85:7
**Zulu** 84:12,13,23  86:16

---

### 0

**07/16/2024** 168:5
**07/23/2024** 168:7

---

### 1

**1:55** 181:15
**10** 2:2
**10:10** 1:6  3:1
**101** 78:21  96:4  119:7
**118** 2:14
**12:22:17** 116:9
**12:39:23** 116:9
**122** 2:14
**123** 2:16
**1250** 1:13
**128** 2:17
**129,156** 2:19
**12th** 170:18  175:7
**134** 5:6,9  7:15  19:6
**135** 60:9  61:2,9
**13662** 2:2
**139,158** 2:19
**14** 23:21,22  167:21
**14(a)** 20:4  23:24  55:13
**140** 40:18
**141** 5:16  6:9,19  8:8
**142** 5:19  6:8,9,19  8:8
**143** 5:21  60:10  61:2
**1500** 1:23
**155** 5:25  6:8  8:8
**156** 6:1,15  9:18  12:3  19:4
**15th** 21:20  22:5,6  23:1  24:25
47:11,14,14  51:22  123:11,22
125:6
**16th** 22:1  23:1  24:25  47:11,14
47:16  51:23  170:20
**17th** 22:8,8,24  23:2  24:16  26:13
26:21  27:16  28:18  30:17  31:13

800.523.7887          7-9-2024, WORD INDEX, Jones case          Associated Reporters Int'l., Inc.

Page 41

32:18 34:8 36:1 42:7 43:22
44:11 47:6,14,21 51:19 52:3
52:19,23 129:16 181:22
**18** 163:24
**18th** 23:2 47:11,14,17,23 51:23
58:24
**19020** 1:20
**19102** 1:24
**19106** 1:14

---

### 2

**2** 1:19
**2:23-cr-00215-KBH-3** 1:3
**2011** 119:1
**2013** 129:14
**2017** 119:4
**2022** 5:14 20:18 22:23 23:18
24:15 25:2,7 26:6,16 27:20
32:20 35:17 37:3,11 42:6
43:11 52:19,19 61:14 78:4
84:9 119:6
**2023** 22:24 24:16 26:21 32:18
36:1 42:8 116:23 122:5 124:1
128:5 129:16 130:3 134:18
**2024** 1:6 168:13 181:22
**20th** 169:1,5
**21** 169:23
**215-575-0702** 1:24
**215-861-8467** 1:14
**21st** 169:14,16,17,20
**22** 29:15
**22nd** 2:23 5:14 20:17 22:23
23:17 24:15 25:2,7 26:6,16
27:20 28:7,17,22 29:3 30:7,21
30:23 31:7,19 32:7,20 34:7
35:17 36:22 42:6 43:11,25
44:2 45:3 46:19 47:1 48:20
51:19 52:2,19 53:3,5 56:4
57:5,7,17 61:14 62:1 63:12,15
63:18,19,22 78:4 79:21 83:7
84:1,9 86:12 119:6 121:8
122:9 169:15
**23** 26:13 29:16
**23-215** 3:4
**2321503** 3:19
**24** 169:1
**24-187** 14:17
**24th** 116:23 122:5,6 124:1,10,15
125:1 127:6 128:5 130:3
131:19 134:17 142:10

---

**25th** 63:5,9 131:15,20 132:10
135:8 156:24
**267-565-7412** 1:20
**267-601-3370** 1:15
**29th** 168:13

---

### 3

**3331** 1:19
**3501** 163:24 164:20
**35th** 77:14 78:1,1,5
**397** 48:6
**3SI** 66:2 71:4 108:4

---

### 4

**404** 24:17,17
**433** 164:4
**450** 1:19

---

### 5

**5200** 124:19 125:9
**530** 164:3
**5960** 119:19

---

### 6

**615** 1:13
**64** 2:9
**647** 48:6
**67** 2:10
**6th** 21:14

---

### 7

**7-Eleven** 54:11
**75** 133:22
**77,102** 2:12

---

### 8

**8** 20:4 23:17 55:4,10
**8(a)** 51:14
**84** 2:23
**89** 2:12

---

### 9

**9** 1:6
**900** 1:23