**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **v.** | **NO.  23-215-03** |
| **CHIHEAN JONES** | |

**HODGE, J.**                                                            **September 19, 2025**

### <u>MEMORANDUM</u>

Before the Court is Defendant Chihean Jones' ("Defendant") Motion for an Evidentiary Hearing (ECF No. 135), converted to a Motion to Suppress ("Motion") by the Court's July 28, 2025 Order (ECF No. 361). Defendant is charged in a six-count Second Superseding Indictment ("Indictment") with various offenses arising out of four (4) different robberies occurring on August 22, 2022 and January 16, 17, and 18, 2023. (ECF No. 135 at 2.) The Government alleges that Defendant participated in two of the four robberies—one on August 22, 2022 (Count I) and one on January 17, 2023 (Count III), both in violation of 18 U.S.C. § 1951(a). (ECF No. 144 at 1.)[1] Defendant's Motion concerns evidence gathered with respect to the August 22, 2022 robbery as a result of Defendant's seizure through an alleged roadblock on Broad and Venango Streets in the city of Philadelphia, which then resulted in his arrest. (ECF No. 135 at 2.)

On July 9, 2024, the Court held oral argument on various motions, including Defendant's Motion to Suppress. (ECF No. 212.) On July 12, 2024, at the request of defense counsel to permit

---

[1] Count IV charges Defendant with 18 U.S.C. § 924 (c)(1)(A)(iii) use of a firearm in furtherance of a crime of violence and Count V charges Defendant with 18 U.S. C. § 924 (j)(1) murder in the course of using and carrying a firearm, both in relation to a robbery that occurred on January 17, 2023. (ECF No. 144 at 1.)

supplemental briefing on the issues, the Court granted the request and ordered supplemental briefing on the Motion to be submitted on or before July 29, 2024. (ECF No. 206.) Following an additional request by the Defendant, the Court extended the deadline for supplemental briefing to September 16, 2024, and the parties were instructed to inform the Court on or before September 30, 2024 whether an additional hearing and argument on the Motion were necessary. (ECF No. 211.) After failing to receive any supplemental briefing or information regarding whether a hearing was necessary, the Court held a status conference on August 19, 2025 (ECF No. 367) to inquire of the Defendant, who is no longer represented by counsel but is representing himself *pro se*,[2] whether or not he wished to provide any supplemental briefing or argument, or rest on what was filed and argued by his previous counsel. At the status conference, Defendant stated that he did not wish to submit any supplemental briefing, declined an additional hearing on the Motion, and agreed to close the record with respect to the Motion to Suppress. (ECF No. 367.) Now appearing ripe for a determination, the Court considers Defendant's Motion (ECF No. 135), the Government's Response to the Motion (ECF No. 144), and the parties' oral arguments on the Motion at the July 9, 2024 hearing (ECF No. 212).

## I.    FACTUAL BACKGROUND[3]

On August 22, 2022[4] at 3:03 P.M. and 3:04 P.M., Philadelphia Police received two 911 calls reporting a robbery at the Metro PCS store at 101 East Olney Avenue in Philadelphia. (ECF

---

[2] On February 13, 2025, the Court granted Ms. Caroline Cinquanto's Motion to Withdraw as Counsel and appointed new counsel, Mr. Riley Ross, to represent Defendant. (ECF No. 277.) Following an oral motion by Defendant during an April 9, 2025 status hearing, the Court granted Defendant's request to proceed *pro se* and appointed Mr. Riley Ross as standby counsel for Defendant. (ECF No. 296.)

[3] The Court adopts the pagination supplied by the CM/ECF docketing system.

[4] The Court notes that Defendant's Motion to Suppress erroneously states the robbery at issue occurred on August 28, 2020. (ECF No. 135 at 2.)

No. 135 at 2–3; ECF No. 144 at 4.) The first 911 caller had limited information about the robbery but reported that an unknown number of iPhones were stolen. (ECF No. 135 at 2; ECF No. 144 at 4; Ex. 4 (3.03.45_CT28).[5]) The second 911 caller reported that the perpetrators were "two Black guys," one of whom "had a gun in his pocket," and gave a description of the suspects' clothing. (ECF No. 135 at 3; ECF No. 144 at 4; Ex. 4 (3.04.06_CT25).) The second caller said that she saw the robbers "run across the parking lot" but "we don't know if they got in a car." (*Id.*)

At 3:09 P.M., 911 dispatch provided the information from the two 911 callers to responding units. (ECF No. 135 at 3; ECF No. 144 at 4–5; Ex. 4 (3.09.11).) When asked for a description of the vehicle by a responding Officer, dispatch stated that the robbers "fled on foot." (*Id.*) Dispatch also broadcast that a tracking device ("tracker") that was taken from the store during the robbery was activated and shown to be heading southeast on Adams Avenue. (ECF No. 135 at 3–4; ECF No. 144 at 4–5; Ex. 4 (3.09.11; 3.12.09).) Dispatch continued to announce the tracker's location, and at approximately 3:16 P.M., dispatch broadcasted the last location of the tracker was "Broad and Butler . . . southbound." (ECF No. 135 at 4; ECF No. 144 at 5; Ex. 4 (3.16.27_B).)

One minute later, at approximately 3:17 P.M., dispatch gave the following sequential updates within a few seconds of one another: (1) "from Real-Time [Crime Center] it's possible that the offender may have gotten onto a bus"; (2) "looks like they may be on foot now between Venango and Lenox"; (3) "they're walking south on Broad towards Venango," specifically on the "east side of Broad"; and (4) "could they be on the subway?" (ECF No. 135 at 4; ECF No. 144 at

---

[5] Exhibits 1–7 to the Government's Response to Defendant's Motion to Suppress were admitted during the July 9, 2025 hearing. (ECF No. 212 at 63:3–64:2.) Exhibit 4 contains a complete collection of 911 calls and police radio broadcasts regarding the August 22, 2022 robbery. The Court refers to these recordings by the file names contained within the exhibit folder. Exhibits 5, 6, and 7 are the August 22, 2022 body camera videos from Officers Cappellano, Strange, and Switaj, respectively. (*Id.* at 63:16–22.)

5; Ex. 4 (3.17.16).) When dispatch announced that the suspects were moving south near Broad and Venango, an Officer responded over police radio, "we're right here." (ECF No. 144 at 5; Ex. 4 (3.17.16).) By that time, the tracker had traveled approximately four miles in seventeen minutes. (ECF No. 212 at 109:23–25.)

Concurrently with the broadcasted updates that the tracker was near Broad and Venango, at about 3:18 P.M., Officers Strange, Cappellano, and Switaj arrived at that intersection. (ECF No. 135 at 4; ECF No. 144 at 5–6; Ex. 4 (3.17.16; 3.17.43_B); Ex. 5; ECF No. 212 at 87:15–18; 88:15–18.) Southbound traffic on Broad Street was already stopped at a red light upon the Officers' arrival at the intersection, and body camera footage shows that the Officers blocked southbound traffic on Broad and westbound traffic on Venango with their vehicles. (Ex. 5.) At the same time, at approximately 3:18 P.M., the broadcast from dispatch announced the tracker was "stationary, Zion Baptist Church," which is located on the corner of Broad and Venango. (ECF No. 135 at 4; ECF No. 144 at 5–6; Ex. 4 (3.17.16; 3.17.43_B); Ex. 5; ECF No. 212 at 87:15–18.) About twenty seconds after the Officers' arrival at the intersection, body camera footage shows that the north and southbound traffic light turned green, and Officer Strange moved his vehicle out of the way of one lane of southbound traffic.[6] (ECF No. 212 at 88:5–9; Ex. 5; ECF No. 144 at 6.) Approximately one minute later, at 3:19 P.M., body camera footage shows that the north and southbound light had turned red again. (Ex. 7.) About thirty seconds later, at 3:20 P.M., Officers Cappellano and Strange were walking the southbound lanes of Broad Street and approached an SUV that Defendant was driving. (Ex. 5; Ex. 7; ECF No. 212 at 85:17–20.) At that time, the north and southbound traffic light was green. (*Id.*) Seconds later, Officers Strange and Cappellano pulled

---

[6] The Court takes judicial notice that the portion of Broad Street that intersects at Venango Street has four lanes, with two lanes traveling northbound and two lanes traveling southbound. PennDOT One Map, Philadelphia Route 611, https://gis.penndot.gov/onemap/.

occupants of Defendant's SUV, Keyonn Vincent and Keyontae Curtis, out of the vehicle. (ECF No. 135 at 5; Ex. 4 (3.22.10_B).) From the time of the Officers' arrival at the intersection until Vincent and Curtis were pulled out of the car, a total of two minutes elapsed, about half, or one minute, of which occurred during a red light. (ECF 212 at 100:22–101:6.)

## II.    LEGAL STANDARD

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. To effectuate a lawful detention of an individual, a police officer must have either probable cause to arrest or reasonable suspicion to stop based on specific, articulable facts, "and the inferences that experienced police Officers could draw from those facts that a crime has been committed." *United States v. Fowler*, 1995 WL 428693, at *2 (E.D. Pa. July 18, 2008) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). These facts "must raise a suspicion that the *particular individual* being stopped is engaged in wrongdoing." *Id.* (emphasis added).

Although a seizure must generally be supported by individualized reasonable suspicion, a lack of such suspicion is not dispositive of constitutionality. *See United States v. Paetsch*, 782 F.3d 1162, 1169 (10th Cir. 2015) (collecting cases). The Supreme Court has held that "special law enforcement concerns will sometimes justify highway stops without individualized suspicion." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). For example, in *City of Indianapolis v. Edmond*, the Supreme Court found that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route." 531 U.S. 32, 44 (2000).

To assess the reasonableness of a general roadblock unsupported by individualized suspicion, the Court turns to the balancing test set forth in *Brown v. Texas*, 443 U.S. 47 (1979). Under *Brown*, the Court balances the following factors: (1) the gravity of the public concerns

5

served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. *Id.* at 50–51 (1979). The *Brown v. Texas* test assesses the reasonableness of a stop up until the moment police develop the requisite reasonable individualized suspicion under *Terry* and its progeny. *Paetsch*, 782 F.3d at 1165, 1173 ("[O]nce individualized reasonable suspicion develops, a defendant may complain about the underlying checkpoint or barricade only for what happened up to that time.").

Evidence discovered during an unreasonable search or seizure is considered "fruit of the poisonous tree," and is inadmissible at trial. *Wong Sun v. United States*, 371 U.S. 471, 484–85, 488 (1963). A defendant may move to suppress evidence pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 41(h). Once a defendant has established a basis for his motion to suppress, the burden is on the government to show that the search or seizure was reasonable. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## III.    DISCUSSION

The Fourth Amendment becomes relevant at the moment a defendant is seized. *See United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *Terry*, 392 U.S. at 16); *see also United States v. Amos*, 88 F. 4th 446, 451 (3d Cir. 2023) ("Reasonable suspicion is evaluated at the moment of seizure, so the first step in a suppression analysis is to determine when the seizure occurred."). It is undisputed here that the Officers did not have a warrant when they stopped traffic, approached the Defendant in the SUV he was operating, and directed the two occupants of Defendant's SUV out of the vehicle, or when they conducted the search of Defendant's SUV. Therefore, because all of these actions were taken by law enforcement absent a warrant, the Government bears the burden of proving the reasonableness of the search and seizure. *Johnson*, 63 F.3d at 245.

Defendant argues that his initial seizure through the "roadblock" at the corner of Broad and Venango was unconstitutional because (1) it was made without any individualized articulable suspicion and (2) it was unreasonable under the balancing test as set forth by *Brown v. Texas*. (ECF No. 135 at 6–8.) In response, the Government argues the police did not create a "roadblock" when they stopped Defendant's car; rather, they engaged in a brief, investigatory stop supported by a reasonable and individualized suspicion under the totality of the circumstances. (ECF No. 144 at 3.) The Government argues that even if the obstruction of traffic could be considered a "roadblock," it was constitutionally reasonable under the *Brown v. Texas* balancing test. (*Id.* at 8–9.)

Thus, the questions before this Court are twofold: (1) whether the police obstruction of traffic with their vehicles at Broad and Venango constituted a "roadblock" as contemplated by *Brown v. Texas* and its progeny; and (2) if so, whether that "roadblock" was constitutionally unreasonable.

**A. The Barricade of Vehicles at the Intersection Was a Roadblock Under Relevant Caselaw**

Defendant asserts that the police obstruction of traffic on Broad and Venango constituted a roadblock unsupported by any individualized reasonable suspicion concerning Defendant himself or his vehicle. (ECF No. 135 at 6.) In response, the Government argues that the brief stop was not in fact a roadblock, but rather an investigatory stop based on individualized reasonable suspicion. (ECF No. 144 at 7–8.) The Court notes that based on the body camera video displayed by the Government, the vehicles in at least one of the southbound lanes at the intersection were impeded from traveling from approximately 3:18 P.M. up until Defendant's car was identified and Curtis and Vincent were pulled out of it at 3:20 P.M. (Ex. 5.) The Officers' reasonable suspicion, according to the Government, developed "within two minutes" of police arrival at the intersection

and was based on the totality of the circumstances, including (1) GPS tracker information that was being broadcast from dispatch to the Officers on location in real time and placed the stolen phones at or near the intersection of Broad and Venango about two minutes before Vincent and Curtis were detained; (2) broadcasted descriptions of the two robbers based off the 911 calls, which matched the passengers in Defendant's car; and (3) the Officers' conclusion that the perpetrators were in a vehicle based on the distance of about four miles the tracker had traveled in about seventeen minutes. (ECF No. 144 at 7–8.) Additionally, Officer Strange, who testified he had been at Philadelphia Police Officer assigned to the 35th District for over four and a half years, testified that he noticed that Defendant and his passengers "were all sat quite upright and staring straight forward," rather than "trying to figure out what was going on" like "everybody in all the other vehicles." (ECF No. 212 at 81:24–82:5.) Officer Strange testified that he found this behavior on the part of Defendant and his passengers "unusual" based on what he observed. (ECF No. 212 at 77:22–78:6; 81:17–82:8.) Additionally, Officer Strange testified that Defendant's vehicle drew his attention because it had tinted windows, which are illegal in the city of Philadelphia,[7] and a fake Pennsylvania temporary tag on the rear. (*Id.* at 82:9–24.)

The Court finds that, in this factual circumstance, there were two stops for purposes of the Fourth Amendment analysis — the first was the stop of all vehicles, which included the Defendant's, at the intersection of Broad and Venango Streets prior to the Officers approaching Defendant's SUV; the second stop followed the Officers' identification of Curtis and Vincent in the backseat of Defendant's vehicle and their observation of their behavior. The Government's response concedes that police did not develop a reasonable and articulable basis to stop Defendant's car until two minutes after their arrival at the intersection, when they went up to the

---

[7] Phila., Pa. Traffic Code § 12-922; 75 Pa. Code § 4524(e).

SUV's windows and were able to see Vincent and Curtis in the backseat.[8] (ECF No. 144 at 8.) However, their reasonable individualized suspicion developed, in part, prior to approaching the SUV based on the description of the suspects and the information relayed to dispatch from the tracker.

Looking at the initial stop of all traffic at the intersection, which is asserted by the Defendant to be an unconstitutional "roadblock" without individualized suspicion, it must be analyzed as a "roadblock" based on relevant caselaw. Although this circuit has not precisely defined what constitutes a "roadblock," Supreme Court precedent establishes that a "roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598 (1989). Thus, the *Brower* Court suggested that a "policeman in the road signaling an oncoming car to a halt" would not constitute a roadblock because such a situation would not be "designed to produce a stop by physical impact if voluntary compliance does not occur," but a tractor-trailer placed across both lanes of a two-lane highway would be considered a "roadblock." *Id.* at 594, 598.

That the obstruction here was created through the police parking their vehicles to block traffic and only lasted a couple of minutes before police developed individualized articulable suspicion does not persuade the Court that this was not a "roadblock." The police vehicles acted as a physical barrier that would have stopped traffic if voluntary compliance did not occur. Courts in other circuits have characterized similar situations as a "roadblock." *See, e.g.*, *United States v.*

---

[8] Defense counsel argued at the July 9, 2024 hearing that Officers would not be able to see Curtis and Vincent through the window tint. (ECF No. 212 at 90:24–92:11.) However, Officer Strange testified that he could see the passengers once he got close to the vehicle. (*Id.* at 91:21–92:4.) Additionally, body camera footage demonstrates that Officers were able to see the passengers of the vehicle once they came close to the windows. (Ex. 5.)

*Abbott*, 2005 WL 3591007, at *3, 6–7 (S.D. Tex. Dec. 30, 2005) (analyzing police obstruction of traffic lanes with their vehicles during pursuit of three armed robbers as a "roadblock," although the officers developed reasonable particularized suspicion within only "a minute or minute and a half of starting [the] survey of the stopped cars"), *aff'd sub nom., United States v. Rogers*, 244 F. App'x 541 (5th Cir. 2007). The Court finds that the blocking of the intersection, albeit brief, with police vehicles constituted a roadblock.

### B.  The Roadblock Was Reasonable Under *Brown v. Texas*

Having concluded that the blocking of the intersection constituted a roadblock, the Court must determine whether such a roadblock was reasonable under the Fourth Amendment. Defendant argues that the roadblock was unreasonable under *Brown v. Texas* because (1) there was no indication that the police knew a vehicle was used to leave the scene of the robbery; (2) the police did not have information about the type of vehicle or identity of the driver if a vehicle was used; and (3) once the roadblock was set up, Officers were repeatedly given information that undercut the need for the roadblock since information was being relayed by dispatch that suggested that the perpetrators may be on foot or on public transportation and tracking information showed the phones were moving even while traffic at the intersection was stopped. (ECF No. 135 at 8; ECF No. 212 at 61:23–62:13, 62:14–20.) The Government counters that even if the halt in traffic could be characterized as a "roadblock" made without individualized articulable suspicion, the roadblock was reasonable under the *Brown v. Texas* test because (1) the crime represented a substantial public threat, (2) the police knew the suspects were fleeing by way of a particular route, and (3) the two minute delay in traffic was not longer than reasonably necessary to identify the perpetrators. (ECF No. 144 at 8–9.) For the reasons discussed below, the Court holds that the roadblock was reasonable.

The fleeing armed robbers represented a substantial threat to the public. This is indisputable. Therefore, the Court determines that it was reasonable for the police to assume that the robbers continued to be armed and dangerous, particularly considering that the roadblock occurred approximately 15 minutes after the robbery took place. The stop was also tailored to advance the public interest. The police designed the roadblock to specifically address the public threat of the robbers by utilizing the tracking data to identify and barricade the "particular route" by which the suspects were fleeing. Moreover, the Officers' area of concentration in searching for the armed suspects was confined to where they were receiving the tracker information and that search for the suspect, which was very fluid and active based on the constant receipt of information being provided to law enforcement from dispatch, supports the reasonableness of law enforcement's actions. Additionally, Officer Strange observed the "unusual" behavior of Vincent, Curtis, and the Defendant and, once Vincent and Curtis were pulled out of the car, the iPhone accessories in plain view in the vehicle. The totality of all of these factors — broadcasted information being delivered in real time and observations of law enforcement — demonstrate to this Court that special law enforcement concerns existed and provided the justification for a highway stop without individualized suspicion. Similar to the finding of the Supreme Court in *City of Indianapolis v. Edmond*, in this case law enforcement effectuated a necessary and narrowly tailored roadblock to catch dangerous individuals who were reported to have robbed a store at gunpoint less than twenty minutes prior to the Officers coming into contact with the Defendant, his SUV, and his two passengers.

Defendant focuses on the "inconsistent" tracking information broadcast to the police that would "nullify" the need for the roadblock, such as the indication that the robbers were fleeing on foot or on public transport, or that they otherwise were not in the area where the police set up the

roadblock. The Court is unpersuaded by these arguments. The tracker was emitting the continued and constant movement of the device. A tracker, by its name and design, is expected to do just that, and the recipients of its information, in this case law enforcement, were responsive, as they should be, to the updates the tracker provided. If the Defendant is suggesting by his argument that he expected the Officers to abort their search because the information received from the two 911 callers and the tracker were not identical in their content, that suggestion is rejected by this Court as unreasonable at best. Officers received real-time updates as to the tracker's location and made judgments based on the totality of the information they received. They were not required to alter their course of action based on each piece of information they received, but instead had to assess the best course of action in light of the entirety of information available to them. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453–54 (1990) ("[F]or purposes of Fourth Amendment analysis, the choice among [] reasonable alternative[]" law enforcement techniques to deal with a serious public danger "remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers"); *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) ("Considering the tight window of opportunity Officers have to locate a fleeing suspect, we find it reasonable for police to rely on third-party GPS data.").

Defendant also argues the roadblock was unreasonable because police did not have an explicit indication that the robbers were in a vehicle, nor did they have a description of the vehicle or its driver. (ECF No. 135 at 8.) However, as Officer Strange testified, the speed of the tracker's movement, which traveled approximately four miles in seventeen minutes, coupled with the fact that Officer Strange was unaware of any bus routes that followed the path the tracker was going in, led the Officers to believe that the tracker was in a vehicle. (ECF No. 212 at 70:21–80:11;

12

96:25–96:9.) Indeed, it was reasonable for the Officers to take that information and conclude that the stolen devices were in a vehicle, especially given that they traveled about four miles within seventeen minutes. (ECF No. 212 at 109:23–110:1.) To ignore such information by law enforcement would have been a dereliction of their duties in trying to protect the public and ensure their safety. Moreover, immediately prior to arriving at the scene, the police received a broadcast from dispatch that the device was southbound on Broad approaching Venango and then was stationary near Zion Baptist Church a few seconds later. This matched the timing that the southbound traffic was stopped at the red light.

Caselaw governing roadblocks instructs the Court to weigh the first two *Brown v. Texas* factors — the gravity of the public concern and the degree to which the seizure advanced the public interest — against the third — the severity of the interference with individual liberty. *Paetsch*, 782 F.3d at 1172. For the third prong of the test, the Court only analyzes the privacy intrusions suffered by Defendant himself, rather than all motorists stopped by the police barricade. *Id.* at 1173–74. The Court also only considers the liberty intrusions that occurred before individualized suspicion of Defendant materialized. *Id.*

The record shows that the roadblock was in place for a total of approximately two minutes prior to the police developing a particularized suspicion as to Defendant's car. The roadblock occurred once the stolen tracker was contained within the traffic paused at a red light and after the light turned green when the vehicles in the traffic lane were unable to move forward due to the police vehicle blocking the lane. (ECF No. 144 at 9.) Officer Cappellano's car blocked southbound traffic for approximately thirty seconds before moving to allow one lane of traffic to flow through. (ECF No. 144 at 8.) The partial roadblock, which allowed one lane of travel to proceed southbound,

then stayed in place for approximately two cycles of green lights before Officers Cappellano and Strange pulled Curtis and Vincent out of Defendant's car.

In light of these facts, the interference with Defendant's individual liberty amounted to a delay for about two minutes at the intersection, which encompassed two cycles of green lights. In weighing the first two *Brown v. Texas* factors against the third factor, the Court finds that the third factor in this case is far outweighed by the other two factors given the minimal intrusion on Defendant's individual liberty. Therefore, the Court holds that the roadblock did not violate Defendant's Fourth Amendment rights.

### C. Officers Had Reasonable Suspicion to Conduct the Investigatory Stop of Vincent and Curtis

Defendant's Motion to Suppress focuses on the "use and operation of the roadblock," and does not set forth arguments challenging the sufficiency of the Officers' reasonable suspicion to remove Vincent and Curtis from Defendant's car once they were identified. Thus, as the Government does assert a position on the issue of the sufficiency of the Officers' reasonable suspicion to remove Vincent and Curtis, the Court views this issue as undisputed by the Defendant.[9]

---

[9] This Court has reviewed the evidence admitted at the July 9, 2024 hearing and concludes that, under the totality of the circumstances, Officers also had developed the requisite articulable reasonable suspicion as to Vincent and Curtis at the time they pulled them out of the car based on: (1) the GPS location information for the stolen device; (2) the description of the robbers based on the 911 calls; and (3) the passengers' lack of acknowledgment of the police presence, which Officer Strange testified that he found "unusual." *See United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) (concluding that police, who were in pursuit of a robber, had at least reasonable suspicion to stop a vehicle where (1) a stolen device with a GPS tracker indicated the defendant was at the intersection where he was detained, (2) the vehicle matched the general description given to police even though it was not an exact match, and (3) the officers thought that the car's occupants were acting unusual by not acknowledging the overwhelming police presence).

Apart from the three factors enumerated above, the police who were canvassing the area where the Defendant and his vehicle were located also had two separate bases for an investigatory stop of Defendant's vehicle unrelated to the robbery — the excessive window tint, which is illegal in the city of Philadelphia, and the fake temporary tag on the vehicle. *See Whren v. United States*,

## IV.    CONCLUSION

Having found that the traffic obstruction can correctly be categorized as a "roadblock" but, under the totality of the circumstances, that such a roadblock was constitutionally reasonable, the Court denies Defendant's Motion to Suppress. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**

---

517 U.S. 806, 813, 819 (1996) (holding that where officers had probable cause to believe that petitioners had violated the traffic code, the stop was reasonable under the Fourth Amendment, regardless of the "actual motivations of the individual Officers involved"). Any one of these reasons could form the valid basis of the stop and further investigation of the Defendant's vehicle, the Defendant as the operator of the vehicle, and Curtis and Vincent.