# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :

    v.           :       **CRIMINAL NO. 23-215**

CHIHEAN JONES       :

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

In an act of pure malice, on January 17, 2023, defendant Chihean Jones fired a single, fatal shot into the back of an unarmed man. That man, S.P., died moments later as the defendant and his accomplices pawed through his pockets looking for cash. The defendant's savagery took the life of a hard-working and generous man; it shattered a family and left a wound in the community. The defendant has never expressed a shred of remorse for his actions. In fact, the defendant committed this murder and robbery only a few months after serving as the getaway driver for the strongarm robbery of a cell phone store, and followed the murder with a years-long intimidation campaign aimed at witnesses and co-defendants. He is a real danger to all who cross him. For these reasons, as well as for the reasons provided below, the government recommends a sentence of life imprisonment, absent any basis for a below-guideline sentence addressed in the supplemental sealed attachment to this sentencing memorandum.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C.

§ 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1] In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. *United States v. Langford*, 516 F.3d 205, 214-18 (3d Cir. 2008).

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

---

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

I.       **BACKGROUND**

On November 21, 2025, after a week-long trial, a jury convicted the defendant of two counts of Hobbs Act robbery (Counts One and Three), in violation of 18 U.S.C. § 1951, one count of the discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four), and one count of murder in the course of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(j) (Count Five).[2]

II.      **SENTENCING CALCULATION**

A.       **Statutory Maximum Sentence.**

Following dismissal of Count Four, the maximum sentence that may be imposed on the defendant is life imprisonment, a term of supervised release of five years, a fine of $750,000, and a special assessment of $300.

B.       **Sentencing Guidelines Calculation.**

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

The two counts of Hobbs Act robbery represent distinct harms, and are therefore correctly grouped separately. Murder in violation of 18 U.S.C. § 924(j) and the related Hobbs Act robbery count are properly grouped together. USSG §§ 2B3.1 and 3D1.2(c). The base offense level for this combined group is 43. USSG §§ 2A1.1(a) and 2B3.1(c)(1).

The base offense level for the remaining Hobbs Act robbery at Count 1 is 20. USSG §2B3.1(a). Because this second group is 9 or more levels less serious than the group with the

---

2 As detailed in a previous filing, the government will move to dismiss the 18 U.S.C. § 924(c) count at the time of sentencing. ECF 486.

highest offense level, it is disregarded for purposes of calculating the defendant's guidelines. USSG §§3D1.4(a) and (c). The final total offense level is therefore 43.

The defendant's 2017 conviction for drug trafficking (Philadelphia CP-51-CR-1930-2015) and 2018 conviction for possession of a firearm by a convicted felon (Philadelphia CP-51-CR-2586-2017) each provide three criminal history points, for a total criminal history score of six. Six criminal history points equate to a criminal history category III. The resulting guideline range is life imprisonment.

## III.    ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A.    Consideration of the 3553(a) Factors Regarding Imprisonment.

The defendant's decision to murder an unarmed man represents the terrible conclusion of a long, violent history. The defendant's arrest record began in 1999 at age 14. Throughout his teenage years, a disturbing pattern of arrests for violent conduct repeated itself. For example, in 2001, 2004, and 2009 the defendant was arrested for aggravated assault only to have charges dismissed or withdrawn. His adult record includes multiple convictions for drug trafficking and firearms offenses. According to the PSR, following the defendant's 2005 conviction for drug trafficking, he effectively escaped from Minsec treatment center and was declared delinquent. Later, and while still under supervision of the State Parole board for that offense, the defendant threatened his paramour and assaulted her cousin.

Although the defendant refused to cooperate with the probation office in its attempts to interview him for the presentence report, the officer nevertheless obtained information from a variety of sources detailing the defendant's upbringing. The defendant's father abandoned the family, but he was raised by his mother, along with numerous siblings, in a home free from abuse or neglect. The defendant previously reported a favorable childhood. He worked sporadically, and as detailed by evidence introduced at trial, the defendant was employed as a security guard at the time he committed these robberies. There is nothing in the defendant's

familial history, his employment record, or any other information about his history and characteristics that can possibly justify his violent nature.

Rather it appears the explanation is both simple and deeply disturbing: the defendant is a violent man who uses force when it suits him. Here, he chose to murder a man as he ran away because, in the defendant's view, it was easier to shoot him in the back than it was to chase him down to obtain keys to a safe. Accordingly, his crime falls squarely within the class of cases to which the applicable guidelines are addressed, and thus consideration of the nature of the offense, § 3553(a)(1), counsels in favor of a life sentence.

Further, and as described above, the defendant's history supports the need for a guideline sentence of life incarceration. Beyond the convictions and arrests detailed in the presentence report, the government introduced overwhelming evidence at trial that just two weeks before the murder of S.P., the defendant fired multiple shots into an occupied home on Higbee Street in Philadelphia. As detailed in text messages between the defendant and the homeowner, the shooting was the result of the homeowner's failure to repay a nominal $50 debt to the defendant. Throughout the weeks leading up to that shooting, the defendant escalated his threats against the homeowner, including by explicitly threatening to kill the man's wife and disabled child. Ultimately the defendant decided to use a firearm – the same firearm he would later use to murder S.P. – to intimidate the homeowner into repaying money the defendant was owed.

The defendant's pattern of violence and intimidation continued unabated in the days following the murder. The defendant repeatedly threatened his confederates both immediately after the murder, and in the days leading up to his arrest. The defendant opined to one codefendant that a second codefendant, K.V., was too soft, and stated that the defendant might have to kill K.V. to keep him quiet. While awaiting trial, the defendant repeatedly wrote to his

former girlfriend R.R., another co-defendant, alternately pressuring her not to cooperate and threatening her if she testified. For example, at one point the defendant told R.R. that he would "fuck up her life" if she didn't stop "rattin" on him. Using his prison-issued tablet, the defendant likewise sent repeated text messages to R.R.'s family to pressure her not to cooperate. Lastly, in April 2025, prior to trial, the defendant told another inmate housed at the Federal Detention Center that the defendant had placed a $5,000 bounty on the head of K.V. and another co-defendant, M.B. In reference to K.V., the defendant said the money was for someone to "fuck him up," and that the defendant would pay half up front and the other half after the assault took place.

These threats continued immediately after his conviction as well. On November 22, 2025, the defendant sent a series of texts to R.R.'s mother and sister. In the texts, the defendant said, among other things, that R.R. was a "rat bitch" and called her a "motherfucker rat bitch nut ass bitch." The defendant continued, "if she can't stand the heat stay fuck out the kitchen."

Ultimately these threats all pale in comparison to the violence the defendant unleashed on January 17, 2023. A sentence less than life imprisonment would depreciate the severity of the defendant's actions, the terrible pain he inflicted upon S.P.'s family, and the permanent loss felt throughout the community of people who knew and loved S.P.

Previous terms of incarceration, court-ordered treatment, and state parole supervision failed to curb the defendant's violence. His incarceration at both local and federal facilities pending trial likewise failed to dampen his violent tendencies. The recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2).

Furthermore, the defendant's previous arrests and convictions failed to curb his lawlessness. For example, as charged in Count One, police caught the defendant fleeing the scene of a strongarm robbery on August 22, 2022. Within months following that arrest, the defendant engaged in a pattern of escalating threats towards the Higbee Street homeowner, culminating in the January 1, 2023 shooting. Mere weeks later, the defendant murdered S.P. In the days and months following that murder, the defendant continued to threaten witnesses and co-defendants. The defendant's utter lack of remorse and refusal to accept responsibility for any of his actions leads to the inescapable conclusion that the defendant will always resort to violence regardless of the consequences. Accordingly, a life sentence is the only punishment available that affords adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant. *Id.*

In addition, adherence to the recommended guideline range assures that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.

The defendant previously reported he was in good health. Although there may be a need for drug treatment, the defendant can receive any such treatment while incarcerated. There is otherwise no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D). Also, restitution is not an issue in this case. § 3553(a)(7).

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a guidelines sentence. As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 569 U.S. at 544, and that guide is once again persuasive in this case.

B.    **Supervised Release.**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, the maximum term of supervised release of five years is warranted. As explained above, the defendant presents a lengthy record of criminal conduct, often involving extraordinary violence. Close supervision following release from imprisonment is warranted to protect the public.[3] A term of supervised release in this case advances the goals of sentencing to

---

3 Although a sentence of imprisonment for the remainder of the defendant's life would seem to preclude the need for a period of supervised release, the government nevertheless requests a term of post-incarceration supervision. Should the defendant ever seek and obtain release, or receive a

*continued . . .*

deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2. The Commission adds: "In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed." § 5D1.1 app. note 3. This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.     CONCLUSION

The government's final recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Christopher E. Parisi*
CHRISTOPHER E. PARISI
AMANDA McCOOL
Assistant United States Attorneys

---

benefit from a change in the law, the supervision will be necessary to ensure the safety of the community, among other factors.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this Sentencing Memorandum has been served by first-class mail to:

>Chihean Jones, 75967-510
>FDC Philadelphia
>PO Box 562
>Philadelphia, PA 19105

*/s Christopher E. Parisi*
CHRISTOPHER E. PARISI
Assistant United States Attorney

DATED:  <u>March 13, 2026.</u>